**23-1659**

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

_____

JAMES NAPIER,

*Plaintiff-Appellant,*

—v.—

ORCHARD SCHOOL FOUNDATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana
No. 1:19-cv-03556-SEB-MKK

Honorable Sarah Evans Barker, District Judge

### BRIEF OF PLAINTIFF-APPELLANT AND SHORT APPENDIX

Richard L. Darst
Cohen Garelick & Glazier
*Counsel of Record*
*Attorneys for Plaintiff-Appellant*
8888 Keystone Crossing Boulevard
Suite 800
Indianapolis, Indiana 46240-4636
Telephone (317) 573-8888
Facsimile (317) 574-3855
Email rdarst@cgglawfirm.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1659</u>

Short Caption: <u>James Napier v. Orchard School Foundation</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>James Napier</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Cohen Garelick & Glazier</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ Richard L. Darst</u>    Date: <u>April 26, 2023</u>

Attorney's Printed Name: <u>Richard L. Darst</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: <u>Cohen Garelick & Glazier, 8888 Keystone Crossing Blvd., Suite 800, Indianapolis, IN 46240</u>

Phone Number: <u>317-573-8888</u>    Fax Number: <u>317-574-3855</u>

E-Mail Address:
<u>rdarst@cgglawfirm.com</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

I.   The order granting summary judgment is in error in deciding issues of fact on the sufficiency of the multiple types of the direct and circumstantial evidence for a jury to find sex discrimination as a cause of Orchard's termination of a male, Mr. Napier, on March 6, 2019, including the following types of evidence:

(1) background circumstances of Orchard's multiple statements against males and favoring females; (2) Orchard has an Elementary School (ES), a Middle School (MS), and no high school; (3) an industry stereotype against males in early childhood schools; (4) Orchard's debate whether or not to hire Napier because he is a male; (5) Mr. Napier's exemplary performance; (6) Orchard's glowing appraisal of him; (7) Orchard's termination of the male Head of School (HOS); (8) Orchard's statements against males and about "the legality of that position;" (9) Orchard hired a female HOS, Dr. Helvie, who said she concentrated in women's studies and followed the philosophy of a radical feminist; (10) two weeks after beginning at Orchard, Dr. Helvie demoted from the four-person senior leadership team the two male directors of Orchard's only schools and replaced the males with two females who did not supervise any teachers; (11) Dr. Helvie immediately told Mr. Napier not to communicate with her directly but to communicate with her through the Assistant HOS (AHOS), Mr. Eble; (12) Dr. Helvie did not regularly communicate directly with Mr. Napier and Mr. Eble and she made them afraid to ask her questions; (13) Mr. Napier and the MS Coordinator, Ms. Brothers, had been working on her job description since June 2018 and it was not confidential; (14) Dr. Helvie requested Mr. Napier to give her a new job description that reflected his priorities for the coordinator role, and she did not request confidentiality; (15) Mr. Napier did not disclose to Ms.

Brothers his new job description that reflected his priorities for the coordinator role; (16) Ms. Brothers did not have the job description with Mr. Napier's priorities and she only had the old job description; (17) Dr. Helvie gave Mr. Napier a high recommendation for a HOS position at another private school; (18) Dr. Helvie disclosed to Ms. Brothers the proposed plan of Dr. Helvie to demote Ms. Brothers to a teaching position, Ms. Brothers became stressed and was observed crying at the school, and Ms. Brothers disclosed to ES Coordinator Gretchen Bricker the statements of Dr. Helvie, which stressed Bricker as well; (19) Direct and ambiguous statements in which Dr. Helvie tried to blame Mr. Napier for disclosing Dr. Helvie's plan, but Mr. Napier did not disclose her plan, Dr. Helvie disclosed her plan; (20) Dr. Helvie told Mr. Napier in March that he was terminated as of the end of the school year, and she failed to give him a notice of an accusation against him and an opportunity to respond before terminating him; (21) Orchard failed to offer a specific reason for the termination; (22) Dr. Helvie's termination of Mr. Napier for a non-specific false reason of a breach of a non-existent and non-specific instruction of confidentiality; (23) Dr. Helvie's immediate mass email to all faculty and staff that Mr. Napier would not be reemployed three months later at the end of the school year, humiliating him, making him a lame duck in his job, and ruining his opportunities for leadership employment; (24) Dr. Helvie's immediate announcement of the promotion in March effective at the end of the school year to the position of Director of the MS of the female coordinator, Ms. Brothers, whom Dr. Helvie had said she was considering demoting to teaching, who was observed crying in the school, and who disclosed to the ES Coordinator Ms. Bricker the statements of Dr. Helvie that caused the stress; (25) suspicious timing; (26) Mr. Napier's complaints of discrimination (27) the failure of Dr. Helvie to investigate Mr. Napier's complaints and her failure to correct the discrimination; (28) the failure of Orchard's board to investigate Mr. Napier's complaints of discrimination and failure to correct the discrimination; (29) Dr. Helvie's and Orchard's failure to investigate the complaints of the many faculty and parents who supported Mr. Napier; (30) Orchard's failing to give Mr. Napier any writeup, counseling, discipline, or any other action that it gave to female employees except the one female whom it terminated for theft; (31) Orchard's failure to give Mr. Napier an Employee Termination Notice that it gave to other involuntarily terminated employees; (32) Orchard's failure to follow its training on preventing and correcting discrimination for Mr. Napier; (33) Orchard's deviations from its policies; (34) the resignation of the male ES Director at the end of the following academic year without any other claimed employment and Orchard replacing him with a female teacher with lower qualifications; (35) Orchard's promotion and hiring of all female leaders for two years, 2020-2021; (36) all of the above evidence showing the pretext of the defendants' non-specific, false, and inadequate reason for the termination; (37) and all of the above evidence showing a

causal link between Mr. Napier's gender and his termination. . . . . . . 23

II.   The order granting summary judgment is in error in deciding issues of fact on the sufficiency of the multiple types of the direct and circumstantial evidence for a jury to find sex discrimination and retaliation as a cause of Orchard's failure to interview or hire Mr. Napier in January 2020, including the following types of evidence:

(1) all of the above evidence described in Issue No. I; (2) all of the background evidence of Orchard's statements and actions against males and favoring females; (3) Mr. Napier's exemplary performance; (4) Mr. Napier's complaints of discrimination, complaints from the faculty, parents and comments in the school association's report supporting Mr. Napier; (5) Orchard's failure to investigate the complaints; (6) Orchard's deviation from its regular procedures; (7) suspicious timing; (8) Orchard's failure to have a policy against retaliation; (9) direct and ambiguous statements and conduct of Orchard; (10) Orchard's better treatment of females and persons who had not complained; (11) Orchard's interview and hiring of Ms. Brothers who had wanted to remain as coordinator, who had wanted Mr. Napier to be director, who had cried at school when Dr. Helvie told her that Dr. Helvie was considering demoting her to teaching, who had disclosed to ES Coordinator Bricker the statements of Dr. Helvie, who was less qualified, and who had no supervisory experience other than as acting director after Dr. Helvie in March immediately without any applications appointed her as acting director; (12) Orchard's failure to offer a specific non-discriminatory reason for its failure to interview or hire Mr. Napier; (13) Orchard's offer of the non-specific, shifting, false, and contradictory reason of past poor performance; (14) Orchard's attempt to cover up its discrimination and retaliation by arguing as Orchard's comparator an unidentified female employee without producing or offering any personnel file, application, documents, or facts relating to the alleged female; (15) all of the above evidence showing the pretext of the defendants' nonspecific, shifting, false, and inadequate reason; (16) and all of the above evidence showing a causal link to the failure to interview and hire him. . . . . . . . . . . . . . . 45

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CIRCUIT RULE 32 CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CIRCUIT RULE 30 CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

## <u>TABLE OF AUTHORITIES TO BE REVISED FOR NAPIER CASE</u>

<u>Decisions</u>                                                                          <u>Page</u>

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . 20

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Coleman v. Donahoe,* 667 F.3d 835 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Echols v. Select Beverage, Inc.*, 64 F.Supp.2d 807 (S.D.Ind. 1998) . . . . . . . . . . . .39

*EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 46

*Humphries v. CBOCS West, Inc.* 474 F.3d 387 (7th Cir. 2007) . . . . . . . . . . . . . . . 31

*Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007). . . . . . . . . . . . . . 31

*Loudermilk v. Best Pallet Co.*, 636 F.3d 312 (7th Cir. 2011) . . . . . . . . . . . . . . . . . 47

*McConnell v. McKillip,* 573 F.Supp.2d 1090 (S.D.Ind. 2008) . . . . . . . . . . . . . . . . 21

*McDonnald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976) . . . . . . . . . . . . . . 29

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . 21

*McKinney v. Office of Sheriff of Whitley County,* 866 F.3d 803 (7th Cir. 2017) . . . 26

*Mills v. Health Care Service Corp.*, 171 F.3d 450 (7th Cir. 1999) . . . . . . . . . . . . . 30

*Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016) . . . . . . . . . . . . . . . 21

*Pilditch v. Board of Educ. of City of Chicago,* 3 F.3d 1113 (7th Cir. 1993) . . . . . . 39

*Preston v. Wisconsin Health Fund*, 397 F.3d 539 (7th Cir. 2005) . . . . . . . . . . . . . 28

*Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Runkel v. City of Springfield*, 51 F.4th 736 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . 30

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
600 U.S. 181 (2023) (SFFA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) . . . . . . . . . . . 46

*Troupe v. May Department Stores Co.*, 20 F.3d 734 (7th Cir. 1994) . . . . . . . . . . . .45

*Vichio v. US Foods, Inc.,* 88 F.4th 687 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . .  5

*Ziccarelli v. Dart*, 35 F.4th 1079 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 20

## **<u>Statutes</u>**

Title 28, United States Code, Section 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Title 28, United States Code, Sections 1331 and 1343 . . . . . . . . . . . . . . . . . . . . . .1

Title 42, United States Code, Sections 1981 and 1981a . . . . . . . . . . . . . . . . . . . . .1

Title 42, United States Code, Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Title 42, United States Code, Section 2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

## **<u>Rules</u>**

Rule 28(a), Federal Rules of Appellate Procedure . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 30, Rules of the Seventh Circuit Court of Appeals . . . . . . . . . . . . . . . . . . . . . 51

Rule 32, Rules of the Seventh Circuit Court of Appeals . . . . . . . . . . . . . . . . . . . . . .50

No. 23-1659

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

JAMES NAPIER,                              )   Appeal from the
                                           )   United States District Court
    Plaintiff-Appellant,               )   Southern District of Indiana
                                           )   Indianapolis Division
  v.                                       )
                                           )   Case No. 1:19-cv-03556-SEB-MKK
ORCHARD SCHOOL FOUNDATION,                 )
                                           )   Hon. Sarah Evans Barker,
    Defendant-Appellee.                )   District Judge

_____

**BRIEF AND REQUIRED SHORT APPENDIX
OF PLAINTIFF-APPELLANT**

_____

<u>JURISDICTIONAL STATEMENT</u>

The information requested by Appellate Rule 28(a)(4) and by the pertinent

subparts of Circuit Rule 28(a) is stated as follows:

(1) The district court had jurisdiction of this case based on the federal

statutes, Title 28, United States Code, Sections 1331 and 1343, and Title 42, United

States Code, Section 2000e-5 for allegations of violations of the Civil Rights Act of

1964 as amended, Title 42, United States Code, Section 2000e and related sections,

pursuant to the Civil Rights Act of 1991, Title 42, United States Code, Section

1981a and related sections.

(2) The court of appeals has jurisdiction of the appeal in this case based on

the statutory provision of Title 28, United States Code, Section 1291.

(i) The date of the entry of judgment sought to be reviewed is March 7,

2023.

(ii) No motion for new trial or alteration of the judgment or any other motion claimed to toll the time within which to appeal was filed in this case.

(iii) There was no disposition of any motion for new trial or alteration of judgment in this case.

(iv) The date of the filing of the Notice of Appeal is April 4, 2023, and there was no extension of time requested or granted for such notice.

(v) This case is not a direct appeal from the decision of a magistrate judge.

(3) This appeal is from a final judgment which disposes of all claims with respect to all parties.

## STATEMENT OF THE ISSUES

I.     Is the evidence sufficient with multiple types of the direct and circumstantial evidence for a jury to find sex discrimination as a cause of Orchard's termination of a male, Mr. Napier, on March 6, 2019, including the following types of evidence:

(1) background circumstances of Orchard's multiple statements against males and favoring females; (2) Orchard has an Elementary School (ES), a Middle School (MS), and no high school; (3) an industry stereotype against males in early childhood schools; (4) Orchard's debate whether or not to hire Napier because he is a male; (5) Mr. Napier's exemplary performance; (6) Orchard's glowing appraisal of him; (7) Orchard's termination of the male Head of School (HOS); (8) Orchard's statements against males and "the legality of that position;" (9) Orchard hired a female HOS, Dr. Helvie, who said she concentrated on women's studies and followed the philosophy of a radical feminist; (10) two weeks after beginning at Orchard, Dr. Helvie demoted from the four-person leadership team the two male directors of Orchard's only schools and replaced them with two females who did not supervise any teachers; (11) Dr. Helvie immediately told Mr. Napier not to communicate with her

2

directly but to communicate with her through the Assistant HOS (AHOS), Mr. Eble; (12) Dr. Helvie did not regularly communicate directly with Mr. Napier and Mr. Eble and she made them afraid to ask her questions; (13) Mr. Napier and the MS Coordinator, Ms. Brothers, had been working on her job description since June 2018 and it was not confidential; (14) Dr. Helvie requested Mr. Napier to give her a new job description that reflected his priorities for the coordinator role, and she did not request confidentiality; (15) Mr. Napier did not disclose to Ms. Brothers his new job description that reflected his priorities for the coordinator role; (16) Ms. Brothers did not have the job description with Mr. Napier's priorities and she only had the old job description; (17) Dr. Helvie gave Mr. Napier a high recommendation for a HOS position at another private school; (18) Dr. Helvie disclosed to Ms. Brothers the proposed plan of Dr. Helvie to demote Ms. Brothers to a teaching position, Ms. Brothers became stressed and was observed crying at the school, and Ms. Brothers disclosed to ES Coordinator Gretchen Bricker the statements of Dr. Helvie, which stressed Bricker as well; (19) Direct and ambiguous statements in which Dr. Helvie tried to blame Mr. Napier for disclosing Dr. Helvie's plan, but Mr. Napier did not disclose her plan, Dr. Helvie disclosed her plan; (20) Dr. Helvie told Mr. Napier in March that he was terminated as of the end of the school year, and she failed to give him a notice of an accusation against him and an opportunity to respond before terminating him; (21) Orchard failed to offer a specific reason for the termination; (22) Dr. Helvie's termination of Mr. Napier for a non-specific false reason of a breach of a non-existent and non-specific instruction of confidentiality; (23) Dr. Helvie's immediate mass email to all faculty and staff that Mr. Napier would not be reemployed three months later at the end of the school year, humiliating him, making him a lame duck in his job, and ruining his opportunities for leadership employment; (24) Dr. Helvie's immediate announcement of the promotion in March effective at the end of the school year to the position of Director of the MS of the female coordinator, Ms. Brothers, whom Dr. Helvie had said she was considering demoting to teaching, who was observed crying in the school, and who disclosed to the ES Coordinator Ms. Bricker the statements of Dr. Helvie that caused the stress; (25) suspicious timing; (26) Mr. Napier's complaints of discrimination (27) the failure of Dr. Helvie to investigate Mr. Napier's complaints and her failure to correct the discrimination; (28) the failure of Orchard's board to investigate Mr. Napier's complaints of discrimination and failure to correct the discrimination; (29) Dr. Helvie's and Orchard's failure to investigate the complaints of the many faculty and parents who supported Mr. Napier; (30) Orchard's failing to give Mr. Napier any writeup, counseling, discipline, or any other action that it gave to female employees except the one female whom it terminated for theft; (31) Orchard's failure to give Mr. Napier an Employee Termination Notice that it gave to other involuntarily terminated employees; (32) Orchard's failure to follow its

training on preventing and correcting discrimination for Mr. Napier; (33) Orchard's deviations from its policies; (34) the resignation of the male ES Director at the end of the following academic year without any other claimed employment and Orchard replacing him with a female teacher with lower qualifications; (35) Orchard's promotion and hiring of all female leaders for two years, 2020-2021; (36) all of the above evidence showing the pretext of the defendants' non-specific, false, and inadequate reason for the termination; (37) and all of the above evidence showing a causal link between Mr. Napier's gender and his termination ? . . . . . . .23

II.    Is the evidence sufficient with multiple types of the direct and

circumstantial evidence for a jury to find sex discrimination and

retaliation as a cause of Orchard's failure to interview or hire a male, Mr.

Napier, in January 2020, including the following types of evidence:

(1) all of the above evidence described in Issue No. I; (2) all of the background circumstances of Orchard's statements and actions against males and favoring females; (3) Mr. Napier's exemplary performance; (4) Mr. Napier's complaints of discrimination, complaints from the faculty, parents and comments in the school association's report supporting Mr. Napier; (5) Orchard's failure to investigate the complaints; (6) Orchard's deviation from its policies; (7) suspicious timing; (8) Orchard's failure to have a policy against retaliation; (9) direct and ambiguous statements and conduct of Orchard; (10) Orchard's better treatment of females and persons who had not complained; (11) Orchard's interview and hiring of Ms. Brothers who had wanted to remain as coordinator, who had wanted Mr. Napier to be director, who had cried at school when Dr. Helvie told her that Dr. Helvie was considering demoting her to teaching, who had disclosed to ES Coordinator Bricker the statements of Dr. Helvie, who was less qualified, and who had no supervisory experience other than as acting director after Dr. Helvie in March immediately without any applications appointed her as acting director effective at the end of the school year; (12) Orchard's failure to offer a specific non-discriminatory reason for its failure to interview or hire Mr. Napier; (13) Orchard's offer of the non-specific, shifting, false, and contradictory reason of past poor performance; (14) Orchard's attempt to cover up its discrimination and retaliation by arguing as Orchard's comparator an unidentified female employee without producing or offering any documents or information relating to the alleged female; (15) all of the above evidence showing the pretext of the defendants' nonspecific, shifting, false, and inadequate reason; (16) and all of the above evidence showing a causal link between Mr. Napier's gender and to the failure to interview and hire him? . . .  45

<u>STATEMENT OF THE CASE</u>

**Mr. Napier has exemplary performance.**

The court of appeals construes the record in the light most favorable to James "Jamie" Napier as the non-movant on summary judgment. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 689 (7th Cir. 2023). The Orchard School is a private school in Indianapolis that has a Middle School (MS) and an Early Childhood and Elementary School (EC/ES or ES), and no high school. [A-1-2; A-26:18; Dkt. 117-1, ¶16]. Mr. Napier has many years of exemplary performance as a teacher and as an administrator. [A-26:17-18; Dkt. 129, p. 26:17-18; Dkt. 118, p. 13:17-17:2].

Mr. Napier had been an Assistant Head of School at University High School (UHS) in the Indianapolis area before coming to Orchard. [Dkt. 104-2, p. 11:21]. Orchard was a feeder school to University HS, since Orchard had no high school. [Dkt. 104-2, p. 165-12]. Mr. Napier was on the Board of Trustees at Orchard. [Dkt. 117-1, ¶15]. The Head of School (HOS) of UHS, Chuck Webster, asked Mr. Napier to apply for the position of Director of the MS at Orchard, because he felt that Mr. Napier could improve the performance of the students coming to UHS from Orchard. [Dkt. 117-1, ¶18].

Effective July 1, 2016, Mr. Napier was hired as Director of the MS, he greatly improved the performance of the students in the Orchard MS, and he was well liked by students, faculty, and parents. [A-47; A-64-76; A-78-80].

In July 2017, the Orchard HOS, Tom Rosenbluth, gave Mr. Napier a glowing performance appraisal. [Dkt. 104-2, pp. 9, 12; Dkt. 117-6]. In February 2019, the new Orchard HOS, Dr. Sherri Helvie, gave Mr. Napier a very high recommendation

for the position of HOS at a private school in Louisiana. [Dkt. 104-2, p. 17:11-7; Dkt. 104-1, ¶ 15]. The Order Granting Summary Judgment (the Order) recognized that Mr. Napier had a "prior record of exemplary performance" before Dr. Helvie terminated him on March 6, 2019 for an alleged unspecified breach of an unspecified instruction on confidentiality. [A-26: 17-18]. There was no such instruction and no such breach. [A-43; Dkt. 104-5; Dkt. 104-2, p. 21 (Napier Dep. 84:12-18].

**Mr. Napier is a recognized advocate of diversity.**

Mr. Napier had worked carefully for years together with the DEI Head, India Williams, to map the disciplines of students to reveal any biases. [Dkt. 104-2, p. 37-38 (Napier Dep. 148:10-150:50]. He led a club titled No Place For Hate and he made a presentation about the club at the Anti-Defamation League. *Id.* He had a very good relationship with another African American female employee, Lisa Pryor, whom Dr. Helvie later promoted to DEI Head. [Dkt. 104-2, p. 36 (Napier Dep. 141:9-142:13); A-77; Dkt. 117-35]. Orchard stated that it wanted to move forward on diversity. [Dkt. 117-14, p. 1]. But Dr. Helvie terminated a leader of diversity at Orchard who was a male, Mr. Napier.

**Mr. Napier has for years supported women and communicated well with women.**

Mr. Napier's wife has been a university chemistry professor for more than 24 years. [Dkt. 104-2, pp. 2-3, (Napier Dep. 8:14-9:3)]. Years ago, Mr. Napier had taught high school mathematics and physics in North Carolina so that his wife could continue her education there. [Dkt. 117-1, p. 1, ¶§ 2-5)]. In 1996, they moved

to Indiana because his wife was offered a teaching position at Butler University. *Id.* Mr. Napier followed his wife to Indiana and obtained a teaching position at Orchard.

Mr. Napier's wife, Stacy O'Reilly, is a staunch feminist, and together they are raising two very independent-minded good student daughters who attended the private school where Mr. Napier worked. [Dkt. 104-2, p. 2-3 (Napier Dep. pp. 8:14-9:3); Dkt. 104-2, p. 44 (Napier Dep. 174:12-176:23-177)]. The fact that an Orchard employee has a daughter in the school has been recognized as an asset in the appreciation and understanding of childhood development. [Dkt. 117-3, p. 1].

As late as February 24, 2019, just before Dr. Helvie told Mr. Napier on March 6, 2019 that he would be terminated effective three months later, the MS Coordinator, Angela Brothers, wrote to Dr. Helvie that Mr. Napier, his Assistant Carol, and Ms. Brothers have poured their hearts and souls into making the middle school a place where students thrive, the faculty feels supported, students and teachers are invested, and everyone is looking forward to being at school." [A-47; Dkt. 117-17, p. 3]. Ms. Brothers requested to be able to continue to work together with Mr. Napier. *Id.* After Dr. Helvie told Mr. Napier that he would be terminated and that Dr. Helvie wanted Ms. Brothers to take his place, Ms. Brothers told Mr. Napier that Ms. Brothers did not want Mr. Napier to be dismissed, and that she was terrified of doing the job of director, but Mr. Napier urged her to take the position under the belief that if she declined, they would both be out of work and the MS would come apart at the seams. (Dkt. 117-1, p. 11 (Napier Aff. ¶189).

When Dr. Helvie terminated Mr. Napier, both women and men attended

meetings supporting Mr. Napier and wrote statements of support for him.  [Dkt. 117-22-117-24; Dkt. 117-26-117-31]. The descriptions of Mr. Napier were summarized by the statement that he "appears to be universally appreciated by the community." [A-65; Dkt. 117-23, p. 28].

**Industry stereotype favoring females in young childhood education.**

There is an industry bias or stereotype in favor of women as educators in early childhood education. [Dkt. 104-2, p. 13-14 (Napier Dep. 52:20-56:22); Dkt. 117-1 p. 1, ¶ 13; Dkt. 117-3, p. 1]. Males are in the minority in young childhood education. *Id.* For example, Mr. Napier testified that a male who is teaching first grade would cause some people to raise an eyebrow. Dkt. 104-2, p. 13-14 (Napier Dep. 52:20-56:22]. A male alone in a room with a young person could be something to avoid. *Id.* There is a need for more males in the lower grades, but there is a bias against males in the lower grades. *Id.* Four of the male employees at Orchard were in the staff office away from all-day classroom contact with individual students: the Head of School, the Assistant Head of School, the Director of the Middle School, and the Director of the Elementary School.

**Orchard's multiple background statements against male employees.**

Ms. Butler and Orchard had made multiple statements against male employees such as the following statements. The Orchard search committee's contact with Mr. Napier, Ms. Brothers, told him after he was hired that there were "very strong feelings about not hiring (him) for the specific reason that (he) was simply one more white male." [A-3:4-9; Dkt. 129, pp. 3:4-9]. Orchard's search committees were composed of a majority of women along with the female Diversity

Director and their recommendations were consensus picks, including the one for Mr. Napier. [A-3-6; Dkt. 129, pp. 3-6]. However, after they recommended Mr. Nick Eble for promotion to Assistant Head of School (AHOS), the board raised questions about the fact that the promotion made four males in the senior leadership. *Id.* Mr. Rosenbluth told the board that the males were chosen by search committees composed of a majority of women along with the female Diversity Director and that their recommendations were consensus picks. *Id.* However, after that, Mr. Eble and others at Orchard then repeatedly said there were too many males in leadership. *Id.*

Orchard made statements that it needed a female Head of School (HOS). *Id.* An email shows that Orchard made statements to a male applicant that he was a male and therefore the message that he was at "'a huge disadvantage' came through loud and clear" "leaving aside the legality of that position;" and that it would be a "BIG challenge" if he got the job moving forward. [A-5:9-10:10]. Orchard stated that "the Hal/Jamie issue creates a complicating factor among some of the community." *Id.* Other statements by Orchard against the male employees are set forth in detail in the Order, and so, they are not repeated. [A-3-6].

**In 2018, Orchard terminated the male HOS.** [Dkt. 104-2, p. 7 (Napier Dep. 26:11-14)].

**In 2018, hired Ms. Jo Butler as a search consultant for Orchard and later hired her as a mentor to Dr. Helvie.**

Orchard hired Ms. Jo Butler as a search consultant, and she made and received disparaging statements against males to and from Orchard's board. [A-5-6; Dkt. 129, pp. 5-6; Dkt. 117-7, pp. 4-5]. In the Spring of 2018, Orchard hired Ms.

Butler to be the mentor to Dr. Helvie, and Dr. Helvie relied on her for advice. [Dkt. 117-10, pp. 1-8].

**In 2018, Orchard hired as HOS Dr. Helvie who emphasized women's studies three times on her resume and who stated that she followed a philosophy of a radical feminist.**

Orchard hired as HOS, Dr. Helvie, who emphasized three times at the top of her resume that she concentrated in women's studies, even at the times when she did not have a major or minor in women's studies, and that she followed the philosophy of a radical feminist. [A-6; Dkt. 117-32, pp. 1, 4].

**Dr. Helvie began as HOS on July 1, 2018 and two weeks later she demoted the male directors of both of Orchard's schools and instructed Mr. Napier to report to her through the AHOS, Mr. Eble, to whom she did not provide much information.**

On July 16, 2018, two weeks after Dr. Helvie started at Orchard and had interviewed employees, she demoted Mr. Napier and the male director of the Elementary School from the four-person senior leadership team. [Dkt. 104-4; A-78-80; Dkt. 104-4; Dkt. 104-2, p. 15, 36 (Napier Dep. 57:1-23, 143:14-20)]. She replaced the two males with two females who did not supervise any teachers. *Id.* The HOS told Mr. Napier not to report directly to her, but to report to her through her AHOS, Mr. Eble. [Dkt. 104-2 pp. 12-13 (Napier Dep. 48:3-50:9)]. The HOS did not give much information to the male AHOS or to Mr. Napier. [*Id.*; A-81-83; Dkt. 104-2, pp. 32-33 (Napier Dep. 128:21-130:25)]. The HOS made Mr. Eble and Mr. Napier afraid to ask the HOS for information or to build a professional relationship with her to obtain information. *Id.*

**In October 2018, Dr. Helvie failed to communicate with Mr. Napier about the posting of a vacancy announcement.**

In October 2018, an Orchard English teacher, Ann Mason, was retiring. [Dkt. 104-2, p. 15-17 (Napier Dep. 60:1-66:3)]. Ms. Brothers discussed with Mr. Eble and Mr. Napier the potential hiring by Orchard of a good teacher, Ms. Jaimie MacDougall, who was leaving the Sycamore School. *Id.* Mr. Napier told Ms. Brothers that they could not offer Ms. McDougall a job, and they would talk later. *Id.* Mr. Eble was excited about the possibility of recruiting Ms. MacDougall. *Id.* The Human Resources director told Mr. Napier to make sure that Ms. Mason was retiring, and he did so. *Id.* The Human Resources director posted a routine vacancy announcement to obtain applications to be considered later. *Id.* Mr. Napier brought up the possibility of hiring Ms. MacDougal, and Dr. Helvie said let me talk to Diane Bromwell, the HOS at Sycamore, which Mr. Napier thought was appropriate before hiring. *Id.* Posting a position was collecting applications and was not a hiring. *Id.* There was no need to talk to the HOS at another school just to post a vacancy at Orchard and collect applications for Orchard to make decisions later. *Id.*

However, Dr. Helvie told Mr. Eble to take the posting down, and he did so, which caused ruffled feathers with Ms. Brothers and Mr. Eble. *Id.* Dr. Helvie did not talk to Mr. Napier about the posting before the posting or after the posting. *Id.* The appropriateness of the posting of the vacancy was confirmed in December, 2018, when Alicia LaMagdeleine, acting chair of the Orchard board and assistant HOS at UHS, hired Ms. MacDougall, and Orchard no longer had the option to hire Ms. MacDougall. [Dkt. 104-2, p. 18 (Napier Dep. 71:7-12)]. Although Dr. Helvie did not talk to Mr. Napier about the posting, Orchard later attempted to raise it as a backup excuse for terminating him. Neither Mr. Eble, nor the HR coordinator, nor

Mr. Napier knew of any problem with the posting until Dr. Helvie took it down and did not say anything. The Order states that Dr. Helvie instructed Mr. Napier not to post, but that is not true. [Dkt. 129, p. 7:13-15; Dkt. 104-2, p. 17 (Napier Dep. 65:20-66:3)]. The Order later states that Mr. Napier concedes that he was instructed not to post, but that is not true, either. [Dkt. 129, p. 28:9; Dkt. 104-2, p. 17 (Napier Dep. 65:20]. If Orchard desires to argue these issues, they are issues of facts.

**In December 2018 and January 2019, Orchard encouraged Ms. Butler and Dr. Helvie to achieve the Board's Charge to the Head to increase diversity.**

Board emails show that in November 2018, Ms. Butler was discussing with Orchard how to make Dr. Helvie's goals more measurable. [Dkt. 117-10, p. 5-6]. In December 2018, Board Chair Colleen O'Brien stated that the 2018-2019 goals for HOS Dr. Helvie were built on the Charge to the Head, with input from Jo Butler. *Id.* A January 16, 2019, email states that the Diversity Committee discussed their goal for the year of how to support the HOS in her charge to move the Orchard School forward on diversity, equity, and inclusion. [Dkt. 117-14].

**On about February 12, 2019, Dr. Helvie gave Mr. Napier a very high recommendation for the position of HOS in a private school in Louisiana.**

On about February 12, 2019, Mr. Napier interviewed for the position of HOS at a private school in Shreveport, Louisiana for which Dr. Helvie had given him a very high recommendation. [Dkt. 104-2, p. 43 (Napier Dep. 170:1-171:13]. Ms. Brothers texted him and asked if she could talk to Dr. Helvie, and he said of course. [Dkt. 104-2, p. 21 (Napier Dep. 83:1484:2)]. Mr. Napier did not know what Ms. Brothers wanted to speak with Dr. Helvie about. *Id.*

12

**On February 14, 2019, Dr. Helvie sent Mr. Napier a request for a job description with his priorities, and she did not give him an instruction of confidentiality with regard to it.**

On February 14, 2019, the HOS sent Mr. Napier a request for a "job description for a modified MS Coordinator role for the next year that reflects your priorities for the role," and she did not give him an instruction on confidentiality with regard to it. [A-43; Dkt. 104-5; 81-83; Dkt. 104, pp. 19-21 (Napier Dep. 74:21-84:18)]. Mr. Napier had been working with his MS Coordinator on her job description since June 2018, and it was not confidential. [Dkt. 117-2, pp. 19-22 (Napier Dep. 74:21-86:13); Dkt. 117-11].

However, he still did not disclose to his MS Coordinator, Ms. Angela Brothers, his job description for a modified MS Coordinator role for the next year that reflected his priorities. [Dkt. 104-2, p. 24 (Napier Dep. 94:10-17); Dkt. 117-1, p. 9, ¶¶ 148, 154]. Ms. Brothers had her old job description that was on file with the HR office, not Mr. Napier's new job description for a modified MS Coordinator position for the next year with his priorities. [A-47-53; Dkt. 117-17, pp. 3, 8-9].

**In February 2019, Ms. Butler was actively advising Dr. Helvie.**

On February 15, 2019, Board Chair Colleen O'Brien asked Dr. Helvie's advice on what information to provide to the whole Board, and Dr. Helvie stated that she was getting advice on whether to have a two-board system and would discuss that issue with Ms. Butler. [Dkt. 117-16].

**On February 20, 2019, Dr. Helvie disclosed her plan to MS Coordinator Ms. Brothers to demote her to teacher, Ms. Brothers was observed crying in the school, and Ms. Brothers disclosed Dr. Helvie's statements to ES Coordinator Gretchen Bricker.**

On February 20, 2019, the HOS Dr. Helvie told the female MS Coordinator

Ms. Brothers the HOS's proposed plan to demote the Coordinator to a teacher position, which the Coordinator did not want, causing the Coordinator to be observed crying in the school and to disclose the ES Coordinator Gretchen Bricker the statements of the Dr. Helvie. [A-45; Dkt. 104-15, p. 1-2]. Two days after Dr. Helvie disclosed her plan to the Coordinator to demote the Coordinator, after Dr. Helvie caused her cry at the school, and after Dr. Helvie caused her to disclose Dr. Helvie's plan to the ES Coordinator, Dr. Helvie wrote a coverup email to the board co-chairs Ms. O'Brien and Ms. LaMagdeleine trying to blame Mr. Napier for disclosing her plan, but he did not disclose her plan and he did not cause the Coordinator to cry or cause the Coordinator to tell the ES Coordinator Dr. Helvie's plan. *Id.* It was Dr. Helvie who disclosed her plan to the MS Coordinator, it was Dr. Helvie who caused the Coordinator to cry, it was Dr. Helvie who did not give an instruction on confidentiality to Mr. Napier or to the MS Coordinator, and it was the MS Coordinator who told the ES Coordinator about the HOS's plan. [*Id.*; A-43].

**On March 6, 2019, Dr. Helvie terminated Mr. Napier for breach of an instruction on confidentiality but she had not given him an instruction on confidentiality, and he had not breached an instruction on confidentiality.**

The HOS Dr. Helvie had not given Mr. Napier an instruction on confidentiality. [A-43; A-81-83; Dkt. 104-2, pp. 19-21 (Napier Dep. 74:21-84:18); Dkt. 104-3, p. 3 (Eble Dep. 15:4-24)]. Dr. Helvie terminated Mr. Napier for breaching confidentiality when she did not give an instruction on confidentiality with regard to the new job description. [A-43, Dkt. 104-5]. Mr. Napier had worked with the Coordinator on her job description since June 2018, and it was not confidential. [Dkt. 117-2, pp. 19-22 (Napier Dep. 74:21-86:13); Dkt. 117-11]. Dr. Helvie claimed

that Mr. Napier disclosed his priorities for the job description, but he did not

disclose his priorities, and the HOS did not give him any instruction on

confidentiality. [A-43-53; A-81-83; Dkt. 117-1, ¶¶ 148, 154]. Ms. Brothers possessed

her old job description, not Mr. Napier's new job description listing his priorities. [A-

47-53; Dkt. 117-17, pp. 3-9].

> **On March 7, 2019, Mr. Napier complained to Dr. Helvie and
> requested time to find other employment, but Dr. Helvie did not
> investigate his complaint, did not correct her action, and did not
> give him Orchard's termination form that it gave to other employees
> who were involuntarily terminated.**

On March 7, 2019, Mr. Napier complained to Dr. Helvie and requested time

to find other employment. [Dkt. 117-1, pp. ¶¶ 193- 204; Dkt. 117-19, pp. 2-3]. Dr.

Helvie did not investigate his complaint and did not correct her action. [Dkt. 104-2,

p. 13-14 (Napier Dep. 52:20-56:22); Dkt. 104-2, p. 39; (Napier Dep. 154:2-7]. Orchard

did not give him Orchard's written reason for termination that it gave to other

employees who were involuntarily terminated. [A-54-63; Dkt. 117-19, pp. 4-9].

Orchard did not follow Orchard's training for preventing discrimination. [A-60-63;

Dkt. 117-20, pp. 1-3; Dkt. 117-21].

> **On March 8, 2019 at 2:37 PM, the HR Coordinator sent an email to Dr.
> Helvie and other supervisors reminding them of the training on
> discrimination. [A-60-62; Dkt. 117-20].**

The March 8, 2019, 2:37 PM email of the the HR Coordinator to Dr. Helvie

and other supervisors reminded them of the January/February Supervisor Training

regarding employment law and legal hiring practices. *Id.* The email attached a list

of five steps under the title Legal Problems and listed as: (1) Failure to

communicate standards (2) Failure to give timely feedback, (3) Failure to allow

15

employees to correct performance, (4) Inconsistency in measuring performance, and (5) Failure to document the performance objectively. [A-60-62; Dkt. 117-20, pp. 1-3]. In spite of being reminded one day after Mr. Napier's complaint of discrimination of the five common failures for discrimination charges, Dr. Helvie failed to correct each of the problems.

**On March 8, 2019, at 4:34 PM, Dr. Helvie issued to all faculty and staff a humiliating email stating, without any reason, that Mr. Napier will not be returning as Orchard's Middle School Director next year and that Angie Brothers has accepted Dr. Helvie's invitation, without any postings, applications or notice, to be acting Middle School Director for the 2019-2020 school year.**

Just one day after Mr. Napier's complaint to Dr. Helvie, instead of providing an Employee Termination Notice, instead of responding to Mr. Napier's complaint, instead of following Orchard's Personnel Policies, and just two hours after the HR Coordinator's reminder of five failures for discrimination, Dr. Helvie issued the humiliating email to all faculty and staff on the termination of Mr. Napier effective three months later and announcing the immediate promotion of the female MS Coordinator to acting Director effective three months later, instead of demoting Ms. Brothers to teacher as Dr. Helvie had planned and had announced to Ms. Brothers and Ms. Bricker. [A-60-63; Dkt. 117-21; Dkt. 117-23, pp. 27-30; Dkt. 104-2, pp. 102:4-13; A-64; A-79; Dkt. 117-40, ¶¶8-42].

**After Mr. Napier complained to the HOS about the termination and she failed to investigate, he complained to the Orchard Board and the EEOC, and the Orchard Board failed to investigate the complaints.**

In addition to Mr. Napier's complaints to the HOS, Mr. Napier complained to Orchard's board, and to the EEOC. [Dkt. 117-19, pp. 2-3; Dkt. 117-25, pp. 1-10; Dkt.

117-29]. Mr. Napier was supported by the faculty, by the parents, and by numerous comments in a school association report to Orchard. [A-47; A-64-80; Dkt. 117-22-26; Dkt. 117-31-32]. Orchard failed to do any investigation of the complaints. [Dkt. 104-2, p. 39 (Napier Dep. 154:2-7].

**Orchard failed to follow its Personnel Policies for resolving complaints and discipline.**

Orchard failed to follow its Personnel Policies, including the policies on Equal Employment Opportunity, Open Door Policy, and Misunderstandings and Concerns [Dkt. 104-16, p. 25], Complaint Procedure [*Id.* at p. 28], Disciplinary Action [*Id.* at pp. 33-34], and Termination of Employment [*Id.* at p. 61].

**On June 17, 2019, the HR Coordinator also sent an email to the CFO pointing out policies that could have helped in the past year. [Dkt. 117-30].**

The policies included actions that the Coordinator had described in her March 8, 2019, 2:37 PM email on training to prevent and correct discrimination two hours before Dr. Helvie issued the mass humiliating email against Mr. Napier. [A-60-63; Dkt. 20; Dkt. 117-3]. Even after Mr. Napier's multiple complaints to Orchard and after the HR Coordinator email of June 17, 2019, Orchard failed to investigate or correct the discrimination, and even failed to interview him.

**Orchard has no policy against retaliation for complaining about discrimination. [Dkt. 104-16, p. 26-27].**

**On August 21, 2019, Mr. Napier filed his complaint of discrimination in court, on October 21, 2019, Orchard filed its answer in court.**

On August 21, 2019, Mr. Napier filed his complaint of discrimination in court. [Dkt. 1]. On October 21, 2019, Orchard filed its answer in court. [Dkt. 11]. On December 27, 2019, Mr. Napier filed his preliminary list of witnesses and exhibits.

[Dkt. 20-21].

> **On December 8, 2019, after support from faculty, parents, and the community, after Mr. Napier's complaints explaining the facts, and after no investigation by the Orchard board disputing the explanations, Mr. Napier applied for the permanent director position, but Orchard failed to interview or hire him and offered the nonspecific false reason of past poor performance when he had exemplary past performance.**

When Orchard requested applications for the position of the permanent Director of the MS, Mr. Napier applied based on his exemplary performance for years, the vague false reason for his termination, his explanation in his complaints, and his support by the faculty, parents, and comments in the school association report. [A-26:18; A-81-83; A-47; A-64-80; Dkt. 117-22-26; Dkt. 117-31-33].

> **Mr. Eble removed Mr. Napier's application from the applicants to be interviewed or hired. [A-82; Dkt. 104-18].**

Dr. Helvie assigned Mr. Eble to lead the search committee. [Dkt. 104-19]. Dr. Helvie had not consulted Mr. Eble about his supervisee, Mr. Napier, before terminating Mr. Napier, Dr. Helvie did not give Mr. Eble any specific reason for terminating Mr. Napier after she terminated his supervisee, and Dr. Helviee had made Mr. Eble and Mr. Napier afraid to question Dr. Helvie or complain. [A-81; Dkt. 104-3, p. 3:15:4-24; Dkt. 104-2, pp. 12-13 (Napier Dep. 48:3-50:9); Dkt. 104-2, p. 33 (Napier Dep. 129 :17-9)]. All that Dr. Helvie told Mr. Eble about her termination of Mr. Napier was "that she felt that their relationship was not going to be conducive to the school moving forward. No specifics." [A-81; Dkt. 104-3, p. 3:15:4-24]. Dr. Helvie did not have a specific reason for the termination of Mr. Napier, and she did not give Mr. Eble a specific reason for the termination of Mr. Napier. *Id.* Mr. Eble had no specific reason for the termination of Mr. Napier and no specific reason

for not providing him an interview or rehire him, other than his conjecture of the conclusory statement of "past poor performance" based on Dr. Helvie's statement about her feeling about the future, which is not a specific reason. [*Id.*; A-81-83; Dkt. 104-18, ¶ 6].

The driving force behind concocting generalized negative feedback for Mr. Napier was Dr. Helvie. [Dkt. 104-19]. Mr. Eble's later 2022 vague affidavit statement that he excluded Napier because of "past poor performance," was without a specific reason and was false. [A-82; Dkt. 104-18; A-26:17-18; Dkt. 129, p. 26:17-18].

**On January 29, 2020, Orchard sent Mr. Napier an email stating that it had moved forward with other candidates. [Dkt. 117-33, p. 12].**

Orchard did not give Mr. Napier an interview or any other information about the selection process.

**On March 3, 2020, Dr. Helvie sent an email to Orchard School announcing that Ms. Brothers was selected as the Middle School Director. [Dkt. 104-19].**

Instead of interviewing and hiring Mr. Napier, Orchard interviewed and hired the female former MS Coordinator, Ms. Brothers, who was not qualified to be Director, and who had no supervisory experience other than her promotion to acting director on March 8, 2019 by the HOS before any applications were requested. [Dkt. 104-2, p. 27-28 (Napier Dep. 105:7-111:6). The selected female had also been observed crying in the school after the HOS disclosed to her in a meeting on February 20, 2019 the proposed plan to assign her to a teaching position, and her crying in school caused stress in the school. [A-45]. The selected female had then disclosed the proposed plan to the ES Coordinator, causing that Coordinator to be stressed, and the ES Coordinator posted a complaint about Orchard on Facebook,

causing the HOS to tell the ES coordinator to take the posting down. [A-79-80; Dkt. 117-40 pp. 2-3]. The MS coordinator was promoted to Director of the MS and the ES Coordinator was granted leave and was offered a teaching position after she disclosed Dr. Helvie's plan and posted the information on Facebook. [A-80; Dkt. 117-40, p. 3]. Dr. Helvie terminated the male Mr. Napier when he did not disclose any confidential information, but Dr. Helvie did not terminate the females Ms. Brothers and Ms. Bricker who did disclose information not only inside Orchard but also outside Orchard. *Id.*

Orchard attempted to cover up its discrimination and retaliation by stating that it had an alleged female comparator who was not interviewed for the permanent position of MS Director because of past poor performance, but Orchard did not disclose the name of the alleged female or any documents or facts about her. [A-82; Dkt. 104-18].

## Standard of Review

The court of appeals reviews a district court's grant of summary judgment *de novo*, giving plaintiff as the non-moving party the benefit of conflicting evidence and any favorable inferences that might be reasonably drawn from the evidence. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). Summary judgment is appropriate where there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

Summary Judgment is appropriate only where there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P.56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment only if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The courts can neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but they view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F.Supp.2d 1090, 1097 (S.D.Ind. 2008).

At summary judgment, the court of appeals asks whether a reasonable jury could conclude that the plaintiff's sex was a cause of his termination. *Vichio v. US Foods, Inc.,* 88 F.4th at 691; *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763-765 (7th Cir. 2016). It is not the job of the court to decide the issues of disputed facts, the credibility of the parties and the witnesses, or the weight of the evidence.

### Summary of the Argument

Mr. Napier stated in his court pleadings before the motion for summary judgment that he was presenting his case under the totality of the evidence method. [Dkt. 37; Dkt. 102]. However, the Defendant in its brief in support of its motion for summary judgment spent only two pages discussing the totality of the evidence method, and the Defendant's discussion was inadequate to present a coherent argument for summary judgment. [Dkt. 104:30:5-31:16].

The Defendant's brief in support of its motion for summary judgment argued the old *McDonnell Douglas* framework that Mr. Napier did not rely on. [Dkt. 104, p. 14:8-30:3]. The Defendant's arguments on the *McDonnell Douglas* framework

misstated the law and the facts, were inadequate for summary judgment, and do not prevent the denial of summary judgment on the totality of the evidence.

The Defendant's motion for summary judgment has presented an argument on every issue of fact in the case, including conclusory issues of fact, instead of any legal issue. The Order offers any excuse or inference for the Defendant on the issues of fact, instead of viewing the evidence in the view most favorable to the nonmovant Plaintiff. The Order chooses from possible inferences, ignores the Plaintiff's deposition testimony as "only his testimony," considers evidence "by itself" or "alone," decides credibility and veracity issues against the Plaintiff, considers evidence "by itself" and "alone," weighs the evidence as "likely" or "more likely," and decides issues of fact, which are the wrong legal standards for summary judgment.

The Order assumed a specific instruction on confidentiality when there was no specific instruction. [A-35:10-13; Dkt. 129 p. 35:1-13]. The Order assumed a breach of confidentiality when there was no breach of confidentiality. *Id.*

Plaintiff disputed that Dr. Helvie gave a specific instruction on confidentiality and Plaintiff disputed a breach of confidence. [A-43; Dkt. 104-5; Dkt. 104-2, p. 21 (Napier Dep. 84:12-18]. The Order suggested several different words that might have been used in an instruction, but the evidence did not show any specific words, or facts of when, where, how, or the circumstances of particular words. The order stated that the nonexistent instruction used the word "proposals." [A-8:11-12; Dkt. 129, p. 8:11-12]. Mr. Napier did not disclose his proposal to Ms. Brothers. [A-43-44; Dkt. 104-5, p. 1; Dkt. 117-15 , p. 2; A-47-52; Dkt. 117-173-9; Dkt. 104-2, p. 24:10-17; Dkt. 117-1, p. 9, ¶ 148].

The Defendant's lack of a specific ground for its motion for summary judgment makes the briefing of the totality of the evidence on all issues difficult, but it shows the inappropriateness of the Defendant's motion for summary judgment. Mr. Napier will try to respond to the Order's Discussions.

<div align="center">

**Argument**

</div>

**Order Discussion Number I. Defendant's Motion to Strike Surreply.** In order to try to simplify the appeal, no discussion is made on the motion to strike.

**Order Discussion Number II. Motion For Summary Judgment, Order p. 15.**

    **a. Gender Discrimination Claim. Order page 15**

        **i.** *McDonnell Douglas* **Framework. Order page 15**

Appellant's Issue No. I.  The order granting summary judgment is in error in deciding issues of fact on the sufficiency of the multiple types of the direct and circumstantial evidence for a jury to find sex discrimination as a cause of Orchard's termination of a male, Mr. Napier, on March 6, 2019, including the following types of evidence:

> (1) background circumstances of Orchard's multiple statements against males and favoring females; (2) Orchard has an Elementary School (ES), a Middle School (MS), and no high school; (3) an industry stereotype against males in early childhood schools; (4) Orchard's debate whether or not to hire Napier because he is a male; (5) Mr. Napier's exemplary performance; (6) Orchard's glowing appraisal of him; (7) Orchard's termination of the male Head of School (HOS); (8) Orchard's statements against males and about "the legality of that position;" (9) Orchard hired a female HOS, Dr. Helvie, who said she concentrated in women's studies and followed the philosophy of a radical feminist; (10) two weeks after beginning at Orchard, Dr. Helvie demoted from the four-person senior leadership team the two male directors of Orchard's only schools and replaced the males with two females who did not supervise any teachers; (11) Dr. Helvie immediately told Mr. Napier not to communicate with her directly but to communicate with her through the Assistant HOS (AHOS), Mr. Eble; (12) Dr. Helvie did not regularly communicate directly

<div align="center">23</div>

with Mr. Napier and Mr. Eble and she made them afraid to ask her questions; (13) Mr. Napier and the MS Coordinator, Ms. Brothers, had been working on her job description since June 2018 and it was not confidential; (14) Dr. Helvie requested Mr. Napier to give her a new job description that reflected his priorities for the coordinator role, and she did not request confidentiality; (15) Mr. Napier did not disclose to Ms. Brothers his new job description that reflected his priorities for the coordinator role; (16) Ms. Brothers did not have the job description with Mr. Napier's priorities and she only had the old job description; (17) Dr. Helvie gave Mr. Napier a high recommendation for a HOS position at another private school; (18) Dr. Helvie disclosed to Ms. Brothers the proposed plan of Dr. Helvie to demote Ms. Brothers to a teaching position, Ms. Brothers became stressed and was observed crying at the school, and Ms. Brothers disclosed to ES Coordinator Gretchen Bricker the statements of Dr. Helvie, which stressed Bricker as well; (19) Direct and ambiguous statements in which Dr. Helvie tried to blame Mr. Napier for disclosing Dr. Helvie's plan, but Mr. Napier did not disclose her plan, Dr. Helvie disclosed her plan; (20) Dr. Helvie told Mr. Napier in March that he was terminated as of the end of the school year, and she failed to give him a notice of an accusation against him and an opportunity to respond before terminating him; (21) Orchard failed to offer a specific reason for the termination; (22) Dr. Helvie's termination of Mr. Napier for a non-specific false reason of a breach of a non-existent and non-specific instruction of confidentiality; (23) Dr. Helvie's immediate mass email to all faculty and staff that Mr. Napier would not be reemployed three months later at the end of the school year, humiliating him, making him a lame duck in his job, and ruining his opportunities for leadership employment; (24) Dr. Helvie's immediate announcement of the promotion in March effective at the end of the school year to the position of Director of the MS of the female coordinator, Ms. Brothers, whom Dr. Helvie had said she was considering demoting to teaching, who was observed crying in the school, and who disclosed to the ES Coordinator Ms. Bricker the statements of Dr. Helvie that caused the stress; (25) suspicious timing; (26) Mr. Napier's complaints of discrimination (27) the failure of Dr. Helvie to investigate Mr. Napier's complaints and her failure to correct the discrimination; (28) the failure of Orchard's board to investigate Mr. Napier's complaints of discrimination and failure to correct the discrimination; (29) Dr. Helvie's and Orchard's failure to investigate the complaints of the many faculty and parents who supported Mr. Napier; (30) Orchard's failing to give Mr. Napier any writeup, counseling, discipline, or any other action that it gave to female employees except the one female whom it terminated for theft; (31) Orchard's failure to give Mr. Napier an Employee Termination Notice that it gave to other involuntarily terminated employees; (32) Orchard's failure to follow its training on preventing and correcting discrimination for Mr. Napier; (33) Orchard's deviations from its policies; (34) the resignation of the male ES

Director at the end of the following academic year without any other claimed employment and Orchard replacing him with a female teacher with lower qualifications; (35) Orchard's promotion and hiring of all female leaders for two years, 2020-2021; (36) all of the above evidence showing the pretext of the defendants' non-specific, false, and inadequate reason for the termination; (37) and all of the above evidence showing a causal link between Mr. Napier's gender and his termination.

There are three elements of claims of discrimination and retaliation.

The elements of a claim of employment discrimination are (1) a protected factor, such as gender, (2) an adverse employment action, and (3) a causal link between the protected factor and the adverse employment action. Seventh Circuit Pattern Civil Jury Instruction No. 3.01; *Ortiz, supra.*

The elements of a claim of employment retaliation are (1) an adverse action (2) a protected activity, such as a complaint of discrimination, and (3) a causal link between the protected activity and the adverse action. Seventh Circuit Pattern Civil Jury Instruction No. 3.02; *Ortiz, supra.*

All evidence must be considered together. Seventh Circuit Pattern Civil Jury Instruction No. 1:12; *Ortiz*, *supra.*

**The Order is in error to consider evidence separately.**

The Order is in error by considering facts separately and alone. *Ortiz, supra.* Some parts of the Order actually used the words "by itself" or "alone" in considering the evidence. [A-17:18; A-22:8; A:22:14; A-39:19].

**The Order is in error in stating that the nonmovant plaintiff cites only his deposition testimony.**

The Order has stated that the nonmovant cites only his deposition testimony. [A-18:8-20; 27:20-38:2]. However, the citation of only the nonmovant's testimony is sufficient evidence. *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803,

25

814 (7ᵗʰ Cir. 2017). Additionally, Mr. Napier has even more evidence than his testimony. *Ortiz, supra.*

**The Order made findings of fact of what facts were likely.**

The Order also followed the wrong legal standard for summary judgment and made findings of fact as to what facts were likely, which is the job of the jury, not the Order on summary judgment. Some parts of the Order actually use the words "likely" or "more likely" in deciding issues of facts. [A-20:16-21; A-22:6-15; A-36:1-2; A-38:8-9].

**The Order is in error in stating that the *McDonnell Douglas* facts and steps are elements and required.**

The Order is in error in stating that four certain types of facts in the old *McDonnell Douglas* framework are required and are elements. *Id.* [A-26:6-8; A-28:15; A-32:20-33:1].

The Order is in error in stating that a prima facie case is required. *Id.*; *Vichio v. US Foods, Inc.*, 88 F.4ᵗʰ at 691.

The Order is in error in stating that evidence of pretext is not considered when the court states that the evidence of a prima facie case is insufficient. [A-33:3-7]; *Ortiz, supra; Vichio, supra.*

**The Defendant's motion for summary judgment failed to state a cogent argument for summary judgment on the totality of the evidence.**

Mr. Napier stated in court pleadings that he was presenting his case under the totality of the evidence method. [Dkt. 37; Dkt. 104, p. 13:5-13; A-15:8-9]. However, the Defendant only spent two pages in its brief supporting its motion for summary judgment discussing the totality of the evidence method. [Dkt. 104, pp.

30:4-31:16]. The Defendant's two pages merely made general denials that the lack of four general pieces of evidence would not allow a reasonable inference of discrimination. *Id.* The Defendant's motion for summary judgment brief argument on the totality of the evidence method was not sufficient to grant summary judgment based on Plaintiff's framework of the totality of the evidence. *Id.*

**The Defendant's motion for summary judgment followed the old *McDonnell Douglas* framework and Plaintiff responded to the motion showing it was erroneous.**

The Defendant argued the case based on the outdated *McDonnell Douglas* framework. [Dkt. 104, pp. 13:17-29:15]. Plaintiff had to respond to the Defendant's motion as it was stated by the Defendant, even though that framework was outdated, no longer required, and did not follow the Plaintiff's theory.

**Order Discussion Number II.**

**Gender Discrimination Claim.**

**i. A. Background or "Fishy" circumstances. Order p. 16.**

**Background evidence is not required, but it can be used as evidence of pretext and causation in the totality of the evidence and the Order ignored the evidence.**

For several reasons, it was error for the Order to require background evidence of a reason for Orchard to favor females. Furthermore, the background evidence presented in this case was sufficient if background evidence is still required.

First, the old background evidence requirement was part of a prima facie case under the *McDonnell Douglas* method for persons in a nonminority, such as male, group, but Mr. Napier did not rely on the *McDonnell Douglas* method, and he

followed the totality of the evidence method that does not require a prima facie case. *Vichio, supra; Ortiz, supra.*

Second, if Mr. Napier had followed the *McDonnell Douglas* method, a prima facie case was not required because the employer offered a non-discriminatory reason, and the court need not consider the prima facie case under *McDonnell Douglas* when the employer has already offered a non-discriminatory reason. *Vichio, supra.* The Order stated the legal standard backwards by requiring a prima facie case and ignoring the evidence of pretext. [A-33:1-7; Dkt. 129, p. 33:1-7].

Third, background evidence had been required in the past for a case of a nonminority employee, such as a male, being discriminated against by another nonminority employee of the same group, such as a male. *Preston v. Wisconsin Health Fund,* 397 F.3d 539, 542 (7th Cir. 2005). Those are not the facts of Mr. Napier's case. The males in the school were a minority. [Dkt. 117-3, p. 1]. The search committee was composed mostly of females. [Dkt. 117-3, p. 5]. Females dominated the supervisory positions above Mr. Napier. Mr. Napier was discriminated against by his female supervisor Dr. Sheri Helvie and by the female co-chairs of Orchard's board, Colleen O'Brien and Alicia LaMagdeleine, who terminated him and failed to investigate his complaints of discrimination. Orchard's search consultant and mentor to Dr. Helvie was also female, Ms. Jo Butler.

Mr. Eble later failed to allow Mr. Napier to be interviewed or hired, and he did so on the basis of a non-specific conclusory statement by Dr. Helvie, a female. [A-81-83]. Dr. Helvie was the driving force controlling Mr. Eble through vague statements and failing to give him specific facts. *Vichio, supra.* There were

28

disproportionate hiring practices favoring women at Orchard, and all promotions
and hirings of leadership positions from 2019 to 2021 were for women. [A-77; Dkt.
117-35]. So, the earlier requirement of background information would not have
applied in this case no matter which framework was followed.

Fourth, there is an industry stereotype favoring women over men in early
childhood education. The stereotype was that women could do a better job with
young children than men. [Dkt. 117-3, p. 1; Dkt. 104-2, p. 14 (Napier Dep. 52:20-
53:12, 56:7-22). An industry stereotype is a sufficient background circumstance
*Preston v. Wisconsin Health Fund*, 397 F.3d 539 (7th Cir. 2005).

Fifth, the recent Supreme Court decision of *Students for Fair Admissions,
Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) (SFFA)
reaffirmed that the right to equal protection applies without regard to any
difference of race, of color, or of other prohibited factor—the right is universal in its
application. 600 U.S. at 206-207; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S.
273, 280 (1976) (racial discrimination is prohibited against whites on the same
terms as discrimination against nonwhites).

Furthermore, the *SFFA* decision held that any special treatment is an
*exception* to the demand for equal protection and must survive a daunting two-step
examination known in the cases as strict scrutiny. 600 U.S. at 206-207. The higher
standard to prove denial of equal opportunity is now no longer required for
individuals in nonminority, male, groups. Instead, any *exception* to treating all
persons (including nonminority group males) with equal opportunity must be shown
by the higher standard of strict scrutiny, not the other way around as was used in

the past when the demographics were different, and a higher standard was required for nonminority males. The Order erroneously applied a higher standard to Mr. Napier throughout the Order.

Sixth, even if Mr. Napier had followed the *McDonnell Douglas* method, and if a higher standard was required for the male in this case, the background circumstances in this case were sufficient and were more than the evidence in other decisions that found sufficient background evidence. *Mills v. Health Care Service Corp.*, 171 F.3d 450, 456 (7th Cir. 1999); *Runkel v. City of Springfield*, 51 F.4th 736, 743 (7th Cir. 2022).

The Order is in error in disregarding Orchard's background statements favoring hiring women on the basis that Orchard's statements were "*prior* to Dr. Helvie's arrival," because they are background evidence that the Orchard's board, search committees, and employees made the background statements, that such statements were made to employees, and that such statements were even made to applicants to discourage males and encourage females like Dr. Helvie. [A-18:21-19:18].

**The Order is in error in relying on an internet search without notice in order to grant summary judgment in favor of women.**

The Order is in error in going outside the record without notice, doing an internet search to support the female position, and citing an advertisement for a "Women's and Gender Studies" program from another college three thousand miles away from Dr. Helvie's University of California in Santa Cruz. *Rowe v. Gibson,* 798 F.3d 622, 628-630, 635-644 (7th Cir. 2015). [A-20:16-21:2; Dkt. 129, p. 20:16-21:2]. In the *Rowe* case the reliance on an internet search outside the record without notice

was made to *deny* a motion for summary judgment for later development of the evidence at trial, and it has not been done to *grant* summary judgment to end a case. *Id.* Even if such reliance had been proper, it was improper for the Order to draw an "inference" as to what facts are "more likely" on an issue of fact. *Id.*

**The Order is in error in disregarding the failure of the Orchard Board to investigate Mr. Napier's multiple complaints and the complaints of the faculty and parents supporting him.**

The Order is in error in disregarding the Orchard board's failing to investigate the multiple complaints of Mr. Napier's and faculty and staff supporting him with the Order's excuse that "they simply reveal the board's support for Dr. Helvie's decisions." [A-21:3-16]. A board supporting a CEO without investigation is the opposite of doing their job of investigating their CEO and taking corrective action.

When an employer does no investigation, it is evidence of the pretext of the reason for the action against the plaintiff. *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 409 (7th Cir. 2007), *affirmed* 553 U.S. 442 (2008). An investigation that is questionable at best because it did not tell the plaintiff about an allegation and allow the plaintiff to explain it, is evidence of pretext. *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 108-109 (2nd Cir. 2010). Simply supporting the alleged discriminator is the opposite of the board's duty. It is strong evidence of liability. An employer's approach of doing nothing after receiving multiple complaints about serious conditions is a straight road to liability under Title VII. *Isaacs v. Hill's Pet Nutrition, Inc.,* 485 F.3d 383, 386 (7th Cir. 2007).

The Order argues that such evidence is not evidence of "fishy background

31

circumstances," but the Order also failed to consider any evidence of pretext in the *McDonnel Douglas* method. [A-33:1-7; Dkt. 129, p. 33:1-7]. So, the Order failed to consider the evidence at any place in the method. Also, the Order did not consider the failure to investigate Mr. Napier's complaints in the totality of the evidence method or in the retaliation claim, either. [A-33-41; Dkt. 129, pp. 33-41]. The Order in the totality of the evidence method does discuss Dr. Helvie's failure to investigate her conclusory allegation before terminating Mr. Napier, and the Order tries to make an excuse for that failure to investigate on the ground that she was involved in the facts. But her involvement does not correct the errors in the failure to find a specific instruction on confidentiality to Mr. Napier and the failure to find any breach of confidentiality of his proposal. [A-35:16-36-2; Dkt. 129, pp. 35:16-36:2]. If Dr. Helvie had given such an instruction, she would have been able to testify to the specific instruction, but she did not.

### Orchard deviated from its standard procedures.

An employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination. *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012). The Order is in error in disregarding Orchard's deviation in regard to Mr. Napier from several of its personnel policies with the Order's excuse that "it is more likely that the absence of such a process constituted flawed employment practices, than a discriminatory practice targeting males." The Order's excuse that "standing alone" this does not constitute a fishy background circumstance that suggests Orchard discriminates against male employees." [A-22:15-21:17]. These are improper statements under the legal standard for summary judgment.

Furthermore, Orchard's HR Coordinator confirmed that "We have provided written documentation to all involuntarily terminated employees, including teachers, maintenance technicians and the previous HOS." [a-56; Dkt. 117-19, p. 6; Dkt. 117-19, pp. 4-9]. Before Orchard's termination of Mr. Napier, it followed Orchard's practices, but in Mr. Napier's termination, Orchard did not have a legitimate reason for termination and failed to follow its policies and practices. [Dkt. 117-19, pp. 4-9]. Orchard was so determined to discriminate against the male, Mr. Napier, and favor the females that it failed to follow the basic legal requirements of of investigating his complaints.

The Order on the same page then disregards evidence that similarly situated women in the workplace were treated better than Mr. Napier with the Order's excuse that he "conflates two elements" (that are not elements) of similarly-situated women with fishy background a circumstance. The Order disregarded evidence at the top of page 22 with the excuse that background evidence of Orchard's deviations with regard to Mr. Napier from Orchard's policies are not evidence about discriminating against male employees. But the Order at the bottom of page 22 when Plaintiff presented evidence of the better treatment of similarly situated female employees showing discrimination, the Order disregarded the evidence on the ground that it does not constitute the separate category of a "fishy background circumstance." [A-22:12-15]. The Order failed to consider all of the evidence together. The Order on page 22 implied that it desired evidence of the treatment of other employees and then when plaintiff presented evidence of the treatment of other employees, the Order disregarded the evidence. [A-22:16-21].

33

**Orchard replaced an all male staff with an almost all female staff.**

The Order is in error in implying that an all-female staff could not serve as a fishy background circumstance sufficient to overcome a "presumption" that an employer would not discriminate against a male. [A-23; Dkt. 129, p. 23]. And the Order in this case should not have any presumption against this plaintiff for the multiple reasons stated earlier. *Vichio, supra; Ortiz, supra; Preston, supra; SFFA, supra.* The Order continues to have a presumption against this plaintiff throughout the Order. [A-26:6-8].

The Order implies that demoting and terminating male employees without specific non-discriminatory reasons and replacing them with females is acceptable under the law, but no known decision has gone so far. The Order states: "Arbuably, it more clearly demonstrates an ongoing pattern and practice of hiring the best qualified people, without regard to their gender," but it cites no such evidence, and stating "arguably" what is "more clearly" violates the legal standards for summary judgment. There was substantial evidence on the motion for summary judgment that Orchard replaced the male employees with less qualified female employees. [E.g. Dkt. 117-40].

The Order's inference that Orchard could discriminate against men for two years when it terminated Mr. Napier in order to "balance" the senior staff is evidence of discrimination based on gender. [A-23:23:10-14; Dkt. 129, p. 23:10-14]. Such balancing is not permitted. *SFFA, supra; McDonald, supra.* It is especially egregious discrimination when the balancing is done with false accusations, demotion, and termination, instead of by recruiting and hiring.

The Order at footnote 2 states that men, not women dominated the supervisory positions at Orchard, but that was not true after the termination of Tom Rosenbluth, the hiring of Ms. Jo Butler as a search consultant, the hiring of Dr. Helvie, and the elections of Colleen O'Brien and Alicia LaMagdeleine as board co-chairs, all of whom dominated the supervisory positions over Mr. Napier at the time of his demotion and termination.

### The Order ignores the Affidavit of Chrystal Lax that shows no education or employment qualifications for human resources.

The Order refers to Plaintiff's Exhibit 39 consisting of documents relating to a person named Crystal Lax. [A-24:1-13; Dkt. 129, p. 24:1-16].

Orchard listed a person named Crystal Lax on its list of leaders, but Orchard failed to produce any personnel documents or any other documents or information for Crystal Lax. [A-77]. Plaintiff offered publicly available documents for Chyrstal Lax, showing that she was not qualified to be a Human Relations employee. [Dkt. 117-39]. In reply, Orchard offered an affidavit of Crystal Lax stating that the the Crystal Lax in the publicly available documents is not the Crystal Lax in the Orchard's list of leaders. But the affidavit of that second Chrystal Lax failed to claim any education or experience or any other qualification to be a Human Resources leader at a time when those qualifications were in issue in this case. [Dkt. 122-1, p1].

### The demotions of Mr. Napier and Mr. Schwartz from the senior team and Dr. Helvie's instruction to Mr. Napier to communicate to her through Mr. Eble is evidence of discrimination and the lack of communication causing the termination of Mr. Napier.

Dr. Helvie's immediate demotions without any explanation or reason of the

male directors of the schools, Mr. Napier and Mr. Schwartz, from the senior team and the replacement of them with two females who did not supervise any teachers, which is the primary business of the school, is evidence of favoring the female employees over the male employees. [Dkt. 117-40, ¶¶ 22-25]. The Order recognizes that after Dr. Helvie's demotion of the male school directors from the senior team, Mr. Napier "was no longer 'in the know' about certain school decisions." [Dkt. 24:14-25:8].

Mr. Napier described how Dr. Helvie also told Mr. Napier not to report directly to her but to report to her through Mr. Eble, and how Mr. Eble was afraid to ask questions of Dr. Helvie for fear of losing his job. [Dkt. 104-2 pp. 12-13 (Napier Dep. 49:8-50:9; Dkt. 104-2, p. 33 (Napier Dep. 129:17-130:8]. Mr. Eble was so afraid of Dr. Helvie that he was afraid to ask questions or complain when Dr. Eble served cake with nuts at the school that endangered people with a serious nut allergy. [*Id.*]

Mr. Napier also described how the lack of communication from Dr. Helvie caused a problem with the posting of a vacancy announcement for applications and caused his termination. [Dkt. 104-2, pp. 6-8 (Napier Dep. 24:2-29:20) ; Dkt. 104-2, p. 25 (Napier Dep. 99:-100:25); Dkt. 104-2, p. 45 (Napier Dep. 177:2-20)]. The lack of communication from Dr. Helvie to Mr. Eble is also shown by the evidence. [Dkt. 104-2, p. 7-8 (Napier Dep. 25:1-29 :20); Dkt. 104-2 p. 33 (Napier Dep. 129:17-130:9); A-81-83; Dkt. 104-3, pp. 3 (Eble Dep. 15:4-25); Dkt. 104-18, pp. 1-2 (Eble Aff. 1-2)]. The Order admitted that Mr. Napier was no longer "in the know," but the order did not credit the evidence, and instead, stated that he "was hardly relegated to insignificance," which was not the issue in the case.

The Order of summary judgment went out of its way to speculate that "some might describe" Mr. Napier's complaints as "whiney," and the Order was needlessly disparaging of the nonmovant plaintiff. [A-25:9-18; Dkt. 129, p. 25:9-18]. The speculation and disparagement are inappropriate for an order of summary judgment. They show how Orchard could belittle the men and make Mr. Rosenbluth, Mr. Eble, Mr. Napier, and Mr. Schwartz afraid for their jobs and afraid to question or complain for fear of being demoted, disconnected, discharged, and disparaged as the Order does.

The lack of Dr. Helvie's communication to Mr. Napier and Mr. Eble caused the termination of Mr. Napier. [Dkt. 104-2, p. 25 (Napier Dep. 99:6-100:1); Dkt. 104-2, p. 45 (Napier Dep. 177:2-178:2); A-81, Dkt. 104-3, p. 3]].

**There is evidence that Dr. Helvie was aware that the senior team consisted of four males, since everyone at Orchard knew.**

The Order recognized that during Mr. Rosenbluth's tenure as HOS, the Senior Administrative Team consisted of four males, Mr. Rosenbluth, Mr. Eble, Mr. Napier, and Mr. Schwartz. [A-4:10-16; Dkt. 129, p. 4:10-16; A-24:14-25:8; Dkt. 129, p. 24:14-28:8].

After many statements by Orchard's board members, staff, employees, search consultant, and search committee to applicants about having four males on the senior team, after Dr. Helvie became responsible for all employees, and after her two weeks interviewing employees, it is not reasonable that Dr. Helvie did not know that the senior team consisted of four males.

Dr. Helvie did not claim that she did not know that the senior team consisted of four males. [104-12, ¶ 4]. Instead, she stated that she "continued the two

37

leadership teams established by Tom Rosenbluth, the Senior Administrative Team and the Academic Leadership Team." *Id.* Since she knew the two leadership teams established by Tom Rosenbluth, it is reasonable to infer that she knew the team members. That is especially true after her numerous conversations with the Orchard search committee, board, staff, her duties to supervise all Orchard employees beginning July 1, 2018, her two weeks of interviews with employees, and her study of Orchard's documents on her senior team and other documents before her July 16, 2018 announcement of the team members for the school year. 2018-2019. [Dkt. 104-4]. For Dr. Helvie not to have known the senior team of the school that she was responsible for operating is not believable. It would been irresponsible for the Head of the School not to know the senior team of the school. It is improper for the Order to draw an inference on summary judgment, let alone draw an unbelievable inference.

## Order Discussion Number II. Defendant's Motion for Summary Judgment

### a.Gender Discrimination Claim

#### i.    *McDonnell Douglas* Framework

#### B.  Meeting Employer's Legitimate Expectations. Order p. 26.

**The Order used the wrong legal standard for meeting expectations.**

The Order admitted that the evidence shows that Mr. Napier had a "prior record of exemplary performance." [A-26:17-18]. However, the Order uses the same non-specific reason to find that he was not meeting expectations as the Order uses as an independent non-discriminatory reason, namely that he failed to "maintain job related confidences and follow instructions of his supervisors." [A-26:15-22].

Orchard's use of the same reason for not meeting expectations as Orchard uses for an independent non-discriminatory reason for termination is circular reasoning. If being terminated was proof that an employee was not meeting the employer's expectations, no one who was terminated would be able to show that he was meeting the employer's legitimate expectations. *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993); *Echols v. Select Beverage, Inc.*, 64 F.Supp.2d 807, 812 (S.D.Ind. 1998).

**Mr. Napier was meeting Orchard's legitimate expectations.**

The Order recognizes that Mr. Napier had a "prior record of exemplary performance. [Dkt. 129, p. 26:17-18]. He had a glowing evaluation from Orchard. [Dkt. 104-2, p. 32 (Napier Dep. 126:1-2; Dkt. 117-6)]. Dr. Helvie gave him a very high recommendation for HOS in Louisiana in February 2019. [Dkt. 104-2, p. 43 (Napier Dep. 171:1-8)]. Dr. Helvie did not give him an instruction on confidentiality. [Dkt. 104-5]. Mr. Napier did not disclose his proposal to Ms. Brothers and did not breach confidentiality. [Dkt. 117-15; 117-17, pp. 3-9]. Mr. Napier met Orchard's legitimate expectations and Dr. Helvie's vague non-specific reason is inadequate for a non-discriminatory reason. The vague non-specific reason is also false and a pretext to terminate the male, Mr. Napier, who did nothing wrong, and to promote the female, Ms. Brothers, whom Dr. Helvie had told she was going to demote, who cried in the school, and who disclosed Dr. Helvie's plan to Ms. Bricker. *Vichio*, 88 4th at 694-695.

**There is no evidence that Dr. Helvie honestly believed her nonspecific reason for terminating Mr. Napier.**

The Order puts an argument about honest belief in its discussion of meeting

expectations, but that is not a requirement of meeting expectations, and meeting expectations is not a requirement of *McDonnell Douglas*, even though Mr. Napier was meeting expectations.

Dr. Helvie did not claim an honest belief in her deposition or affidavit, let alone try to justify any honest belief. [Dkt. 104-12]. An honest belief must be reasonable, and Dr. Helvie has not made any showing of a reasonable honest belief. An honest belief is about a subjective matter like qualifications, not an objective matter such as what the accused discriminator said or did, because the discriminator should know what she said or did. When Dr. Helvie does not know or testify to what words were spoken about confidentiality, if any, and when, where, how, and in what circumstances, then it is evidence that Mr. Napier would not know. Not only does Dr. Helvie not know such facts, Dr. Helvie did not investigate the facts before terminating Mr. Napier or after he complained. Neither did Orchard investigate the facts before his termination or after his complaints. The lack of testimony about facts and the lack of any investigation are evidence of the lack of a reasonable good faith belief in anything.

**Order Discussion Number II. Defendant's Motion for Summary Judgment**

    **a.  Gender Discrimination Claim**

        **i. *McDonnell Douglas* Framework**

            **C.  Adverse Employment Action. Order p. 28.**

Not disputed by the Defendant or the Order.

**Order Discussion Number II. Defendant's Motion for Summary Judgment**

    **a. Gender Discrimination Claim**

### i. *McDonnell Douglas* Framework

### D. Similarly Situated Women. Order p. 29.

The Order argues that none of the women were similarly situated to Mr. Napier. [Dkt. 129:18-20]. If none of the women were similarly situated to Mr. Napier, Mr. Napier is not expected to introduce evidence that they were treated better. Better treatment of women who are not similarly situated is not expected. Better treatment of similarly situated women is not required to prove discrimination, but it is relevant evidence where there are similarly situated women.

The Order repeatedly says that each woman was a "poor" comparator, without denying that they are comparators. [Dkt. 129, p. 30:14; Dkt. 129:30:11; Dkt. 129, p. 32:120]. Ms. Bostrom and Ms. Williams were treated better by being placed on the senior team in place of the male school directors. The fact that neither had academic responsibilities show their lesser qualifications to lead a school.

Ms. Brothers was not qualified to be the Director of the Middle School. [Dkt. 104-2, p. 27-28 (Napier Dep. 107:17-111:6)]. Dr. Helvie had told Ms. Brothers that Dr. Helvie planned to demote her to a teaching position, but after Ms. Brothers was observed crying in the school, and had told Ms. Bricker about Dr. Helvie's plan, Dr. Helvie promoted Ms. Brothers to Director of the Middle School and terminated Mr. Napier who did nothing wrong.

Ms. Bricker complained on Facebook about being demoted to teaching, but Dr. Helvie simply asked her to take down her posting, granted her leave, and

offered her the teaching position instead of terminating her. [Dkt. 117-40, p. 3]. Dr. Helvie did not offer Mr. Napier any leave, counseling, discipline, or teaching job, and instead, terminated him and issued a mass humiliating email about him.

Orchard gave female employees and other employees who did not complain about discrimination counseling or writeups, but did not give those alternatives to Mr. Napier. Dr. Helvie even denied Mr. Napier's request to delay an announcement so he could obtain other employment. [Dkt. 117-19, p. 2].

Orchard argues that it is "silly" to expect Dr. Helvie to "fire herself for any discrimination she might have committed against him," but it is not silly to expect Dr. Helvie to investigate his complaints and take corrective action. [Dkt. 129:5-8]. But Orchard's Handbook policies expect her to receive complaints and solve them. More importantly, the Orchard board supervised both Dr. Helvie and Mr. Napier's complaints, and the board failed to investigate or take corrective action for discrimination. It is not unheard of for CEO's or even board members to fire themselves by resigning in order to correct discrimination. The Order's statement that it is "silly" is in error.

**The Order did not find that Orchard produced any specific non-discriminatory reason for the termination of Mr. Napier and the Order did not find that Mr. Napier failed to produce evidence of the pretext of a specific non-discriminatory reason of Orchard.**

Instead, the Order stated that it need not and chooses not to conduct the *McDonnell Douglas* analysis. [A-33:1-7; Dkt. 129, p. 33:1-7]. The Order viewed the case from the viewpoint of the employer and stated that if plaintiff is unable to

establish a prima facie case, "an employer may not be subjected to a pretext inquiry," but the Order is in error. *Vichio, supra.*

## Order Discussion II. Defendant's Motion for Summary Judgment

### a. Gender Discrimination Claim

#### ii. *Ortiz* Standard. Order p. 33

The Order States that for "all the reasons detailed above, this evidence, viewed as a whole, fails to raise any genuine issues of material fact." [Dkt. 129, p. 34:5-6]. The Order is in error in applying the Ortiz standard for the same reasons stated above that the evidence described above must be considered.

The Order states that many of the statements of bias were made "prior to" Dr. Helvie's arrival, but they were made by Orchard's board, search consultant, and the Orchard community that selected Dr. Helvie and gave her the charge to increase diversity. [Dkt. 129, p. 34:9]. The *Mills* decision found evidence of disproportionate hiring patterns favoring women going back seven years. 171 F.3d at 457. The evidence also shows that Dr. Helvie engaged in worse discrimination than Orchard before she came on board by promoting and hiring all women for two years. [Dkt. 117-35, p. 1]. Dr. Helvie also told Mr. Napier not to communicate directly to her and then she did not give Mr. Eble and Mr. Napier information.

The Order discounts the timing of the actions, but they are similar to or better evidence than the evidence in *Vichio, supra,* which found that evidence of discrimination sufficient.

The Order uses improper legals standards for the summary judgment, such as "perhaps more convincingly in the context," "coincidence," "likely," "loses steam," "persuasive force," "supports an inference," and "likely." " [Dkt. 129, pp. 35:11, 36:1, 36:3, 36:18, 36:22, 38:9].

The Order is in error in stating that Mr. Napier made "undisputed breaches of trust and confidences," which is not true, and "his admission," which is not true, and the Order acknowledges "he has challenged the reason given for his termination as unworthy of belief." [Dkt. 129, pp. 35:12, 36:3, 37:10].

The Order is in error in excusing the failure to investigate by Dr. Helvie and by the board because Dr. Helvie had personally participated. This is not a legitimate excuse, but rather, more reason to investigate discrimination by important decision-makers. There is no CEO exception or board exception for the duty to investigate, but rather, it is a higher duty to investigate.

The Order is in error in disregarding the coverup email of Dr. Helvie as not related to gender, but it attempts to place blame on the innocent male and excuse the females who disclosed plans, Dr. Helvie, Ms. Brothers, and Ms. Bricker.

The Order is in error in stating that it is "likely" that the immediate email without any explanation spared him embarrassment, when it actually made him a lame duck director for three months, damaged his opportunities to obtain an administrative leadership job, and embarrassed him with the faculty, parents, family and friends.

The decision of *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) recognized that: "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Id.* Mr. Napier has many more types of evidence than just one type, and the many types are discussed above throughout the brief because the Order discusses them in multiple different sections.

**Order Discussion II. Defendant's Motion for Summary Judgment**

   **b.  Retaliation Claim, Order p. 38.**

**Brief of Appellant Argument No. II.** The order granting summary judgment is in error in deciding issues of fact on the sufficiency of the multiple types of the direct and circumstantial evidence for a jury to find sex discrimination and retaliation as a cause of Orchard's failure to interview or hire Mr.  Napier in January 2020, including the following types of evidence:

> (1) all of the above evidence described in Issue No. I; (2) all of the background evidence of Orchard's statements and actions against males and favoring females; (3) Mr. Napier's exemplary performance; (4) Mr. Napier's complaints of discrimination, complaints from the faculty, parents and comments in the school association's report supporting Mr. Napier; (5) Orchard's failure to investigate the complaints; (6) Orchard's deviation from its regular procedures; (7) suspicious timing; (8) Orchard's failure to have a policy against retaliation; (9) direct and ambiguous statements and conduct of Orchard; (10) Orchard's better treatment of females and persons who had not complained; (11) Orchard's interview and hiring of Ms. Brothers who had wanted to remain as coordinator, who had wanted Mr. Napier to be director, who had cried at school when Dr. Helvie told her that Dr. Helvie was considering demoting her to teaching, who had disclosed to ES Coordinator Bricker the statements of Dr. Helvie, who was less qualified, and who had no supervisory

experience other than as acting director after Dr. Helvie in March immediately without any applications appointed her as acting director; (12) Orchard's failure to offer a specific non-discriminatory reason for its failure to interview or hire Mr. Napier; (13) Orchard's offer of the non-specific, shifting, false, and contradictory reason of past poor performance; (14) Orchard's attempt to cover up its discrimination and retaliation by arguing as Orchard's comparator an unidentified female employee without producing or offering any personnel file, application, documents, or facts relating to the alleged female; (15) all of the above evidence showing the pretext of the defendants' nonspecific, shifting, false, and inadequate reason; (16) and all of the above evidence showing a causal link to the failure to interview and hire him.

**Order Discussion No. II. Defendant's Motion For Summary Judgment**

**b. Retaliation Claim. Order p. 38.**

The Order acknowledges that Mr. Napier engaged in protected activity under Title VII and that he suffered an adverse action. The Order only disputes that Mr. Napier raised any genuine issue of material fact over whether there existed a causal connection between his protected activity and the adverse employment action. [A-39:1-7].

Order admits that Mr. Eble, Mr. Napier's supervisor, "apparently had not been informed of the specifics of Mr. Napier's termination." [Dkt. 129, p. 40:3-4]. A non-specific reason without evidence known to Mr. Eble for his decision is not a sufficient non-discriminatory reason. *EEOC v. Target Corp.,* 460 F.3d 946, 957-958 (7th Cir. 2006); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255-56 (1981).

The lack of knowledge of Mr. Napier's supervisor for any reason to terminate him is also evidence of the failure of Dr. Helvie to consult with him about the

appropriateness of terminating Mr. Napier and the lack of knowledge and fear that Dr. Helvie created in Mr. Eble and Mr. Eble to ask questions or complain.

Mr. Napier was also qualified to be interviewed, and he was better qualified than Ms. Brothers to be selected, as explained in earlier sections.

The fact that Orchard had not interviewed Mr. Napier in any investigation shows the retaliation against him and the even greater need to interview him when there has been no investigation, not reason given to his supervisor, and a false general reason given to Mr. Napier. Only Orchard can correct its discrimination, and it has refused to do so at several opportunities.

The Order is in error by relying on the unidentified female who allegedly had past performance "issues" for whom Orchard failed to provide any information or documents. The unidentified female is not evidence for Orchard in this case, but rather, evidence of Orchard again covering up the discrimination and retaliation. *Loudermilk v. Best Pallett Co., LLC,* 636 F.3d 312, 315 (7th Cir. 2011) (evidence cooked up after the fact comes close to conceding retaliation, especially an attempt to block the gathering of evidence).

<u>CONCLUSION</u>

For all of the foregoing reasons, the judgment of the District Court should be reversed, and the case should be remanded to the District Court for further proceedings.

Respectfully submitted,

<u>s/ Richard L. Darst</u>
Richard L. Darst

47

Richard L. Darst
Attorney at Law
Suite 800
8888 Keystone Crossing Blvd.
Indianapolis, Indiana 46240-4636
Tel: 317-573-8888
Fax: 317-574-3855

## Circuit Rule 32 Certification

Pursuant to Rule 32(a)(7) and Rule 32(g)(1) of the Federal Rules of Appellate Procedure and Circuit Rule 32(c), the undersigned attorney hereby certifies that the brief complies with the type-volume limitation of Circuit Rule 32(c). The number of words in the brief is 13819. The name and version of the word-processing system employed is Microsoft Word for Microsoft 365.

s/ Richard L. Darst
Richard L. Darst

## Circuit Rule 30(a) and (b) Certificate

All materials required by parts (a) and (b) of Circuit Rule 30 are hereby certified to be included in the Required Short Appendix.

s/ Richard L. Darst
Richard L. Darst

## Certificate of Service

I certify that on February 13, 2024, I electronically filed the foregoing and the appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

s/ Richard L. Darst
Richard L. Darst

# APPENDIX

Table of Contents

**<u>Required Short Appendix</u>**                                          **<u>Page</u>**

Order Granting Defendant's Motion for Summary Judgment and
Granting In Part Defendant's Motion to Strike . . . . . . . . . . . . . . . . . . . . . . A-1

Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-42

February 14, 2019 Dr. Helvie email to Mr. Napier requesting a new job
description with his priorities for a modified MS Coordinator role and the
request did not contain any instruction on confidentiality . . . . . . . . . . . . . . A-43

Coordinator job description with priorities that Mr. Napier gave to
Dr. Helvie and that he did not disclose to MS Coordinator, Ms. Brothers . . A-44

February 22, 2019 Dr. Helvie email to Ms. O'Brien and Ms. LaMagdeleine
on February 20, 2019 meeting with Ms. Brothers when Dr. Helvie disclosed
to Ms. Brothers Dr. Helvie's plan to demote Ms. Brothers to teaching,
Ms. Brothers was observed crying in the school, and Ms. Brothers disclosed
Dr. Helvie's plan to ES Coordinator, Ms. Bricker . . . . . . . . . . . . . . . . . . . . . A-45

February 24, 2019 Ms. Brothers email to Dr. Helvie on her difficult meeting
with Dr. Helvie, Ms. Brothers desire to continue working well with Mr.
Napier, and attached her old 2018 job description . . . . . . . . . . . . . . . . . . . . A-47

March 7, 2019 Dr. Helvie email to Ms. Meiss with emails that a written
termination notice to Mr. Napier will follow shortly . . . . . . . . . . . . . . . . . . . A-54

March 7, 2019 Dr. Helvie email to Ms. Meiss that we don't know for
certain of Angie information and all involuntarily terminated employees
have received written documentation of the reason . . . . . . . . . . . . . . . . . . . . A-56

Draft Employee Termination Notice to Mr. Napier for breach of confidence
of unspecified instruction to draft job duty documentation independently
in strict confidence job duty documentation . . . . . . . . . . . . . . . . . . . . . . . . . A-57

March 7, 2019 Ms. LaMagdeleine email to Ms. Meiss on assumption of offer
of one year contract each year given good performance . . . . . . . . . . . . . . . . A-58

March 8, 2019 Dr. Helvie email to Ms. Meiss on not providing termination
notice of reason to Mr. Napier at this time and start drafting response to Mr.
Napier's requests for Dr. Helvie's review . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-59

March 8, 2019, 2:37 PM, Ms. Meiss email to Dr. Helvie with January/February
Supervisor Training regarding employment law and legal hiring practices .  A-60

March 8, 2019, 4:34 PM. Dr. Helvie email to Orchard Employees that Mr.
Napier will not be returning and Ms. Brothers has accepted my invitation
to be acting Middle School Director for the 2019-2020 school year. . . . . . . . .  A-63

March 29, 2019 email from Mr. Rawe on the failure of the head and the
Board that seemed dishonorable to Mr. Napier who appears to be universally
appreciated by the community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-64

Summary Chart of ISACS Survey Quotations Regarding Napier . . . . . . . . . . A-68

Middle School Faculty and Administrative Leaders (2019-2022) . . . . . . . . . . A-77

Affidavit of Gretchen Bricker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-78

Deposition of Mr. Eble, p. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-81

Affidavit of Nicholas Eble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-82

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES NAPIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03556-SEB-MKK |
| | ) | |
| ORCHARD SCHOOL FOUNDATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE**

This cause is before the Court on Defendant's Motion for Summary Judgment, [Dkt. 103], filed on August 1, 2022, pursuant to Federal Rule of Civil Procedure 56, and Defendant's Motion to Strike, [Dkt. 124], filed on December 21, 2022. Plaintiff James "Jamie" Napier ("Mr. Napier") has brought this lawsuit against his former employer Orchard School Foundation ("Orchard"), alleging that Orchard violated his Title VII rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981a, by engaging in reverse sex discrimination and then retaliating against him following the filing of his complaint for discrimination in this case. Orchard denies these allegations based on the uncontroverted material evidence for which summary judgment in its favor is warranted and seeks further relief in its Motion to Strike.

For the reasons detailed below, we GRANT IN PART and DENY IN PART Defendant's Motion to Strike and GRANT Defendant's Motion for Summary Judgment.

## Factual Background

### I.    General Background

Defendant Orchard School Foundation operates The Orchard School, a non-profit
and independent school covering early childhood through middle school in Indianapolis,
Indiana. Am. Compl. 5; Helvie Aff. ¶ 2. Mr. Napier was first hired by Orchard as a middle
school teacher in 1996. Napier Aff. ¶ 5. Mr. Napier left for other employment in 2003 and
returned to Orchard in 2016, taking the position of Middle School ("MS") Director. Napier
Aff. ¶¶ 12, 21. As MS Director, Mr. Napier's duties included supervising MS teachers and
the MS Coordinator, Angela Brothers. Napier Aff. ¶ 22. Dr. Sherri Helvie became
Orchard's Head of School ("HOS") on July 1, 2018. Napier Aff. ¶ 48. On March 6, 2019,
Dr. Helvie informed Mr. Napier that his employment contract would not be renewed for
the 2019-20 school year,  though he was allowed to continue in his position as MS Director
until June 30, 2019. Napier Aff. ¶¶ 177, 256.

Two months after the conclusion of his tenure with Orchard, Mr. Napier filed the
instant suit on August 21, 2019. Am. Compl. In December 2019, Mr Napier filed a new
application to return to his prior position. Following Orchard's rejection of his reapplication
for the MS Director position, Mr. Napier filed a second lawsuit on August 31, 2021,
alleging that in the rejection of his reapplication, he was retaliated against for engaging in
protected activity, in violation of Title VII. The Court has consolidated the two cases into
this single cause number. [Dkt. 88.]

## II.      Orchard Prior to 2018

Mr. Napier first taught at Orchard from 1996 to 2003, and returned to Orchard School as MS Director in 2016, after teaching and holding an administrative position at another school. Pl. Ex. 33. Mr. Napier testified that, following his hiring, he spoke to Ms. Brothers who disclosed that there had been an internal debate among staff and perhaps others over his hiring. Napier Dep. 137:12–16. Napier claims that "[Brothers's] story was that those were fairly hot conversations, and a lot of people have very strong feelings about not hiring me for the specific reason that I was simply one more white male coming into the spot." *Id.*

Prior to July 1, 2018, Orchard was led by Dr. Helvie's predecessor, Tom Rosenbluth. Napier Aff. ¶ 23. Alongside Mr. Napier as MS Director, Hal Schwartz held the position of Early Childhood and Elementary School ("EC/ES") Director. *Id.* at 39. Mr. Schwartz was hired as EC/ES Director in 2016. Schwartz Aff. ¶ 2. During that hiring process, Scott Weaver, an Orchard faculty member, expressed his opinions on the candidates, including Mr. Schwartz, in an email to Mr. Rosenbluth, stating that he "oppose[d] the viewpoint that we need a woman because I think it comes by way of imposing a stereotype on the male minority." Pl.'s Ex. 3. Weaver opined that Mr. Schwartz was "[a] risk worth taking [because the] likelihood of getting/retaining young male adults as well spoken, intelligent, humorous/playful, engaging, and warm as him are slim and declining." *Id.*

During 2016, Nick Eble was appointed to the position of Assistant HOS. Eble Aff. ¶ 2. While Mr. Eble was under consideration for that position, Mr. Rosenbluth addressed concerns raised by certain Orchard board members who had asked him to "[s]peak to the

fact that we have two white male division directors and now potentially Nick." Pl.'s Ex. 3.

In response to those concerns, Mr. Rosenbluth explained:

> The search committees for both Division Directors were very representative and were composed of a majority of women and our Diversity Director was on both committees. Additionally, all faculty and parents were given an opportunity to meet and give feedback on all the candidates. We had a diverse pool of candidates in each search and we will continue to broaden our candidate pools going forward. Hal and Jamie were the consensus picks.

Pl.'s Ex. 3.

During Mr. Rosenbluth's tenure as HOS, Mr. Napier was included in meetings of the Senior Administration Team, which consisted of Mr. Rosenbluth, Mr. Eble, and Mr. Schwartz, each a white male. Napier Dep. 49. During meetings of this group, Mr. Eble, among others, on occasion expressed the view that there were "too many white male[s]" in senior leadership positions. *Id.* Mr. Napier stated that he tended to agree with this opinion but did not understand it to mean that the males currently in leadership at the school should or would be fired in favor of women. Napier Dep. 54:25–55:11. During the 2016-17 school year, Mr. Napier received a positive performance evaluation from Mr. Rosenbluth. Pl.'s Ex. 6. No statements to the effect that there were "too many white males" were ever made by Dr. Helvie before or after her arrival as HOS. *Id.* at 55.

In mid-2017, Mr. Rosenbluth was notified by Orchard that his employment contract would not be extended signaling that he would not be returning as HOS following the 2017-18 school year. Napier Dep. 26:11–14. In anticipation of Mr. Rosenbluth's departure, the school undertook a search for the next HOS, which process ultimately led to Dr. Helvie's hiring. *Id.* During the search process, Orchard board members exchanged an email

communication conveying the "unsolicited comments" of various Orchard parents indicating that "[w]hen asked about diversity and specifically recruiting a female – response was ….Hard to find a woman -because not head of household….difficult relocation [sic]." Pl. Ex. 7. The email also stated that the school "[n]eed[s] diversity . . . Awarding Nick blocked the situation on what we can do for the HOS…if we want diversity…we need to find a femaile [sic]," referring to the fact that, after Mr. Eble's promotion to administration, all members of the school's top administrative staff were white males. *Id.*

Further, on December 2, 2017, in a conversation between Orchard Board members and its search consultant, Jo Butler, who had been engaged to assist with finding HOS candidates, regarding an interview with a particular candidate who, if hired, would be the fourth white male within the school administration, Butler stated:

> Somehow the "you're a white male and therefore at a huge disadvantage" came through loud and clear. Leaving aside the legality of that position, I think he has another opportunity that has come up, so he is looking for some guidance. . . . Yes, [the candidate] is a white male, but I think part of the challenge at Orchard is the dynamic of the four particular males at the top. My impression is that there is a little frat boy feeling that is going on, in part, due to the sarcastic nature that I observed in Tom and Jamie. I don't think they are very self-aware when it comes to how the four of them huddled together might appear to the predominantly female faculty. I think the right male would get that.

Pl.'s Ex. 7. In response, Dan Appel, an Orchard Board member, replied:

> We did talk about the white male issue in the context of something he would need to address if we selected him. It is an issue he needs to be aware of. We were clear that that was not a determining factor in our selection. His answer on how he would address it was good. Yes the Hal/Jamie issue creates a complicating factor among some of the community.

*Id.* Later, Colleen O'Brien, another Orchard Board member, responded to Butler and Appel as follows:

> As a group I don't think our intention was that it's a disadvantage in the process so much as it would be a disadvantage or a BIG challenge if he got the job moving forward. To me I felt we were pressing the point of the faculty impression and how would you work to overcome the lack of diversity perception if he were chosen. . . . For what it's worth, all three of us were impressed with how he answered regarding facing that challenge – very frank and very positive that he could lead that discussion and affect change.

*Id.*

### III.    Dr. Helvie's Background and Arrival at Orchard

Following completion of the HOS search, Orchard Board members selected Dr. Helvie to lead the school. Dr. Helvie's qualifications included a B.A. from the University of Nevada, Reno, with a major in English and a minor in Women's Studies, an M.A. from the University of Nebraska-Lincoln, with emphases in Women's Literature and Critical Theory and a minor in Classical Greek, and a Ph.D. from the University of California-Santa Cruz in literature, with a degree notation in Women's Studies. Pl.'s Ex. 32. She entered on duty as the HOS on July 1, 2018.

Shortly thereafter, Dr. Helvie sent an email to all Orchard employees describing her activities of her first two weeks at Orchard's helm. Def.'s Ex. D. She reported that she had conducted a meeting with the "Senior Administrative Team," including Mr. Eble, Jennifer Bostrom, Director of Institutional Advancement, and Courtney Williams, Chief Financial Officer, as well as a meeting with the "Academic Leadership Team," including Mr. Eble, Mr. Schwartz, and Mr. Napier. Def.'s Ex. D; Helvie Aff. ¶ 4. Dr. Helvie regarded these officials as comprising the school's leadership structure and as a continuation of the

approach under Rosenbluth. Helvie Aff. ¶ 4. Mr. Napier's day-to-day responsibilities and salary did not change following his shift from the "Senior Administrative Team" to the "Academic Leadership Team;" Mr. Napier nonetheless perceived this shift as a demotion, since, as he expressed, he was no longer "in the know" on school decisions and had less access to the HOS. Napier Dep. 32:3–35:3. The Academic Leadership Team met every two weeks, though occasionally meetings were cancelled. *Id.* at 72:11–13.

### IV. Napier's Discharge

#### a. Teacher Job Posting

In October 2018, Orchard was informed by an MS English teacher that she intended to retire at the end of the 2018-19 school year. Napier Dep. 61:3–7. Mr. Napier and Ms. Brothers focused their hiring attentions to replace the retiring English teacher on a specific teacher then employed by another school, which candidate Mr. Napier discussed with Dr. Helvie. *Id.* at 64:12–16. During their discussion, Dr. Helvie instructed Mr. Napier not to post the position until he heard back from her in order to allow her an opportunity to speak with the head of the other school. *Id.* Sometime later, when Mr. Napier had not heard back from Dr. Helvie, he directed the Orchard human resources department to post the vacancy. *Id.* at 65:1–19. Mr. Napier believed that in posting the position he was simply beginning the hiring process by creating an applicant pool, since the ultimate hiring decision would be Dr. Helvie's not his. *Id.* at 64:12–25. Within a couple of days of the posting, Dr. Helvie instructed Mr. Eble, who had also become aware of the posting, to take it down. *Id.* at 63:3–5, 65:24–66:3.

### b. Ms. Brothers's Job Description

Early in Dr. Helvie's tenure as HOS, she undertook discussions with Mr. Napier regarding Ms. Brothers's role as MS Coordinator. *Id.* at 68:5–10. Dr. Helvie was considering whether to retain Ms. Brothers's position as well as the EC/ES Coordinator position then occupied by Gretchen Bricker. Dr. Helvie was reluctant to retain positions based on vague job descriptions. *Id.* at 66:25–67:21. As part of her review, Dr. Helvie requested that Mr. Napier put together a job description for the MS Coordinator position; she made a similar request of Mr. Schwartz regarding Ms. Bricker's position. Napier Dep. at 67:21–68:4; Def.'s Ex. E. These reviews were discussed at leadership meetings attended by Mr. Napier, prompting Dr. Helvie to remind attendees that what was said at the meetings should be kept confidential. Napier Dep. at 90:9–10. Dr. Helvie testified that she directed both Mr. Napier and Mr. Schwartz to keep their proposals confidential. Helvie Aff. ¶ 7. Mr. Schwartz has confirmed that he was specifically told to keep his review confidential. Schwartz Aff. ¶ 6. In contrast, Mr. Napier has testified that he "can't recall her saying this specific thing is of [] uber secrecy." Napier Dep. 90:11–12.

Around January or February 2019, Ms. Brothers began to develop concerns that her job was in jeopardy, prompting her to ask Mr. Napier whether "there's something up." *Id.* at 82:21–22. Mr. Napier reportedly responded to her inquiry saying, "if and maybe possibly." *Id.* at 82:24–25. He also discussed with her the job description he was crafting for her position, viewing their discussion as permissible because, in his mind, any secrecy regarding his review project had already been breached and was "water under the bridge." *Id.* at 90:17–18. Following their discussion, Ms. Brothers asked Mr. Napier for his advice

on whether she could discuss these pending changes with Dr. Helvie; Mr. Napier did not

object. *Id.* at 83:14–17.

Ms. Brothers and Dr. Helvie met soon thereafter, on February 20, 2019. Def.'s Ex.

O. During their meeting, Dr. Helvie confirmed that Ms. Brothers's job was, indeed, under

review for possible elimination, making it likely that she would need to return to teaching

if she remained employed at Orchard. Hearing this news, Ms. Brothers became

understandably upset. Def.'s Ex. O; Bricker Aff. ¶ 38. Near the same time, Ms. Bricker

became aware that her position with the school was also at risk, prompting her to approach

Mr. Schwartz to discuss the issue. Bricker Aff. ¶ 38. On February 22, 2019, Dr. Helvie

expressed to members of Orchard's governing boards her opinion that Mr. Napier's breach

of confidentiality in his conversations with Ms. Brothers had "egregiously compromised

[her] trust in him." Def.'s Ex. O.

### c.   March 6, 2019 Meeting and Resulting Email

On March 6, 2019, Dr. Helvie met with Mr. Napier (Orchard's HR Coordinator

Stephanie Meiss was also in attendance) to inform Mr. Napier that his employment contract

would not be renewed for the 2019-20 school year. Napier Dep. 93:6–18, 94:23–24. Dr.

Helvie explained that she had lost trust in him, based on his having shared with Ms.

Brothers the information related to his review of her position, which disclosure had caused

both Ms. Brothers and Ms. Bricker considerable distress. *Id.* at 94:20–23. Dr. Helvie also

stated that she would soon inform the school staff via email of her decision on Mr. Napier's

termination and invited him to add his own contributions to the email notification. *Id.* at

96:7–10. Later that same afternoon, Dr. Helvie offered Ms. Brothers the position of Acting

MS Director. *Id.* at 95:24–96:1. Ms. Brothers then consulted with Mr. Napier, seeking his advice as to whether she should accept the position, and Mr. Napier encouraged her to take the job, which she ultimately accepted. *Id.* at 100:15–25.

On March 8, 2019, Mr. Napier met with Dr. Helvie and HR Coordinator Meiss a second time. *Id.* at 101:19–24. Mr. Napier had opted not to contribute to the email notice to the staff that his contract would not be renewed, choosing instead to maintain his opposition to and displeasure with the nonrenewal decision. *Id.* at 101:25–102:4. At 4:34 that same afternoon, Dr. Helvie sent out the email to Orchard staff informing them that Mr. Napier would not be returning the following year and that he would be staying on for the remainder of the current school year. She also expressed her appreciation for his work at Orchard and wished him luck in his future pursuits in the field of education. Pl.'s Ex 21. The email also informed staff that Ms. Brothers would be taking over Mr. Napier's MS Director position on an interim basis. *Id.* Mr. Napier was informed by Ms. Meiss that the purpose of the email to the Orchard staff was to inform them of changes so they would know prior to their own decision-making regarding the renewal of their contracts for the next school year. Napier Dep. 104:16-23. Mr. Eble was not involved in the meeting between Dr. Helvie and Mr. Napier regarding his termination nor did he play any other part in the decision-making process regarding Mr. Napier's employment. Eble Dep. 15:4-5. Dr. Helvie never disclosed to Mr. Eble any specific reason for Mr. Napier's discharge but did tell him that "she felt that their relationship was not going to be conducive to the school moving forward." Eble Dep. 15:16-21.

## V.      Events Following Napier's Discharge

Approximately one week after the email notice to staff was sent out, Mr. Napier sent his own letter to Orchard Board members detailing his grievances against Dr. Helvie. Pl.'s Ex. 25. Following their receipt of the news of his termination, numerous Orchard parents and faculty members sent statements of support to Mr. Napier, as well as thanks for his service. Pl.'s Ex. 23; Pl.'s Ex. 24. Certain Orchard faculty members joined in sending a letter to Orchard Board members to express their concerns over Mr. Napier's firing and to request a meeting with board members. Pl.'s Ex. 22. One faculty member decided not to return to Orchard allegedly due to Mr. Napier's firing. Meiss Dep. 35:7–13. During the days following the issuance of the notice of Mr. Napier's nonrenewal, Dr. Helvie conducted various meetings with Orchard faculty and parents to reassure them that Mr. Napier was not terminated for any illegal or untoward behavior, though she did not disclose in those sessions any specific reasons for her action. Helvie Dep. 38:25–42:19. On March 11, 2019, Dr. Helvie and Mr. Schwartz notified Ms. Bricker that her position was going to be eliminated as well and that, in order for her to remain employed by Orchard, she would need to accept a teaching position. Bricker Aff. ¶ 43. Ms. Bricker opted not to do so, thus also declining to enter into an employment contract with Orchard for the 2019-20 school year. Bricker Aff. ¶ 49.

Mr. Napier filed this lawsuit on August 21, 2019, following receipt of a right to sue notice from the Equal Employment Opportunity Commission ("EEOC") on May 28, 2019. Am. Compl. Seven months later, on December 9, 2019, Mr. Napier submitted to Orchard an application to return to the position of MS Director. Pl.'s Ex. 33. Mr. Eble received and

processed that application, rejecting it as he did another application by another former Orchard employee, both on the basis of their "poor past performance." Eble Aff. ¶¶ 4–7. Sometime thereafter, Mr. Eble offered the permanent MS Director position to Ms. Brothers, who had up until then been serving in an acting capacity. *Id.* at ¶ 8. On January 29, 2020, Orchard informed Mr. Napier that his application had been rejected. Pl.'s Ex. 33. That rejection prompted Mr. Napier to file a second charge of discrimination with the EEOC based on his failure to be rehired. He received a right to sue notice from the EEOC on that claim on June 3, 2021. On August 31, 2021, he filed a separate, second lawsuit challenging Orchard's failure to rehire him. On September 21, 2021, Mr. Napier's separate lawsuits were consolidated by the court under the above cause number. Later, he amended his complaint to incorporate all his claims into a single pleading. Am. Compl. The claims raised in his amended complaint are now the subject of Orchard's pending motions, which we address below.

## Legal Standard

Summary judgment is appropriate where there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them

in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

In employment discrimination cases, the summary judgment standard is applied rigorously "because intent and credibility are such critical issues and direct evidence is rarely available." *Howard v. Indianapolis Pub. Sch.*, No. 1:13-cv-02039-SEB-TAB, 2017 WL 1165497, at *7 (S.D. Ind. Mar. 29, 2017), *aff'd*, 727 F. App'x 198 (7th Cir. 2018) (citations omitted). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, our Seventh Circuit has made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). We find based on our careful review of the submissions by the parties that  no genuine disputes exist as to any material facts that would foreclose a summary ruling.

## Discussion

### I.    Defendant's Motion to Strike Plaintiff's Surreply

We turn first to resolve Defendant's Motion to Strike Plaintiff's Surreply Brief. [Dkt. 124.] Orchard contends that Mr. Napier's surreply brief was improperly filed under Local Rule 56-1(d), which allows "[a] party opposing a summary judgment motion [to] file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." Orchard concedes that it included some references constituting new evidence in its reply and that certain objections were also

interposed in that response brief, such that a surreply limited to those points is permissible. However, Orchard seeks to strike those portions of the surreply brief that do not conform to Rule 56-1(d), which limits surreply briefs only to "new evidence and objections."

The "purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 U.S. Dist. LEXIS 29463, at *4 (S.D. Ind. Mar. 25, 2010). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

Our review of Mr. Napier's surreply brief confirms Orchard's claim that the tendered brief exceeds the allowable parameters of the Rule. Only five sentences of Mr. Napier's twenty-page brief, in fact, address Orchard's "new evidence." [Dkt. 123 at 8, 14–15, 20.] Of the remaining portions of the brief, only a small part addresses Defendant's objections, repeating instead arguments previously set out in his Response Brief. Remarkably, in his ten-page Response to Orchard's three-page Motion to Strike [Dkt. 125], Mr. Napier's focus is primarily on rehashing arguments he advanced in prior briefs, barely mentioning any specific grounds justifying its filing.

Accordingly, the Court will strike those sections of the Plaintiff's Surreply [Dkt. 123] and the Plaintiff's Response to Defendant's Motion to Strike [Dkt. 125] that simply repeat and rehash prior arguments against summary judgment. The portions of the surreply

that address the new evidence first cited in Defendant's reply brief will not be stricken and will be considered in our forthcoming analysis.

For the foregoing reasons, the Defendant's Motion to Strike is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>.

## II.   Defendant's Motion for Summary Judgment

### a.   Gender Discrimination Claim

#### i.   *McDonnell Douglas* Framework

Although Mr. Napier requests that we examine his claims under the approach in *Ortiz v. Werner Enterprises Inc.*, which directs lower courts in Title VII discrimination cases to examine all the evidence as a whole, 834 F.3d 760, 765 (7th Cir. 2016), he has elected to structure his brief and supportive arguments under the *McDonnell Douglas* burden-shifting framework. We therefore will conduct our review of Mr. Napier's claim under both analytical frameworks. We begin by examining plaintiff's prima facie claim of discrimination under *McDonnell Douglas*, after which we shall turn to the *Ortiz* standard.

Under the *McDonnell Douglas* burden-shifting framework, to survive summary judgment, the plaintiff in a reverse discrimination case must establish the following four elements to constitute a prima facie case: (1) "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something "fishy" about the facts at hand'"; (2) he was performing his job up to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly-situated individuals who are not men. *Phelan v. City of Chicago*, 347 F.3d 679, 684–85 (7th Cir.

2003) (quoting *Mills v. Health Care Service Corp.*, 171 F.3d 450, 457 (7th Cir.1999)). "If the plaintiff satisfies his initial burden, the burden shifts to the defendant to present a legitimate, nondiscriminatory reason for the decision." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). "If the defendant does so, the burden returns to the plaintiff to show that the defendant's explanation was pretextual." *Id.* Applying the *McDonnell Douglas* analysis, we conclude that Mr. Napier has failed to overcome his burden to establish a prima facie case of discrimination.

## A. Background or "Fishy" circumstances

The first element of the plaintiff's prima facie case requires him to show that his employer was "the unusual employer who discriminates against majority employees." *Mills*, 171 F.3d at 457. Stated otherwise, the plaintiff must demonstrate that there are background or "fishy circumstances" which, even if "far from actual evidence of discrimination, are enough to overcome the background presumption that a [] man was not subject to employment discrimination." *Id.* (analyzing a reverse race discrimination case).

In his Response Brief, Mr. Napier lists forty-three allegedly "fishy" circumstances which constitute the requisite background circumstances in his case. Pl.'s Resp. at 13–17. A close examination of each of the items on that list, however, discloses that many of the facts cited there bear no relation to the issue of whether Orchard was an employer inclined to discriminate against men; as to those bearing no such relationship we will not discuss further.[1] The remainder of the list of 43 "fishy circumstances," following our careful

---

[1] For example, we are at a loss to understand how the alleged fact that "Napier and his wife have two teenage daughters" tends to show that Orchard had a reason or inclination to discriminate against men. Pl.'s Resp. at 13 ¶ 5.

review, do not, together or individually, constitute background circumstances of the sort that suggest, never mind clearly show, that Orchard held an employment bias against men, as we explicated more fully below. Mr. Napier has included in his argument four issues of allegedly disputed fact. *Id.* at 17–18. However, none of these issues of allegedly disputed fact pertains to any *material* fact; similarly, none, together or individually, reveals any basis for establishing that Orchard is the unusual employer who discriminated against men.

We undertake our analysis of Mr. Napier's specific "fishy background circumstances" in detail in the ensuing paragraphs, beginning with the claim that the timing of his termination—a mere nine months following Dr. Helvie arrival on duty as Orchard's HOS—was suggestive, along with the fact that her termination decision was based on "vague false reasons." Pl.'s Resp. at 14 ¶ 10. Initially, we note that this argument is weakened by putting the cart before the horse, because it requires a finding (or at least an assumption) that he was terminated for a discriminatory reason in order to find that Orchard is likely to discriminate. Although at summary judgment all reasonable inferences are to be drawn in a way most favorable to the non-moving party, the plaintiff still has the burden of establishing a prima facie case, and we simply cannot adopt the proffered conclusion without some evidence to support it.

There is no support for a finding that Mr. Napier's termination was itself a fishy circumstance. Even assuming that suspicious timing of a termination can sometimes serve as such a fishy background circumstances, Mr. Napier's firing, which occurred nine months

We are similarly unpersuaded that the information contained in paragraphs 1–4, 6–9. 11–12, 18–20, and 29 is in any way relevant to this determination.

after Dr. Helvie was hired, is far too remote in time to be deemed suspicious, since it was sufficient to allow her an opportunity to work and interact with Mr. Napier and provide and experiential base for making management decisions. Nothing before us supports the conclusion that this timing of her decision(s) serves as proof of Orchard's penchant for discriminating against men. Thus, we hold that the timing of his firing does not constitute a "fishy" background circumstance sufficient to establish the first element of Mr. Napier's prima facie case.

Secondly, Mr. Napier maintains that there exists an industry-wide pattern of discrimination against men within the fields of elementary and middle school education. Pl.'s Resp. at 14 ¶ 13. Mr. Napier adduces no evidentiary support for this theory, either in the caselaw or otherwise. No judicial opinion to our knowledge recognizes that, in certain industries, a reverse discrimination plaintiff is relieved of his burden of establishing a prima facie case based on the specific identity of his employer or vocational sector. In any event, plaintiff has put forward no evidence establishing such a pattern of discrimination in the field of elementary and high school level education, citing instead only his own deposition testimony as support for this claim. Because there is no evidentiary support for his claim, showing either that industry-wide discrimination against men within the field of education exists or that, if it did, it existed at Orchard and constituted a fishy background circumstance, we reject Plaintiff's theory/contention that on this basis the Court could conclude that Orchard specifically discriminates against men.

Next, Mr. Napier cites an array of comments purportedly made by Orchard administrators and board members evincing discriminatory tendencies against men as

background circumstances that counter the assumption that employers do not discriminate against men. Pl.'s Resp. at 15 ¶¶ 22–25. These comments include the following: the alleged debate that was generated by Mr. Napier's initial hiring over whether, as a man, he should have been hired as MS Director; comments from certain board members to Mr. Rosenbluth regarding diversity when Mr. Eble was promoted to Assistant HOS; statements by Mr. Eble and others expressing the view that there were "too many males" in Orchard's administration; the email communication between/among board members discussing the desire on the part of some Orchard parents to find a female HOS; and Orchard board members Butler, Appel, and O'Brien's discussion of the interview with an HOS candidate. *Id.* While evidence that such statements from board members, parents, or other administrators influenced or pressured Dr. Helvie into favoring the hiring of women over men could constitute a "fishy circumstance," here that evidence falls short of the intended mark. It turns out that each of these statements was made *prior* to Dr. Helvie's arrival on duty at Orchard. No evidence has been adduced that shows she was ever made aware of or told about these statements or the underlying sentiments. Without a time or causal connection between Dr. Helvie, who made the decision on Mr. Napier's nonrenewal of his employment contract, and these statements or views, they simply do not qualify as fishy, background circumstances.

Mr. Napier also argues that Dr. Helvie's own educational background constitutes a "fishy circumstance" indicating that Orchard, under her leadership, is inclined to discriminate against men, in terms of the "vibe" that she created at the school, of the placement of women in administrative positions they had not previously held, and of

statements made and views held by various others at the school. Pl.'s Resp. at 15 ¶¶ 26–28,

19. Orchard argues that Mr. Napier's argument is a nonstarter, because, taken to its extreme,

it suggests that any employer/decisionmaker, whose personal academic studies focused on

a particular subgroup of society, would likely discriminate in favor of that group in the

course of performing his or her responsibilities. Def.'s Br. at 18. More critical, as Orchard

argues, is the fact that Mr. Napier has failed to cite any evidence to show that Dr. Helvie's

educational background ever did, in fact, influence her employment decisions. Def.'s Reply

Br. at 11.

We decline to find that Dr. Helvie's personal educational attainments in the field of

women's studies constitutes a fishy circumstance. To begin with, Dr. Helvie's educational

pursuits were undertaken nearly two decades prior to the events at issue here. In addition,

assuming they represent a biased view in favor of women, which we refuse to assent to,

they have not been shown to have any connection to any statements made by other Orchard

administrators or board members or any administrative hiring decisions made by Dr.

Helvie. Based on the evidence, no "vibe" has been shown to have existed at Orchard

emanating from Dr. Helvie's education or area of academic interest/expertise. If any

reasonable inference could be reliably drawn from her educational background in gender

studies, it would more likely be an aversion to any form of gender discrimination. *See e.g.,*

Wellesley College, Women's and Gender Studies, https://www.wellesley.edu/wgst (last

visited February 10, 2023) (promoting Wellesley College's Women's and Gender Studies

Department's "focus[] on gendered stereotypes and how to look past them."). We thus hold

that Dr. Helvie's undergraduate and graduate studies do not constitute a "fishy background circumstance" that could show that Orchard discriminates in hiring against men.

Continuing with Mr. Napier's claims, he maintains that the background circumstances surrounding his firing are themselves fishy, because, rather than investigate the various complaints about his termination, as raised by parents and faculty members and as consistent with the allegations he included in his EEOC charge, Orchard's board both ignored those complaints and voted to award Dr. Helvie an increase in salary. Pl.'s Resp. at 16 ¶¶ 31–35. We perceive nothing fishy about these circumstances. Each of these complaints arose following the disclosure of the school's decision to terminate Mr. Napier, not prior to it. Reactions of some of the parents and faculty are not necessarily relevant indicators of the reasons behind the decision usually due to the fact that the people making them were not engaged in the decision or even informed of the reasons for the firing. Thus, such reactions cannot be imputed to the Orchard administration. Further, the Board's failure to directly engage with Mr. Napier following the termination decision and its decision to give Dr. Helvie a raise do not provide evidence that her decisions against Mr. Napier were discriminatory; indeed, they simply reveal the board's support for Dr. Helvie's decisions.

Mr. Napier also contends that shortcomings in Orchard's personnel policies and Orchard's failure to follow its policies together raise a likelihood that Orchard discriminates against men. He notes that Orchard's policies did not include a prohibition against sex discrimination, and that the multiple references that were included in Orchard employment policies espousing an "Open Door Policy" "requiring an effort to resolve issues before termination" as well as a policy allowing complaints to be lodged with the board were not

followed by Orchard. As a result, he was effectively prohibited from being able to appeal his termination to the Board. Pl.'s Resp. at 16 ¶¶ 38–40.

Neither of these issues in our view raises "fishy circumstances." First, Orchard did have a policy prohibiting employment discrimination based on "gender," Pl.'s Ex. P 25, which mirrored Mr. Napier's complaint for "gender discrimination." Am. Compl. at 7. Secondly, Mr. Napier's argument that he was prevented from lodging an appeal because there was no one for him to appeal his discharge to, because of unenforced personnel policies, does not, by itself, provide proof that Orchard pursued and enforced discriminatory policies. Assuming Mr. Napier or another employee might desire to challenge a supervisor's employment decisions but was unable to do so, it is more likely that the absence of such a process constituted flawed employment practices, rather than a discriminatory practice targeting males. Even assuming deficient personnel policies were in place at Orchard and that they were not always followed, suggesting ad hoc decision-making, standing alone this does not constitute a "fishy background circumstance" that suggests Orchard discriminates against male employees.

Mr. Napier cites various other background circumstances, i.e., that Ms. Brothers and Dr. Helvie, as women similarly situated in the workplace, were treated better than he was. Pl.'s Resp. at 16 ¶ 41. In advancing this argument, he conflates two elements by contending that similarly-situated women who were treated more favorably constitutes a fishy background circumstance. We reject this argument for reasons as more fully explained below.

Mr. Napier puts forward as an additional fishy background circumstance the fact that over a two-year period, from 2020 to 2021, the entire leadership team at Orchard, with the exception of Mr. Eble, was comprised only of women. Pl.'s Resp. at 16 ¶ 41. While arguably replacing an all-male staff with an all-female staff could serve as a fishy background circumstance sufficient to overcome the presumption that an employer would not discriminate against the majority, we see no evidence to support that theory here.

In *Mills*, the Seventh Circuit determined that this element had been satisfied in a reverse sex discrimination case where, over a seven-year period, "nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions." 171 F.3d at 457. However important distinctions exist between the facts of this case at bar and those in *Mills*. Although an all-male administrative staff (from the time of Mr. Napier's hiring in 2016 to his termination in 2019) was replaced by an almost entirely female staff (Mr. Eble being the exception), within a very short period of time, two men were hired onto the Orchard leadership team. Pl.'s Ex. 35; Def's Reply at 9. Over a six-year period, the Orchard administration progressed from all-male, to nearly all-female, to a more balanced array. This overall pattern is clearly unlike the hiring pattern in *Mills*. This pattern of hiring falls short of being a fishy background circumstance that shows that Orchard is the unusual employer who favors women over men employees. Arguably, it more clearly demonstrates an ongoing pattern and practice of hiring the best qualified people, without regard to their gender[2].

---

[2] In addition, at the time of Mr. Napier's firing, it was men, not women, who dominated the supervisory positions at Orchard—another distinction from *Mills*.

Mr. Napier has pointed to the hiring of an allegedly unqualified woman as the school's HR Coordinator as evidence of fishy background circumstances. Pl.'s Resp. at 16 ¶ 42. We reject this description of Crystal Lax's hiring as HR Coordinator as "fishy." Mr. Napier attempts to buttress his description and characterization by referencing a print-out of a LinkedIn page tied to the name Crystal Lax, without producing any evidence that establishes that the LinkedIn page actually pertains to the same individual employed by Orchard. Orchard introduced an affidavit from its HR Coordinator denying any connection between its employee and the LinkedIn profile. Pl.'s Ex. 39; Lax Aff. Even if the Court refused to credit the affidavit in this summary judgment context, the print-out of the profile itself fails to establish that Ms. Lax is or was unqualified to serve as the HR Coordinator. Further, there is no evidence validating the reliability of the LinkedIn page as current or accurate in reference to Ms. Lax's qualifications. Thus, no fishy background circumstance arises from Orchard's decision to hire Ms. Lax.

Finally, Mr. Napier claims that reductions in responsibilities for positions occupied by men and corresponding increases in responsibilities for positions occupied by women is a fishy circumstance that suggests Orchard discriminates against men. As support for this contention, Mr. Napier argues that, prior to Dr. Helvie's hiring, the HOS (Mr. Rosenbluth), Assistant HOS (Mr. Eble), and the Division Directors (Mr. Napier and Mr. Schwartz) were all members of the senior administrative team. Following Dr. Helvie's arrival on duty, the division directors were replaced by the Director of Institutional Advancement (Jennifer Bostrom) and the Chief Financial Officer (Courtney Williams). The four positions that previously constituted the senior administrative team were

thereafter organized into the Academic Leadership Team. Recognizing our obligation at this juncture to view the facts in a light most favorable to the non-moving party, it is not lost on us that in doing so the Academic Leadership Team was hardly relegated to insignificance, since it, too, met with Dr. Helvie every two weeks, and Mr. Napier participated in those sessions. Mr. Napier has conceded that neither his day-to-day duties nor his pay were reduced following his removal as a member of the Senior Administrative Team, indeed, the only change in his job description was that, according to his personal assessments, he was no longer "in the know" about certain school decisions.

Plaintiff has failed to adduce evidence giving rise to any issues of material fact with regard to any reductions in job responsibilities for positions occupied by males at Orchard. Mr. Napier was retained on the Academic Leadership Team, and his responsibilities mirrored in major respects those he performed under Mr. Rosenbluth, when the senior team included the HOS, Assistant HOS, MS Director, and EC/ES Director. Despite the name change for this group, Mr. Napier had virtually the same access to the HOS as before Dr. Helvie arrived at Orchard. His vague (some might describe them as whiney) complaints that he was no longer "in the know" is unavailing in the face of uncontroverted evidence showing that he continued to play a meaningful role in the meetings of the management group that was comprised of the same participants as before Dr. Helvie took over.

In any event, no evidence has been adduced to show that Dr. Helvie was even aware that this organizational structure had, in fact, been changed. Dr. Helvie testified that she believed that she had inherited this structure established by her predecessor, Mr. Rosenbluth. To prove that Orchard discriminates against men, Mr. Napier is not required

to show that Dr. Helvie demoted him (as well as Mr. Schwartz) solely because they were men, but he must at least show that she was aware of the change in their roles at the school. Lacking that, the claim that she re-organized or shuffled the leadership teams, assuming she did so herself, fails to demonstrate that Dr. Helvie was inclined to discriminate against men.

For all the foregoing reasons, the Court holds that Mr. Napier's efforts to demonstrate that the requisite background or "fishy" circumstances in this case come up well short of the mark.

### B.      Meeting Employer's Legitimate Expectations

Mr. Napier's efforts to demonstrate the second element of his *prima facie* case, to wit, that he was meeting his employer's legitimate job expectations at the time of his termination, also fall short. He contends, based on the evidence, that he was meeting all of Orchard's legitimate expectations, citing his positive performance evaluations by prior supervisors as well as supportive messages from parents and teachers following his termination. Pl.'s Ex. 23; Pl.'s Ex. 24; Pl.'s Ex. 25. Orchard, on the other hand, cites evidence showing that Mr. Napier, in disobeying Dr. Helvie's instructions twice within a matter of a few months, eroded her trust. Despite what likely was his prior record of exemplary performance, he failed to meet his employer's reasonable expectations that he maintain job related confidences and follow the instructions of his supervisors.

Based on our careful review of the uncontroverted evidence, we hold that Mr. Napier has failed to create a genuine issue of material fact regarding whether he was meeting Orchard's employment expectations. In *Haley v. Urb. Outfitters*, 2023 WL

1775670 (7th Cir. Feb. 6, 2023), the Seventh Circuit analyzed whether a reverse sex discrimination plaintiff had met his burden with regard to this element, noting that the plaintiff had shown that during the years prior to his termination, he had received positive feedback from his employer in a performance review. *Id.* at 2. There, the court relied on "evidence in the record support[ing] Urban Outfitters' assertions that Haley's managers had honestly held beliefs that Haley did not perform his duties satisfactorily." *Id.* at 3. The record included complaints about Haley's work even where Haley disputed the substance of the complaints. *Id.* Thus, the Court of Appeals ruled that "[i]t is not the court's task, … to evaluate whether the employer's purported reason for the adverse employment action was correct, justified, or even if it was fair. We look only to see if the employer honestly believed those reasons." *Id.*

In similar fashion here, despite Mr. Napier's disagreement with the underlying allegations regarding his job performance, he has failed to adduce evidence to show that Dr. Helvie did not honestly believe her stated reasons for discharging Mr. Napier, to wit, his breach of her trust and confidences. Mr. Napier characterizes Dr. Helvie's proffered non-discriminatory reason for his termination as "a vague statement that Napier was told not to talk to his coordinator about her job duties, which is false and makes no sense." Pl.'s Resp. at 20. But we do not find this reason to be vague or nonsensical. It references two specific incidences of his failing to maintain the confidences entrusted to him by his employer. To establish that her reason was "false," Mr. Napier cites only his own deposition and affidavit. *Id.* We do not decide in the current context whether her reasoning was flawed or unconvincing to Mr. Napier, only whether Dr. Helvie's views were honestly

held, and there is no evidence in this record before us to that effect that overcomes Dr. Helvie's veracity.

Mr. Napier also maintains that there is a genuine dispute between the parties as to whether he violated Dr. Helvie's instructions regarding the public posting of the MS teaching position. However, he concedes that he was instructed not to post the position until Dr. Helvie had spoken to the head of the other school, and that, despite his not having heard back from Dr. Helvie, he posted the position anyway[3]. Whatever reason he may have had for believing his posting would not cause serious concerns, it is clear from the evidence—and, indeed, he concedes—that he violated Dr. Helvie's instructions. His equivocations by which he argues that he understood the instructions only to prohibit him from hiring the other teacher, rather than from posting the job vacancy, lack persuasive force because he further concedes that Dr. Helvie, not himself, possessed the authority to hire new employees. No evidence supports the conclusion that Dr. Helvie instructed him not to do something he lacked the authority to do in any event. Having failed to show that Dr. Helvie did not honestly believe her stated reason for discharging him, Mr. Napier has not satisfied this element of his prima facie case.

## C.    Adverse Employment Action

The third element of plaintiff's prima facie case requires him to show that he suffered an adverse employment action. We can quickly dispense with a discussion of this issue since there is no dispute between the parties that the decision not to renew Mr.

---

[3] Mr. Napier attempts to claim that he did not actually post the position, because it was HR who did so. This argument fails because he concedes that he was the one who instructed HR to do so.

Napier's employment contract constituted an adverse employment action. He has thus satisfied this element.

### D.      Similarly Situated Women

Finally, Mr. Napier must show as part of his prima facie case that women similarly situated to him were treated more favorably than he was with regard to his termination. Mr. Napier has identified five (5) women, whom he claims, as Orchard employees or administrators, were given better treatment than he was accorded: 1) Jennifer Bostrom, 2) Courtney Williams, 3) Dr. Helvie, 4) Angela Brothers, and 5) Gretchen Bricker. Mr. Napier maintains that Ms. Bostrom and Ms. Williams were treated more favorably when they were promoted to membership on the Senior Administrative Team at the same time he was "demoted" from the group. Pl.'s Resp. at 16 ¶ 41. He further contends that Dr. Helvie, herself, was able to retain her HOS position without incurring any Board investigation or Board-imposed discipline after she lied about and discriminated against Mr. Napier. Pl.'s Resp. at 16 ¶ 41. He further argues that Ms. Brothers was promoted to succeed him in his position without having even applied for the job and despite being significantly less qualified than he was. Pl.'s Resp. at 16 ¶ 41, 24. Finally, Mr. Napier contends that Ms. Bricker was treated worse than he, citing her own affidavit to that effect. Bricker Aff. ¶ 67.

Our review brings us to the conclusion that the cited instances and related evidence do not support a finding that any one of these women was both similarly situated to Mr. Napier and received more favorable treatment. "A similarly situated employee is one who is directly comparable to the plaintiff in all material respects." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (citation and quotation marks omitted).

In assessing whether employees are similarly situated, "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Without evidence that Bostrom's and Williams's placement on the Senior Administrative Team conferred greater authority on them within the workplace, or a change in responsibilities, or higher pay, there is no basis on which to conclude that they were treated more favorably than Mr. Napier. His continued participation in leadership by serving as a member of the Academic Leadership Team did not disadvantage him or diminish his standing. Moreover, Ms. Bostrom and Ms. Williams both had responsibilities separate and distinct from Mr. Napier's academic responsibilities, which differences make them poor comparators in this context. Neither engaged in conduct or incurred any discipline comparable to that experienced by Mr. Napier that resulted in a loss of trust in them by Dr. Helvie. The fact that Dr. Helvie placed Ms. Bostrom and Ms. Williams on the Senior Administrative Team does not raise an inference of discrimination against Mr. Napier.

Dr. Helvie, herself, is also not well situated as a comparator to Mr. Napier. First, Dr. Helvie was Mr. Napier's supervisor, which is a highly probative distinction between them. *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir.) ("[T]o be similarly situated, a manager must have been treated more favorably by the same decisionmaker that

fired the [plaintiff]."). More problematic is Mr. Napier's assertion that he was treated less favorably than Dr. Helvie because she was neither investigated nor disciplined after she made the discriminatory decision to terminate him. This argument invites the assumption that Dr. Helvie's discrimination against him provides a basis for his prima facie case of discrimination. This is a clear distortion of the analytical template applicable here. Mr. Napier claims that his supervisor, Dr. Helvie, treated herself more favorably than she treated him, which is silly since, clearly, Dr. Helvie did not (and would not) fire herself for any discrimination she might have committed against him. Dr. Helvie is not and cannot be regarded as a similarly situated female Orchard employee who received better treatment compared to Plaintiff.

Similarly, Ms. Brothers is a poor comparator to Mr. Napier. Unlike Mr. Napier, there is no evidence that she failed to follow explicit directions from her superior or that she revealed job related confidences in a manner that might cause her supervisor to deem her untrustworthy. As such, she is not similarly situated to Mr. Napier and her selection to replace Mr. Napier as the MS Director, following the failure to renew his contract, is insufficient to raise an inference of discrimination. Mr. Napier also proffers that a comparison of the respective qualifications of himself and Ms. Brothers shows that she was not qualified to occupy the position he had previously held. While Mr. Napier clearly possessed significantly more school-related administrative experience than did Ms. Brothers, she herself had acquired two decades of experience at Orchard as both a teacher and a department coordinator. Def.'s Ex H. Mr. Napier's contention that based on his opinion Ms. Brothers was temperamentally unfit for the job is irrelevant. Pl. Resp. at 27.

As we have noted previously, the Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Ne. Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). A reasonable employer could conclude that Ms. Brothers, who had two decades of teaching and other experience at Orchard, was a well-qualified candidate—indeed, the better choice—for MS Director over Mr. Napier, especially since the reason for his termination did not reflect a lack of experience, rather the loss of trust of Orchard's HOS.[4] We decline to probe further into the details of their respective qualifications in the fashion of a "super-personnel department."

Finally, it is unclear how Ms. Bricker is a similarly-situated woman who received better treatment compared to Mr. Napier. By our assessment, she also is a poor comparator, given that she had a different supervisor than Mr. Napier (reporting to Mr. Schwartz) and had not engaged in misconduct similar to that by Mr. Napier. In addition, there simply is no evidence adduced here that she was treated more favorably than Mr. Napier. Ms. Bricker, like Ms. Brothers, held a position that was in fact placed under review for possible elimination. Ms. Bricker ultimately chose to leave her employment with Orchard, declining to accept a demotion to classroom teaching. On these facts, it could easily be said that Ms. Bricker received worse treatment than Mr. Napier, since she was discharged without having engaged in any misconduct. Ultimately, neither Ms. Bricker nor any of the other women employees cited by Mr. Napier was similarly situated to him and/or treated more favorably than he. The evidence thus fails to satisfy this fourth element.

---

[4] The Court notes that, despite the Plaintiff's contention that Ms. Brothers was not qualified for the position due to her lack of experience, Mr. Napier himself had only classroom teaching experience prior to being hired into his first school administration position. Pl.'s Ex. 33 at 6.

Having failed to establish three of the four elements of his prima facie case for sex discrimination, we need not and choose not to conduct the *McDonnell Douglas* analysis. "If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002). Plaintiff's proof would not succeed under a *McDonnell Douglas* analysis either, opening the way to summary judgment in Orchard's favor.

### ii. *Ortiz* Standard

Although Mr. Napier has failed to put forward a prima facie case in support of his sex discrimination against Orchard, we shall engage in a discussion of the evidence pursuant to the *Ortiz* standard in an effort to determine whether, in viewing the evidence as a whole, a reasonable juror could conclude that Napier's sex was the cause of his discharge from employment.

In *Ortiz v. Werner Enterprises Inc.*, the Seventh Circuit clarified that in conducting Title VII analysis, district courts should not divide the submitted evidence into categories of "direct" and "indirect" evidence for separate evaluation. 834 F.3d at 765. *Ortiz* directs that "all evidence belongs in a single pile and must be evaluated as a whole" to answer the ultimate question of "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765–66. Importantly, the Seventh Circuit stipulated that this approach does "not concern *McDonnell Douglas* or any other

burden-shifting framework" and was, in fact, "consistent with *McDonnell Douglas* and its successors." *Id.* at 766.

Viewing the evidence then as a whole, we conclude that no reasonable factfinder could find that Mr. Napier's gender was the cause of his discharge from employment by Orchard. For all the reasons detailed above, this evidence, viewed as a whole, fails to raise any genuine issues of material fact respecting whether Mr. Napier's sex was the basis for or cause of his termination. The evidence of discrimination relied upon by Mr. Napier, primarily statements made by others, included none made by Dr. Helvie, indeed, the cited remarks actually occurred prior to her arrival on duty at Orchard. In *Crabtree v. National Steel Corp.*, the Seventh Circuit addressed whether allegedly discriminatory statements made in the workplace by other employees constitute dispositive evidence of discrimination. 261 F.3d 715, 723 (7th Cir. 2001). In *Crabtree*, an age discrimination claim, a supervisor had stated that certain employees "were too old to go with him through the millennium." *Id.* The supervisor who allegedly made these comments was not involved in making any discriminatory decision(s). The court thus excluded the evidence, holding that "[s]tray remarks made by non-decisionmakers are not evidence that the decision had a discriminatory motive." *Id.* That was true of much of the evidence under review here: the allegedly discriminatory statements were made by non-decisionmakers with regard to Mr. Napier's nonrenewal of his contract. Dr. Helvie alone, according to the evidence, with the concurrence of the Board, made the decision to discharge Mr. Napier.

Mr. Napier's reliance on the timing of his termination as an issue of material fact incorporates four underlying facts: 1) He was fired only weeks after a school meeting on

diversity initiatives at which Dr. Helvie was in attendance; 2) it occurred close to the time

of Dr. Helvie's conversation with Ms. Brothers concerning her position being at risk of

discontinuation; 3) Dr. Helvie's decision was made "abruptly," without prior investigation

or separate conversations with Mr. Eble or Mr. Napier, himself; and 4) that during the time

period between March 6, 2019 and March 8, 2019, Dr. Helvie's response to these

developing staffing issues caused stress to Ms. Brothers, despite ultimately treating her

more favorably than he was treated; she should have talked to him in the process, says Mr.

Napier, in order to reach a better solution.

These reasons, jointly and severally, again fall well short of establishing suspicious

timing with regard to Mr. Napier's termination. Viewed as a whole, the evidence as to the

timing of his non-renewal is perhaps more convincingly considered in the context of his

own undisputed breaches of trust and confidences in violation of Dr. Helvie's specific

instructions. Mr. Napier relies on the coincidence of timing, but other factors pertain as

well. In sum, no evidence has been presented by Mr. Napier showing any connection

between Dr. Helvie's termination decision and the meeting she attended regarding

Orchard's diversity initiatives. In addition, that Dr. Helvie did not conduct any

investigation, including a conversation with Mr. Napier, before deciding to terminate him

also does not create suspicions, given that Dr. Helvie had personally participated in the

events leading up to her decision regarding his dismissal, making her personally aware of

the events necessitating it. Specifically, she herself had instructed Mr. Napier to keep his

assigned position review confidential but Mr. Napier failed to do so. As a result, Dr. Helvie

was placed in a position of having to manage the consequences of Ms. Brothers's learning

prematurely that her position was under review. It's likely that no investigation would have been necessary but for Mr. Napier's unauthorized disclosures. This argument by Plaintff loses steam in the face of his admission that he had, by his breach of trust, given Dr. Helvie a non-discriminatory reason for his termination. Finally, Dr. Helvie's having informed Ms. Brothers that her position was likely to be eliminated as well, despite her subsequent retention as acting MS Director, does not support an inference of suspicious timing or discrimination. The timeline reflects the consequences of Mr. Napier's failure to maintain Dr. Helvie's confidence in him and supports Orchard's proffered non-discriminatory reason for his termination.

In reviewing Mr. Napier's cited instances of various women employees at Orchard whom he claims were allegedly treated more favorably than he, we have previously detailed the reasons that in our view none of them was in fact similarly situated to Mr. Napier and thus are not proper comparators. The evidence also fails to establish that the women he has identified were in fact treated more favorably.

Mr. Napier's contention that Dr. Helvie's "unusual" actions reveal the discriminatory nature of her termination decision as to him, referencing the alleged surprise expressed by various Orchard employees as well as members of the community in response to his announced discharge, lacks both evidentiary and persuasive force. Mr. Napier opines that sudden terminations of employment such as occurred with him were unusual over the course of Orchard's history, giving rise to some criticisms by others of Dr. Helvie's decision and management style. Pl.'s Resp. at 30; Napier Aff. at 5 ¶ 259. None of these assertions, however, supports an inference of gender-based discrimination. A surprised reaction on the

part of individuals who were not involved in or knowledgeable of the events leading up to the discharge decision does not translate into reasons showing that the termination decision were discriminatory, even if the surprise is interpreted as approval of Mr. Napier's tenure as MS Director. Whatever the historic practices were at Orchard prior to Dr. Helvie's arrival, they evince nothing in terms of proof that *her* motives in making the decision not to renew of Mr. Napier's contract nor do they provide evidence that it was a discriminatory determination based on his sex.

Mr. Napier's final contention considered here under the *Ortiz* rubric is that a genuine issue of material fact forecloses Orchard's entitlement to summary judgment, given that he has challenged the reason given for his termination as unworthy of belief, deeming it, in fact, pretextual. Dr. Helvie's stated reasons for terminating Mr. Napier were his breach of confidences and his violation of her trust based on his pre-mature, employment-related disclosures to Ms. Brothers. Mr. Napier does not dispute that he informed Ms. Brothers about his job description re-write task, prompting Ms. Brothers to speak with Dr. Helvie prior to its completion and a course of action decided on by her. Mr. Napier argues that his act of divulging information that was to remain confidential was not what actually caused Ms. Brothers (and Ms. Bricker, by extension) distress; rather, it was the fact of and the manner in which Dr. Helvie conducted the meeting with Ms. Brothers that caused her distress. When Dr. Helvie came to realize her mistake in talking to Ms. Brothers, according to Mr. Napier, she decided to place the blame on Mr. Napier. According to Mr. Napier, he was thus the scapegoat, fired to cover up for Dr. Helvie's mistakes. Even if true, this

alternative explanation for his termination has not been shown to have been in any way tied to Mr. Napier's gender.

Mr. Napier cites the email announcing his discharge to Orchard staff as evidence demonstrating that the reason for his termination was pretextual, arguing that the message and its timing were humiliating to him. We see nothing about the text of the email to be either derogatory or disparaging of him. It expressed appreciation for Mr. Napier's service and wished him good luck. It contained no reference to any misconduct. To the extent it lacked detail as to the reasons for his termination, that in fact likely, spared him embarrassment. Mr. Napier was being permitted to remain in his position until the end of the school year. Further, after the announcement was made, Dr. Helvie emphasized that the reasons for Mr. Napier's not retuning to Orchard had nothing to do with any untoward or illegal behavior on his part. Whether the timing of the email was insensitive we offer no opinion; but no matter what, it clearly fails to equate to or reveal or provide any discriminatory motive or conduct. Mr. Napier thus has failed to show that the email is evidence of pretext. Accordingly, no genuine issue of material fact exists regarding whether Mr. Napier's sex was the reason for and the cause of his termination of employment.

For these reasons, Orchard is entitled to summary judgment on Mr. Napier's gender discrimination claim.

### b.  Retaliation Claim

Mr. Napier's final claim—that he was retaliated against for having engaged in the protected activity of filing suit to contest his discriminatory dismissal by denying his

application seven months later for reemployment—similarly fails to raise any genuine issues of material fact. While there is no dispute that the filing of this lawsuit constitutes protected activity under Title VII and that the rejection of his application to be rehired for the permanent MS Director position following his non-renewal was an adverse employment action, Mr. Napier has failed to raise a genuine issue over whether there existed a causal connection between his protected activity and this adverse employment action.

Mr. Napier maintains that when he applied for rehiring he was clearly qualified for the position, and that Mr. Eble's reason for rejecting his application, i.e. poor past performance, was untrue, because he had in fact performed well previously as MS Director, that Dr. Helvie's reason for firing him was false and discriminatory, and that Mr. Eble was further, in fact, unaware of the specific reason for Mr. Napier's prior termination. Mr. Napier argues that "poor past performance" is a vague reason, making it legally insufficient to constitute a legitimate, nondiscriminatory reason for Title VII purposes. Also, Mr. Napier repeats his contention that there is "extensive evidence" of Orchard's treating women employees more favorably. Pl.'s Resp. at 35.

We do not dispute that Mr. Napier undoubtedly possessed many of the requisite qualifications for the MS Director position, since he previously had occupied this post, but this fact by itself does not demonstrate that Orchard's reason for failing to rehire him was retaliatory and also discriminatory. There is a total dearth of evidence supporting Mr. Napier's theory that the rejection of his application was in retaliation for his having filed a lawsuit against Orchard, and we find no causal connection within the evidence cited by Mr.

Napier. Mr. Eble was aware, of course, that Mr. Napier had previously held this very position for which he was applying, and he knew that Mr. Napier had been let go because he did not perform up to the level expected by Dr. Helvie. Although Mr. Eble apparently had not been informed of the specifics of Mr. Napier's termination, Mr. Eble's knowledge that he had previously broken Dr. Helvie's trust was sufficient to justify his assessment that Mr. Napier's application should be rejected based on his poor past performance. The specific reason relied upon by Mr. Eble for his decision not to rehire Mr. Napier, if true, and we have seen no evidence to doubt its truth beyond Mr. Napier's argument, would be sufficient to justify his rejection for nondiscriminatory, nonretaliatory reasons, even if he was not aware of all the circumstances surrounding Mr. Napier's discharge. Since Mr. Napier has failed to proffer evidence that calls into question the veracity of Mr. Eble's and Orchard's nonretaliatory reason for declining to rehire him, we find that no genuine issue of material fact exists that would support a finding that he was illegally retaliated against.

We have previously discussed and rejected, Mr. Napier's claim that similarly-situated women employees were treated more favorably than he was. We extend this analysis to include these claims with respect to Orchard's rehiring decisions or acts of retaliation. Although Mr. Napier claims he has extensive evidence of such instances, the only woman cited by either side as being similarly situated in the rehiring context comparable to Mr. Napier also had past performance issues and was rejected in the same stage of the hiring process. Thus, she was not treated more favorably than Mr. Napier.

For these reasons, once again, no genuine issues of material fact exist that preclude summary judgment in Orchard's favor on Mr. Napier's retaliation claim.

**Conclusion**

For the reasons detailed above, Defendant's Motion to Strike [Dkt. 124] is <u>GRANTED</u>

<u>IN PART</u> and <u>DENIED IN PART</u>, and Defendant's Motion for Summary Judgment [Dkt.

103] is <u>GRANTED</u>. Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date:      3/7/2023

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jessica L. Billingsley
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
jbillingsley@cchalaw.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES NAPIER,                                   )
                                                )
                        Plaintiff,              )
                                                )
            v.                                  )        No. 1:19-cv-03556-SEB-MKK
                                                )
ORCHARD SCHOOL FOUNDATION,                      )
                                                )
                        Defendant.              )

**FINAL JUDGMENT PURSUANT TO FED. R. CIV. PRO. 58**

The Court, having this day entered its summary judgment ruling, now enters FINAL

JUDGMENT.

Judgment is entered in favor of Defendant Orchard School Foundation and against

Plaintiff James Napier. The Plaintiff shall take nothing by his Complaint, and this action is

terminated.

Dated:     3/7/2023

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jessica L. Billingsley
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
jbillingsley@cchalaw.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

**Subject:**              Following up on information

From: **Sherri Helvie** <shelvie@orchard.org>
Date: Thu, Feb 14, 2019 at 9:04 AM
Subject: Following up on information
To: Jamie Napier <jnapier@orchard.org>
Cc: Nick Eble <neble@orchard.org>

Hi Jamie.  Just a quick note to follow up about three pieces of information I need soon.

1.  A job description for a modified MS Coordinator role for next year that reflects your priorities for the role--I need this in writing no later than Tuesday.
2.  The current job description for the Coordinator of Student Life and Leadership--please send this by the end-of-day on Friday.
3.  The information we offered to the Appels regarding the math curriculum in relation to AIMSweb benchmarks.  You'll recall that I wrote this to Andrew and Susan:

> I have also asked Jamie (along with Linda and Allie) to outline Orchard's math curriculum map against the AIMSweb benchmarks in order to track what we can anticipate over the last few months of school in regards to the learning targets for Caroline.

Can you let me know when that will be completed?  Once it is, let's review it together before you send it to the Appels.

Thanks Jamie, and I hope this final day of Winterm goes well.

Sherri
--



**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School  |  orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

   

## Coordinator of Student Life and Leadership

| | MS Value | Orchard Value | Leadership Value | FT Teacher Possible? |
|---|---|---|---|---|
| **Current Roles and Duties as CSL&L (part time)** | | | | |
| To coordinate Community service for all 24 MS advisories once per trimester | 2 | 3 | 1 | 2 |
|     Secure appropriate destinations and laisse between visit site and Orchard | | | | |
|     Secure transportation to and from service destinations | | | | |
|     Assist in scheduling, both dates and schedule for the day in relation to event | | | | |
| To coordinate MS participation in special days/events | | | | |
|     Field day - facilitate the numerous activities for MS | 4 | 2 | 1 | 2 |
|     Picnics - secure planning and vendors to allow MS picnic | 4 | 1 | 2 | 2 |
|     Dance - Facilitate planning, hosting and clean-up of MS Dance | 4 | 2 | 1 | 3 |
|     Overnights - assist with planning and execution of the 8th grade overnight | 3 | 1 | 2 | 0 |
| Facilitate MS student government and oversee the operations of said government | 2 | 4 | 1 | 3 |
| Coordinate MS speaker series for town meetings | 1 | 1 | 1 | 0 |
| Coordinate Orchard Parent U | 2 | 4 | 1 | 2 |
| Facilitate Orchard connecting to outside contests and serve as liaison to the contests | 2 | 3 | 3 | 1 |
|     example: Minute to win it | | | | |
| Ongoing communication via Silvis Magister about student life and leadership | 2 | 2 | 3 | 2 |
| Facilitate student ambassadors @ open houses including trainings | 2 | 4 | 2 | 3 |
| Coordinate students teaching assistants | 2 | 2 | 2 | 1 |
| | | | | |
| **Additional - Not part of CSL&L (brings to full time)** | | | | |
| Coordinate the database for MS student support services | 3 | 2 | 4 | 1 |
| Coordinate the administration of the ERB standardized tests | 0 | 4* | 0 | 0 |
|     Assist in adjusting the MS schedule to accommodate for testing both standard time and extended time. | | | | |
| Provide in-house counseling for students | 4 | 2 | 4 | 0 |
|     Liaison between student therapists and school as needed | | | | |
|     Conduct peer mediation meetings and laisse between families and therapists as needed | 4 | 3 | 4 | 1 |
| Sixth grade team leader | 4 | 3 | 4 | --X-- |
| Sixth grade advisor | 4 | 2 | 4 | --X-- |
| Teach two-trimester elective classes: Creative writing | 2 | 1 | 3 | 0 |
| Teach Winterm | 3 | 2 | 3 | --X-- |
| Directly assist the MS director in | | | | |
|     Ongoing strategies around recruitment and retention | 2 | 4 | 4 | 1 |
|     Liaison between the admissions office and the MS | 2 | 4 | 4 | 2 |
|       Brochure – MS focus | 1 | 4 | 1 | 2 |
|       Website – MS focus | 1 | 4 | 1 | 2 |
|       Tours – MS focus | 2 | 4 | 2 | 1 |
|       Shadow Visits – MS focus | 3 | 4 | 2 | 1 |
|     Coordinate Merit Scholarships | 2 | 4 | 3 | 1 |
| Assist with light disciplinary scenarios, especially concerning social and teen conflict | 3 | 2 | 4 | 0 |
|     Often tasked to play "good cop" vs MS Director "bad cop". | | | | |

0 implies no value          0 not possible
|
4 implies max value        4 easy fit

4* required for Sagamore SGO     --X-- assumed

Exhibit_48-00001

**Subject:**                    ot imm diat l  urg nt  ut  a  a ituation

From: **Sherri Helvie** <shelvie@orchard.org>
Date: Fri, Feb 22, 2019 at  :12  M
Subject: Not immediately urgent, but I have a situation
To: Colleen O' rien <ctob   @yahoo.com>, Alicia LaMagdeleine <alamagdeleine@universityhighschool.org>

Hi Colleen and Alicia.  I want to update you on a situation I'm managing.

I have been working with Hal and Jamie to examine the Coordinator roles in each of their divisions, and those conversations began before winter break.  While Hal has been timely in providing me with information and working productively towards defining what his priorities for the role would be, especially if it is re-calibrated to a stipended role that a full-time teacher could assume, Jamie has failed to provide information repeatedly, until finally I sent him deadlines last week to provide me with the information I needed.

One of those items was a job description that reflected his priorities for the role, and it was due on Tuesday.  On Tuesday he brought a list to me, and told me that he had asked Angie to help him make the list.  Of course I was surprised that he had breached our administrative confidence as we work to clarify what that role might look like before speaking directly with Angie.  I told him that I anticipated that Angie would likely share that news with   retchen as well, who would certainly have questions.  I also shared with him that Angie had made an appointment to meet with me the next day, and asked if he had any idea what it was about.  He said that he did not.  I told him I was certain it was about this.  For the purposes of wrapping up our meeting I told him that I would take the information he had provided, as well as the information that came back from the   utler focus groups to make a final decision about administrative priorities for next year.

The next day Angie met with me and said that she's feeling confused because the feedback she has consistently received is that she has been doing a good job in her role this year, and now she feels like that is in question.  And then she became upset  understandably .  I told Angie that Jamie told me he had asked her to help him outline and prioriti e her current work as Coordinator, and I'm sure that must have left her feeling confused.  I told her that I've been impressed with everything I've seen her do in my time at Orchard, and agree that she has done an excellent job.  I said that I am looking closely at all of our administrative roles in the organi ation to make sure that they are in full alignment with our institutional priorities, and one of the things that's factoring into my decision for next year is understanding what we need to have in place to make sure that our Learning Support systems are functioning as we want them to be, and I'm waiting for the information from the   utler focus groups to help me decide our direction for next year.  I also told her that I had not authori ed Jamie to advertise the sixth-grade English position because I wanted to be certain that we have a job for her next year that, coupled with a smaller administrative, stipended role, would mean that she would not see a reduction in her overall income if I did indeed make a change for next year.  I also told her that it was not my intent to subject her to worry and uncertainty about next year, and I was sincerely sorry for that.

 ased on a conversation I had with Courtney yesterday, I'm pretty certain Angie spoke with Stephanie in H  , and I don't blame her.

Today Hal told me that   retchen approached him and said she'd heard that Angie had left the building crying after a meeting with me, and "people were asking" about whether or not there might be some changes to   retchen's role.  I think it's reasonable to assume Angie shared her conversation with me with   retchen.  Hal told   retchen that he would meet with me to get more clarity around my plans for next year, and would set up a time to follow up with her  an appropriate response for a question he did not expect to receive .

I'm going to meet with Jamie on Tuesday to address two things with him:

1.  His decision to enlist Angie in writing out and prioriti ing her current duties has subjected her to incredible worry and doubt about her future at our school when we do not have all the information we need, and is a failure in his duties as a supervisor and a Division Director.  Further, it has impinged upon Hal as his fellow Division Director, who now has a similar situation to manage that was of Jamie's making.
2.  His decision to breach the confidentiality of our Academic Leadership Team conversations  Hal, Jamie, Nick, and me as we collaborate and plan around the staffing needs that we have as an entire school is unacceptable, and has egregiously compromised my trust in him.

I will document the conversation and decide what I want to do next.  I welcome your guidance, and we can discuss this when we have our next call.

We had talked about the fact that we might have a staff member who would utili e gossip to register discontent if I made this change. Sadly Jamie appears to have activated the gossip network himself.

Sherri

--



**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School  |  orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

   

| | |
|---|---|
| **From:** | Sherri Helvie <shelvie@orchard.org> |
| **Sent:** | Sunday, February 24, 2019 8:03 PM |
| **To:** | Nick Eble |
| **Subject:** | Fwd: meeting follow-up |

FYI

---------- Forwarded message ---------
From: **Sherri Helvie** <shelvie@orchard.org>
Date: Sun, Feb 24, 2019 at 8:02 PM
Subject: Fwd: meeting follow-up
To: Colleen O'Brien <ctob68@yahoo.com>, Alicia LaMagdeleine <alamagdeleine@universityhighschool.org>


FYI

S.

---------- Forwarded message ---------
From: **Angela Brothers** <abrothers@orchard.org>
Date: Sun, Feb 24, 2019 at 7:27 PM
Subject: meeting follow-up
To: Sherri Helvie <shelvie@orchard.org>


Hello Sherri,

Thank you for meeting with me on Wednesday. I knew the meeting would be a difficult one for me but had hoped to be able to cover more with you than I was able. I have reached out to Tommi to schedule another time to meet.

I am including a job description for the MS Coordinator of Student Life and Leadership from a year ago when I was in negotiations with Tom for a salary increase. Though I made a few edits and added a separate list of duties assigned in the 18-19 school year, it largely matches the hard copy Stephanie Meiss has on file from March of 2018.

The foundation and success of Orchard are built on relationships. I believe the programs I support, have created, and/or lead, help set our school apart from others. The relationships I create with students, families, faculty, as well as prospective students, families, and faculty, not only support the school and its initiatives but make our community stronger. I believe these relationships are just as important as the duties included in this job description but are ones that aren't easily quantifiable.

In the spring of 2015, morale in the middle school and the strength of the middle school was incredibly low. Over the past four years, things have improved dramatically. And while it's hard to comparatively measure such things as morale, student investment, and teacher buy-in, retention and acquisition numbers are measurable. Jamie, Carol, and I have poured our hearts and souls into making the middle school a place where students thrive, the faculty feels supported, students and teachers are invested, and everyone is looking forward to being at school. I believe if we are able to continue to work together, we will only continue to improve and grow Orchard's middle school to become a leader not only in the midwest but in the country.

Exhibit_50-00001

In addition to the Coordinator of Student Life and Leadership job description, you will find a speech I gave last year at the Board of Governors' Years of Service Dinner where I was being recognized for 20 years of service. Over the past few weeks, I have thought many times about what I said that night. Since those words are on my mind, I want to share them with you.

Thank you for taking the time to read. I look forward to the opportunity to meet with you again soon.

Respectfully,
Angie

--



**Angela Brothers**

MS Coordinator of Student Life & Leadership

voice/fax: 317-713-5773

The Orchard School   orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

--



**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School   orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

--

Exhibit_50-00002



**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School  |  orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

   

Exhibit_50-00003

Twenty years ago, I came to visit Orchard for the first time to meet Linda Gelhausen, the teacher with whom I would be student teaching. While I don't remember the exact date, it was clearly a Friday afternoon in late May. There were children singing on The Green, running the grounds, working in small groups sprawled through the hallways, building with popsicle sticks, and reading aloud to one another all while dressed in bow ties and patent leather Mary Janes. It seemed there was magic happening everywhere. And within just a few minutes, I knew I was home.

It was only a few months later when the school year began that I started meeting other teachers. And I met many teachers that had been here for years...15, 25, even 30 years. While I understood the magic that was happening inside these walls was really something exceptional, I questioned how these people could stay in one place for so long. Weren't they bored? Weren't they looking for other challenges or different experiences?

And here, twenty years later, I stand. And I can easily look to my younger self, who had fewer wrinkles and less grey hair, and answer the question: After 20 years, why are you still here? Because this institution has given me so many opportunities to grow, challenge myself, create, succeed, and fail. It has taken me on wonderful adventures. Through my former students, parents, and colleagues, it has given me some of my strongest and most cherished friendships. Orchard has invested in me in ways other institutions would not. It has and will always be so much more than a job or a career. These people are my family, and this place is my home.

It's not to say all of this comes without some price. As teachers of this institution, we sacrifice time... time with our families and time with our friends. We go dark during grade report writing. And more times than most of us would like to admit, we are emotionally unavailable for those we love...because we love our students - and this institution too, and there are days when that well is dry when we go home. We sacrifice our salaries, as do all teachers, but even more so than most other educators in this city and beyond. The opportunity to be an Orchard teacher is an honor. And the decision to stay an Orchard teacher is rewarding and fulfilling, but it isn't an easy one.

It's no secret that the key to any successful business or institution is in its relationships. Families, teachers, and administrators come to Orchard because of its progressive philosophy and practices. But, the families - they stay and spend the money on years of tuition, and the teachers and administrators- they make the sacrifices, because of the investment the institution puts into our hearts and the hearts of our children. People stay because of the relationships.

Exhibit_50-00004

Change is healthy; it's required for growth and rejuvenation. It can also be scary and unsettling. We have experienced quite a bit of change in the last few years. And there is more on the horizon: new leadership, new faculty. Many of those with institutional memory have, are, or are close to moving on to their next chapters. In the midst of this change, my hope is that Orchard will continue to make the investments into the hearts of students and into the hearts those that make these sacrifices. Because they are the school's most valuable assets.

It has been and continues to be an honor to be among you. Thank you.

Exhibit_50-00005

Reporting to the Middle School Director, the MS Coordinator of Student Life is responsible for monitoring and enhancing the quality of student life in the Middle School including student-focused events and student behavior. MS Coordinator of Student Life helps to foster a positive, engaging, and caring atmosphere and a healthy Middle School community by providing programming and leadership opportunities that enable students to flourish. MS Coordinator of Student Life proactively and effectively communicates with parents. MS Coordinator of Student Life works closely with the school counselors, grade level Team Leaders, MS Director and Assistant to the MS Director in providing programming and restorative practices that embrace and teach the Orchard's core values: friendship, fairness, honesty, self-discipline, responsibility, respect, compassion, trustworthiness, and moral courage. The responsibilities of the Coordinator of Student Life include:

Student Life
- ❖ Counseling students when necessary, working closely with the school psychologist and MS Director.
- ❖ Overseeing and chaperoning student-planned events (dances, movie nights, etc.)
- ❖ Planning and maintaining a Middle School Student Activities calendar.
- ❖ Developing and implementing ongoing student programming that is both fun and builds community.
- ❖ Communicating effectively and proactively with parents regarding upcoming student programming and events.
- ❖ Working with MS Director, marketing, and admissions teams to increase the number of MS applicants and MS student population.
- ❖ Facilitating MS admissions committee.
- ❖ Facilitating the Student Ambassadors Program.
- ❖ Attending Orchard Open Houses and Visit Days.
- ❖ Utilizing the marketing and communications office to share information and promote Middle School activities.
- ❖ Organizing the Middle School Teacher Assistant Program.
- ❖ Organizing and hosting Orchard Parent U (co-coordinate with School Counselor, Diversity Director, and ES Student Service)
- ❖ Organizing and coordinating logistics for Orchard's Middle School Service Day Program.
- ❖ Co-hosting and organizing the eighth-grade retreat.
- ❖ Planning and running weekly MS Town Hall Meetings.

Exhibit_50-00006

Case 1:19-cv-03556-SEB-DLP   Document 117-17   Filed 11/22/22   Page 9 of 9 PageID #: 1459
Case: 23-1659        Document: 19        Filed: 02/13/2024        Pages: 141

0882

❖ Coordinating with outside agency (Jump the World) and foreign language teachers for exchange student program.
❖ Supporting the school's students, parents, faculty, and leadership.
❖ Performing other duties as assigned by the MS Director and Head of School.

**Sixth Grade:**
➢ 6th grade team leader and related duties
  ○ Plan weekly team meeting,
  ○ Attend weekly team leader meeting
  ○ Manage sixth team members
  ○ Communicate with the sixth grade parent community
  ○ Ensure duties are covered
  ○ Handle student discipline issues
  ○ Create student schedules
➢ 6th grade advisor and related duties
  ○ Mentor advisees
  ○ Facilitate a MS club each trimester
  ○ Facilitate daily team times
  ○ Perform daily supervision duties
  ○ Lead parent-teacher conferences,
  ○ Attend class trip to St. Louis and communicate related information to parents
➢ Teach digital creative writing elective

Responsibilities assumed in 18-19 school year:

❖ MS Counselor
❖ ERB coordinator for middle school standardized testing
❖ Coordinating MS admissions, communicating with prospective families, and scheduling/ facilitating Shadow Days
❖ Giving MS tours for prospective parents.

Exhibit_50-00007

| | |
|---|---|
| **From:** | Sherri Helvie <shelvie@orchard.org> |
| **Sent:** | Thursday, March 7, 2019 11:05 AM |
| **To:** | Stephanie Meiss |
| **Subject:** | Re: Documents |

Thanks Stephanie.

S.

On Thu, Mar 7, 2019 at 10:50 AM Stephanie Meiss <smeiss@orchard.org> wrote:
 Here is the email exchange with Jamie this morning.



**Stephanie Meiss**

Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School  orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

   


---------- Forwarded message ---------
From: **Stephanie Meiss** <smeiss@orchard.org>
Date: Thu, Mar 7, 2019 at 10:04 AM
Subject: Re: Documents
To: Jamie Napier <jnapier@orchard.org>


Hi Jamie,

I have placed a copy of your personnel file in a sealed envelope in your mailbox. An update on your written termination notice will follow shortly.

Thanks,
Stephanie



**Stephanie Meiss**

Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School  orchard.org

Exhibit_55-00001

Case 1:19-cv-03556-SEB-DLP   Document 117-19   Filed 11/22/22   Page 5 of 9 PageID #: 1475
Case: 23-1659     Document: 19     Filed: 02/13/2024     Pages: 141

0996

615 West 64th Street
Indianapolis, Indiana 46260



On Thu, Mar 7, 2019 at 8:27 AM Jamie Napier <jnapier@orchard.org> wrote:
Stephanie,

Good morning.

I am emailing to request the contents of my personnel file and a write-up outlining my termination rationale.

Please let me know when I might come get those documents or if you would like to get them to me by some other means.

Thank you.

Jamie

--



**Jamie Napier**

Middle School Director

voice/fax: 317-713-2187

The Orchard School   orchard.org

615 West 64th Street
Indianapolis, Indiana 46260



--



**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School   orchard.org

615 West 64th Street
Indianapolis, Indiana 46260



Exhibit_55-00002

| | |
|---|---|
| **From:** | Sherri Helvie <shelvie@orchard.org> |
| **Sent:** | Thursday, March 7, 2019 12:41 PM |
| **To:** | Stephanie Meiss |
| **Subject:** | Re: Document for Tami |

Thank you Stephanie, this looks good.  I'll send this to Tami and get her feedback.

If she does advise us to send it, the only thing I think she's likely to suggest is that we don't know for certain that Angie shared the information with Angie; therefore we'd probably use language like I did yesterday, which is "Following your decision to involve Angie in this documentation process, somehow information was shared with Gretchen, and the restful is that it has impinged upon Hal who is now fielding questions from his supervisee."

But no need to make that change now; I'll send this along to Tami.

Thank you!

S.

On Thu, Mar 7, 2019 at 12:32 PM Stephanie Meiss <smeiss@orchard.org> wrote:
> Attached is the draft of the written termination notice for Jamie. Please feel free to edit as you see fit.
>
> To address your question from our meeting this morning in regards to what our practice has been to date regarding terminations, in my time here (2.5 years) we have provided written documentation to all involuntarily terminated employees, including teachers, maintenance technicians and the previous HOS.
>
> While we haven't had any directors leave in my time here, I did pull files for the directors that have left over the 5 years prior to my tenure and they all either resigned or retired. Therefore there is no recent precedent set in regards to providing documentation for an involuntary termination at the director level.
>
> Thanks,
> Stephanie



**Stephanie Meiss**

Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School  orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

   

Exhibit_57-00001

Case 1:19-cv-03556-SEB-DLP   Document 117-19   Filed 11/22/22   Page 7 of 9 PageID #: 1477
Case: 23-1659   Document: 19   Filed: 02/13/2024   Pages: 141

0971



THE **ORCHARD** SCHOOL

## Employee Termination Notice

___ **Voluntary Termination**                    _X_ **Involuntary Termination**

**Employee Name:**  Jamie Napier                **Job Title:**  Middle School Director

**Dates of Employment:** 6/27/2016 – 6/30/2019     **Current Annual Salary:** $115,849.29

**Reason for Separation from Employment:**

___ Employee resigned with verbal notice

___ Employee resigned with written notice.

___ Employer no longer had work available for employee at time of separation.

_X_ Employee dismissed for the following reason(s):

In the course of evaluating the Middle School Coordinator of Student Life and Leadership position for the 2019-2020 school year, you divulged to Sherri Helvie, Head of School, that you enlisted the help of Angie Brothers, current MS Coordinator, in the development of job duty documentation that you were instructed to draft independently in strict confidence. This violation of confidentiality is a failure in your role as the Middle School Director, resulting in unnecessary worry for Angie while information was still being gathered and a decision had yet to be made.

Additionally, sharing this information with Angie caused a chain of events that included Angie notifying Gretchen Bricker of a possible change in Gretchen's employment for the 2019-2020 school year and Gretchen repeatedly questioning Hal Schwartz, the Elementary School/Early Childhood Director, on the status of her employment for next year.

This breach of confidentiality has compromised the trust that is essential to the Middle School Director position. It is for this reason that you will not be returning for the 2019-2020 school year as the Middle School Director.

Case 1:19-cv-03556-SEB-DLP   Document 117-19   Filed 11/22/22   Page 8 of 9 PageID #: 1478
Case: 23-1659   Document: 19   Filed: 02/13/2024   Pages: 141

021094

**Marianne Garrard**

| | |
|---|---|
| **From:** | Alicia LaMagdeleine <alamagdeleine@universityhighschool.org> |
| **Sent:** | Thursday, March 7, 2019 4:28 PM |
| **To:** | Stephanie Meiss; shelvie@orchard.org |
| **Subject:** | Re: [EXT] Fwd: Document for Tami |

Hi Sherri and Stephanie,

This is mostly a question for my own contextualization, so feel free to tell me it's out of bounds.

I believe Suellen had to physically sign a contact/employment agreement each year as an Orchard teacher. Is that not the case for administration? Should it be?

For comparison, I hold a senior admin role at University but am on a one year contract each year. The assumption is that I will be offered a new one given good performance, but it is not a guarantee. All other senior admin, except the head, function this way.

Sent from my iPhone

On Mar 7, 2019, at 3:14 PM, Stephanie Meiss <smeiss@orchard.org> wrote:

> Tami,
>
> Please find attached Jamie's original offer letter dated 4/29/2016 along with two other letters dated 6/2/2107 and 4/3/2018 regarding pay increases for each new fiscal year.
>
> Thanks,
> Stephanie



> **Stephanie Meiss**
>
> Human Resources Coordinator
>
> voice/fax: 317-713-5766
>
> The Orchard School | orchard.org
>
> 615 West 64th Street
> Indianapolis, Indiana 46260

On Thu, Mar 7, 2019 at 3:11 PM Sherri Helvie <shelvie@orchard.org> wrote:
> Hi Stephanie.  Can you provide copies of Jamie's original offer, and any other renewal letters he's received so Tami can have that context?
>
> Thank you,
> Sherri

Exhibit_58-00001

**Marianne Garrard**

| | |
|---|---|
| **From:** | Sherri Helvie <shelvie@orchard.org> |
| **Sent:** | Friday, March 8, 2019 1:12 PM |
| **To:** | Stephanie Meiss |
| **Subject:** | Re: JN Response Document |

Thank you, Stephanie.

S.

On Fri, Mar 8, 2019 at 12:21 PM Stephanie Meiss <smeiss@orchard.org> wrote:

Attached is the document we reviewed this morning outlining Jamie's response to our notification that we are not bringing him back as MS Director next year.

I will revise the termination form that Tami edited into letter format and keep on file as our own documentation. We will not be providing this to his at this time.

I will also start drafting the letter in response to Jamie's requests for Sherri's review by Wednesday 3/13. Our goal is to have the document ready for Tami's review by Monday 3/18 with the intention of meeting again with Jamie on 3/22.

Thanks,
Stephanie


**Stephanie Meiss**

Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School | orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

    

--

**Sherri Helvie, Ph.D.**

Head of School

voice/fax: 317-713-5713

The Orchard School | orchard.org

615 West 64th Street
Indianapolis, Indiana 46260

    

Exhibit_60-00001

Case 1:19-cv-03550-SEB-DLP   Document 117-20   Filed 11/22/22   Page 1 of 3 PageID #: 1480
Case: 23-1659        Document: 19        Filed: 02/13/2024        Pages: 141



<div align="right">Jamie Napier &lt;jnapier@orchard.org&gt;</div>

## March/April Supervisor Training
2 messages

**Stephanie Meiss** &lt;smeiss@orchard.org&gt;                                 Fri, Mar 8, 2019 at 2:37 PM
To: Sherri Helvie &lt;shelvie@orchard.org&gt;, Courtney Williams &lt;cwilliams@orchard.org&gt;, Nick Eble
&lt;neble@orchard.org&gt;, Deborah Thornburgh &lt;dthornburgh@orchard.org&gt;, Jennifer Bostrom
&lt;jbostrom@orchard.org&gt;, Mark Murff &lt;mmurff@orchard.org&gt;, Hal Schwartz &lt;hschwartz@orchard.org&gt;, Jamie
Napier &lt;jnapier@orchard.org&gt;, Nate Surls &lt;nsurls@orchard.org&gt;, Cindy Larsen &lt;clarsen@orchard.org&gt;, Regan
Reams &lt;rreams@orchard.org&gt;

Good afternoon,

Thank you to everyone who completed the January/February Supervisor Training regarding employment
law and legal hiring practices.

**The topics for March and April are as follows:**

1. Performance Appraisals - How to Conduct Effectively
2. Workplace Privacy - What Supervisors Need to Know

**Supervisor Login Page Link: http://afi.lezage.com/login.cfm?dp=7**
**Access Code: 6DMHMNZG**

Please plan to complete this mandatory training by April 30, 2019.

Thanks,
Stephanie



**Stephanie Meiss**
Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School | orchard.org
615 West 64th Street
Indianapolis, Indiana 46260

   

**Stephanie Meiss** &lt;smeiss@orchard.org&gt;                                 Wed, Apr 24, 2019 at 2:41 PM
To: Sherri Helvie &lt;shelvie@orchard.org&gt;, Courtney Williams &lt;cwilliams@orchard.org&gt;, Nick Eble
&lt;neble@orchard.org&gt;, Deborah Thornburgh &lt;dthornburgh@orchard.org&gt;, Jennifer Bostrom
&lt;jbostrom@orchard.org&gt;, Mark Murff &lt;mmurff@orchard.org&gt;, Hal Schwartz &lt;hschwartz@orchard.org&gt;, Jamie
Napier &lt;jnapier@orchard.org&gt;, Nate Surls &lt;nsurls@orchard.org&gt;, Cindy Larsen &lt;clarsen@orchard.org&gt;, Angela
Brothers &lt;abrothers@orchard.org&gt;

Exhibit_61-00001

Just a reminder that another resource for completing faculty/staff evaluations is the supervisor training for March/April that includes how to conduct an effective performance evaluation.

Thanks,
Stephanie



**Stephanie Meiss**
Human Resources Coordinator

voice/fax: 317-713-5766

The Orchard School | orchard.org
615 West 64th Street
Indianapolis, Indiana 46260

   

[Quoted text hidden]

A-61

Exhibit_61-00002

# Legal Problems and Discrimination Charges

- Failure to communicate standards
- Failure to give timely feedback
- Failure to allow employees to correct performance
- Inconsistency in measuring performance
- Failure to document performance objectively

Exhibit_61-00003

Case 1:19-cv-03556-SEB-DLP   Document 117-21   Filed 11/22/22   Page 1 of 1 PageID #: 1483
Case: 23-1659      Document: 19       Filed: 02/13/2024      Pages: 141

0037

Stephanie Meiss <smeiss@orchard.org>

---

## [Orchard Employees] Please Read: Information About the Middle School
1 message

**Sherri Helvie** <shelvie@orchard.org>                                      Fri, Mar 8, 2019 at 4:34 PM
To: Orchard Employees <OrchardEmployees@orchardgroups.org>

Dear Faculty and Staff,

I'm writing to share some news about next school year.  Jamie Napier will not be returning as Orchard's Middle School Director.  In his nearly three years in the role, Jamie has introduced important program innovations that have helped our Middle School live up to our ideals as a Progressive school, and I'm appreciative of his many contributions to Orchard.  I wish him well in his future pursuits in education.

Angie Brothers has accepted my invitation to be acting Middle School Director for the 2019-2020 school year.  Angie is currently Orchard's Middle School Coordinator of Student Life and Leadership, and she has been an integral member of the Middle School leadership team.  Angie first came to Orchard 21 years ago as a student teacher, and joined the Middle School as a sixth-grade Humanities teacher the following year. I'm glad to welcome her to our Academic Leadership team next fall, and am confident that she will be a very effective leader of our exceptional Middle School.

Please join me in thanking Jamie for his leadership, and in welcoming Angie into her new role.

I'm sharing this information with you first as faculty and staff, and will communicate with families shortly.  If you have any questions, or are wondering how to respond to questions from families, please be in touch with me.

Sherri

--



**Sherri Helvie, Ph.D.**
Head of School

voice/fax: 317-713-5713

The Orchard School ǀ orchard.org
615 West 64th Street
Indianapolis, Indiana 46260

   

Exhibit_62-00001

On Mar 29, 2019, at 4:48 PM, Eric Rawe <ericrawe@me.com> wrote:

CONFIDENTIAL
067859

It was heartening to witness parents as partners Monday night. Yet that partnership seemed one-sided given the lack of direct answers. Conversations with parents since have confirmed a lack of knowledge about Jamie's dismissal and the vision for the future. This feels like a failure of leadership by the the head and the board. Assuming hire/fire decisions require board approval, it is hard to imagine majority of board parents affirming this decision.

The 'labor law answer' only created more questions and distrust. It seemed dishonorable to Jamie. The meeting might have been much different had it started with a clear statement from the head and a board member. Even the familiar PR spiel for departing executives and coaches would have been more honorable:

* I want to thank Jamie and his teams' for their amazing work.

* However, I have had to make a very difficult decision, supported by the board, to go a different direction.

* I believe this is best way to implement the boards vision.

* We will start a national search immediately.

Exhibit_69-00008

CONFIDENTIAL
067860

* In the interim, I have complete confidence in Angie.

Or more simply, as the head and I want to pick my lieutenants. Like Lord Business in the Lego Movie, it's not personal, it's just business. People would have understood, grumbled, and still been pissed. Maybe the conversation could have pivoted to cheerleading and vision. Instead the meeting felt like a sausage-making session with parent concerns being fed into the grinder. Fillers of fear overwhelmed trust leaving the result inedible. How the sausage was made doesn't make sense.

Jamie appears to be universally appreciated by the community. He ying supported teachers and parents while Angie's yang nurtured the students. As Shaleh offered, the math program dramatically increased during his tenure enabling her most recent Orchard grad to test into Algebra 2 at Brebeuf. Her older twins, who hadn't benefited from the renewed math program, had not. I can only imagine the new MS head will be hired and measured against Jamie's program and results.

How does his dismissal/non-renewal/termination, conscious uncoupling, firing (or whatever label labor law allows) further the community at this point? Parents understand change. They have been living it. Some have experienced the departure of two heads of school and MS along with a significant number of gifted staff. Donna, Megan, Kristen, Grace, Nate and now Gretchen are a couple names that come to mind.

Megan and Gretchen were instrumental in supporting my children. I am unclear how a new director of student services

Case: 23-1658   Document: 19   Filed: 02/13/2024   Pages: 141

Exhibit_69-00009

CONFIDENTIAL

assisted by part-time efforts from full-time teachers can provide the same level of support. The notion that full-time teacher can assume part-time responsibilities seems like a mathematical paradox.

Parents and teachers were literally crying Tuesday morning. My trust in leadership and the notion of parent's as partners has been ground-down by these recent decisions. Moreover, these changes are going to take time to germinate. Taking a year to hire a new head suggests that it could be '21-22 before a new year has had a year of experience. As one parent asked about next year, "will my child's last year be a throwaway?" Jen and I are faced with the same decision for our '22 grad.

Regarding the board nomination, thank you for considering me. When I self-nominated two years ago, I knew nothing about the board and their role and suspect 80% of parents would admit the same today. So I contacted a couple board members for their perspective. One shared "I have seen how the sausage is made and I wish I could 'unsee' it." I have no doubt that Orchard shares the same challenges as other organizations. Parents as partners may actually be a hindrance on some level especially regarding transparency. Given those challenges, I thank you and the other board members for their tireless and unrecognized efforts.

Having been nominated last year, I assumed your invitation was in part a requirement for board members to recruit new candidates. I have neither any expectation of being elected, nor do I have specific skills, connections, legacy, or treasure that would seemingly be an obvious benefit.

Exhibit_69-00010

CONFIDENTIAL 067862

In the final scene of the movie "Scent of Woman," Col Slade makes an impassioned flamethrower plea to the school's leadership regarding an injustice. From Jamie's reputation, program results, and scant information regarding his dismissal, this seems like a injustice. Or maybe it is as simple as the head and/or a small cabal within leadership wanting to go another way. I ask the leadership and specifically the board to consider the negative impact on the community, to own their decisions, and to be as transparent as possible.

Sincerely,

Eric Rawe

Exhibit_69-00011

Case: 23-1659     Document: 19     Filed: 02/13/2024     Pages: 141

## Summary Chart of ISACS Survey Quotations Regarding Napier

**Q1. What are the strengths or positive aspects of the school?**

- The positive things I think about when I think of Orchard are the supportive middle school faculty and the middle school students. I enjoy working with the 7th grade and getting to know each of the students. There was strength in the middle school administration that will be experiencing changes next year. This school year was an overall positive one. We took a big hit when we were told Jamie was leaving and still fell unsatisfied with the reasoning behind the decision. I feel positive about the middle school math department and think we are all on the same page. (page 3)

- Our strength is that we teach kids to advocate for themselves and to form relationships with each other and with their teachers. This is a place where students trust almost all of their teachers and feel like they can go to them even years later for academic issues or just personal issues. For the most part, kids are taught that they can do it all-- they can be the athlete, the scholar, and the artist all at once. There is lots of freedom for teachers to create their own curriculum and to cater what they teach to their passions. I have been lucky to have an incredible administrative staff working with the middle school (Director of Student Life and Leadership, Middle School Director, Assistant to the Middle School Director) who always know what is going on in my classroom, are always willing to offer their support and expertise, and who genuinely care about me and our students. They encourage us to change and grow rather than stick to our comfort zones. They are one of the strengths of our school as a whole. We have some fantastic teachers, and I would consider my middle school teaching colleagues to be some of the best in the business. We are all in this profession because we find the intellectual and emotional challenges rewarding and invigorating. We are collaborative and honest with each other, and I consider my coworkers to be some of my closest friends. (pages 6-7)

- Jamie Napier and the middle school faculty (page 11)

- This school has a faculty that care deeply about the students and their success. We have very supportive families that want to be here and believe in our mission. Jamie Napier and now Angie Brothers are incredible administrators. They are by far the best educators and leaders with whom I have ever had the pleasure to work. (pages 11-12)

- Jamie Napier. Many of the teachers are excellent: Ryan Mosskowski, Brendan Chandler, Justin Burris, Allison Housefield, Ana Grillo, Anne Maitzen, Karen Dean, Reegan Homburg among many others. The outdoor space. The MS math program over the last 3 years has developed into something that is quite good. MAST was a good addition to the curriculum. A bit more differentiation in math particularly would be even better. (page 46)

- My son is thriving but older son who left the school did not have a great experience in middle school. The middle school has been transformed over the last couple of years and I am extremely frustrated and disappointed with the departure of Jamie Napier. (page 49)

Exhibit_84-00001
A-68

- If I was filling this survey out last year, the majority of my responses would've been positive. One year later and I struggle to find anything positive to say. I absolutely loved this school and everything it stood for until this year. Just this past year Orchard has changed to the point I don't even recognize it. All the wonderful middle school teachers seem to be struggling with the firing of Jamie Napier. It was so obvious how much they respected and learned from him. Jamie's presence in the middle school has been exactly what was needed. He's always available to any student, teacher, or parent. His loss to Orchard will have devastating consequences!!! (page 56)

- there are many excellent MS teachers, although still a few weak teachers. overall faculty are excellent changes in MS under leadership of Napier have been outstanding. Increased academic rigor, especially math, under Napier's leadership is strength. (page 70)

- Math (Mr. Napier) English (Mr. Burris) Spanish (page 75)

- Teachers have the opportunity to create curriculum that fits the needs of children. By and large, students feel known and valued. It is a welcoming and inclusive community for students. Kids are happy to be at school. There are many wonderful traditions. Jamie Napier is a supportive and innovative administrator in the middle school. By the far the best part of the Orchard school though are the people. So many wonderful, kind, thoughtful people that it is a pleasure to know! (pages 88-89)

- If I could send my child to the Orchard school that I attended, I would. However, the new headmaster has ruined the school. (page 98)

- Children have exposure to public speaking and being in stage. More offerings in speech and debate in middle school s needed. We need upper level math in Middle School. Foreign language in middle school has improved. Teachers in both lower and middle school need administrators they respect. I have had children at Orchard since 2003. In my experience, Jamie Napier has been the best head of middle school since Joe Marshall held the position. (pages 100-101)

- Jamie Napier was the positive aspect of the school. He is now leaving as are we. Sherri Helvie had a meeting where she could have provided an explanation and a path forward, instead more parents are leaving. The ES is pretty good and the ES director is nice but why stay when the MS will be such a mess. Dr. Helvie is unable to either see there is a problem or offer or implement any solutions. (page 105)

**Q2. What are the weaknesses or your concerns about the school?**

- Due to recent events (i.e. the director of the middle school being abruptly fired without due cause), there is a severe lack of trust between faculty and administration. My faith in our school as a whole is shaken, but I believe in our middle school, our kids, and our mission. (page 2)

- We have a central office whose staff is larger than the middle school faculty. Their job is to raise money and make the school look nice, but the actual mission of the school is being ignored. When we make sacrifices and cuts, it is our students who lose. In addition, asking Jamie Napier to step down was, without question, the worst decision that could

Exhibit_84-00002

have been made for our students, families, and faculty. His mission and work are completely aligned with who we say we are as a school. If he can be asked to leave, it shakes our foundation to the core. He stands for what the school is, and to say that we should go in a different direction is saying that the school should go in a different direction - one where students are no longer at the center of the table. And that, sacrificing students for the sake of optics or business, is our biggest weakness right now. (pages 11-12)

- Terrible focus on math, even after some improvement. Smart high school kids NOT well prepared in math, seriously affecting their options for math in high school. Current board and leadership willing to jettison an excellent middle school head sets the wrong tone after years of poor middle school leadership. In the face of improvement in the math program and faculty appreciation of the head, this seems like a very poor, short-sighted choice. Very poor judgment. (page 27)

- The current head of the school (Dr. Sherri Helvie) is a disaster in leadership, outright incompetence and deceit. She seems to be operating on information that is not connected to reality. One can only assume the upper level administrators are feeding bad information into a broken leader. I understand she was hired by a committee that had no faculty representation or input and it certainly shows. Was it her intention to manufacture a crisis? Was it malice or stupidity? (page 36)

- Concerns regarding new head of school and the direction the board is taking. Changes to the middle school are concerning and unwarranted. Many families have expressed displeasure and concern. Additionally, too many director/admin positions are being created. Increased cost of tuition without adding direct teaching staff- seems to cover "top heavy" school. (page 37)

- What is going on with the teacher exodus, and why is Jamie Napier being dismissed? I don't like rumors. I understand that privacy requires some silence, but Jamie's dismissal was handled poorly. The school should've been more forthcoming in some way to stop all the rumors. Now I'm hearing that parents are removing their kids, but they won't say why. I need more information to ensure that my child is safe and should remain at the school. The large teacher exodus, I assume, had to do with Tom's lack of communication, but again we seem to have teachers leaving. We need more information from the faculty, and we need to know why they are leaving. I understand retirements, but it's still concerning. (page 42)

- Very non-transparent on the reasons when faculty leave the school. Example: Jamie Napier. When you share no information, people assume the worst. TeenConnect fees are way too high. By this age, these kids are need very little supervision. So charge fees accordingly. (page 43)

- I have not been impressed with the new head of the school at all! She is promoting administration bloat and dumping more work on teachers. I strongly disagree with her decision to remove Jamie Napier from his position both in the manner in which it was done and with the lack of concrete reasons related to running the school. If it was an interpersonal matter then there are ways other than termination to address said issues, if, even by head's own admission, all other aspects of running the middle school program

Exhibit_84-00003

were going quite well. Data is a powerful tool, there should have been more input from families and teachers (through surveys) about proposed redirection of middle school before roll out. Incredibly poor management all around by the Head of School. We have started looking at other options for next year but unfortunately with it being the 8th grade year for my child it is a hard sell. I can guarantee that we definitely would not be coming back if my child was younger and not so attached to the orchard school as a whole having been there for many, many years. (pages 45-46)

- It feels as though the Orchard School has lost its way. I don't know what has precipitated this, whether it is a difficult financial situation or an out of touch board. Either way, the parents are left feeling that they are receiving less and less of what was promised to them with each passing year. The Head of School doesn't seem to have taken stock of the community, or its needs before making drastic decisions. Her answers to very direct questions seem evasive, and do not inspire confidence. The Board of Trustees seems to have its own agenda, and to not be in tune with the needs of the community. There is a major breakdown in communication that makes decision making feel like an us (administration and board) vs them (students, faculty, staff, parents). The instability that results from regular faculty and staff turn over, particularly in administration. Lack of transparency in decision making. A feeling that the organization is becoming increasingly top heavy, while teachers continue to lose resources that support their efforts in the classroom. This is of particular concern this coming year, in which there is reduced staffing for counseling and learning support, and increased administrative hires. The nine promises. They are attractive, but when you feel they are unmet, there is a feeling of betrayal. It would be better to promise less if you can't deliver on everything. For instance meeting children where they are at is very enticing, but in our 9 years at Orchard I can say that's only happened on rare occasions, especially for kids with high aptitudes, not enough to be considered a promise kept. Learning enrichment was never a priority, until Jamie joined the MS, now that he is leaving, it is hard to know where the high achieving students will fall. (pages 46-47)

- First of all, Orchard claims to support diversity. With that said, teachers only support those who fit their narrative. If a person has a thought/opinion that differs from the rest of the group, say a conservative point of view, that student is ostracized by students AND teachers. It's appalling. If you say you embrace diversity, then you should ALSO mean diversity of THOUGHT. You say that you are getting students ready to deal with all kinds of people in the "real world," but Orchard fails miserably in this area. I think it's wonderful that you support students who are gay, bisexual, trans, etc. Those students definitely need a safe space! What about those students who are really religious? What about those students who are Republican? Should they be made to feel like they are "less than" because of how they're being raised? Oh---and by the way--just because a family is religious and Republican, it doesn't not mean their homophobic. You would think educated people would know that, but that doesn't appear to be the case. In addition, the fact that Jamie Napier is not returning is extremely upsetting. He is a good man, a smart man, and a great leader. Shame on the administration for not holding on to him. He was actually helping the school's abysmal math program. He was a good disciplinarian, and parents (& students) respect him. And finally, for a school that offers Spanish each year, it's a shame that once Orchard students get to high school, they either have to start over

Exhibit_84-00004

or they struggle greatly in Spanish II. I've heard it from countless families. For a school that promises so much, you fail miserably. For what parents pay, you really need to step up your game, Orchard. (pages 47-49)

- Dismissal of Mr. Napier questionable and disruptive. Constant churn in administration. (page 53)

- While the leadership wasn't as strong as I'd like in the past, the new leadership this year has managed to come in and completely destroy what was once a fabulous school. I plan to remove my children from the school next year and will strongly encourage any of our friends from sending their children there. The firing of Jamie Napier was the worst decision I can ever imagine this school making. I'm appalled at how it was handled, and the disrespect this wonderful educator/leader has had to endure. The communication with parents has been a joke too. It's obvious he hasn't been allowed to interact with us. We used to receive awesome updates from him regularly, and that's stopped completely. Knowing Jamie, my only guess would be that he's not allowed. (page 56)

- The new head of school's decision to terminate the well-loved, highly-capable and respected middle school director is a grave mistake. The trickledown effect has caused irreparable damage to the faculty's morale and the parent community's trust in this new regime as there was no viable reason provided for the decision. (pages 56-57)

- The Head of School is misleading and untruthful. The Executive board is misleading and untruthful. The extended board is meek and seems to believe that their mission is to support the Head of School and not the school itself. The bylaws governing the board should be rewritten so that the board works to support what is best for our students, their teachers, and the teachers administrators - not the Head of School, who should have to answer to the entire community. The Executive Board should no longer be allowed to hire or fire anyone without parent and teacher input. The current board has made a terrible hire in the current Head of School and has shown itself to be bullying in its attempt to cover itself instead of doing what is right for the school. As long as Sherri Helvie remains at Orchard our family will no longer donate to the school. (page 57)

- Biggest concern right now, is the continued change of teachers and faculty. Realizing that change is needed and good, but with the recent letting go of Jamie Napier and Gretchen Bricker, it's concerning. These are two beloved people at the school and have brought really good things toward the school. The focus on creating new additions t(particularly diversity) is something that I believe that the school is already strong in. There is a real disconnect with what the parents believe and what upper administration believes. (page 62)

- As a parent, I have been very pleased with the progression the middle has made over the last couple of years. It seems to me that the non-renewal of Mr. Napier's position as director of the middle school has forced the middle school into a period of chaos and upheaval. A good leader should never create chaos but that seems to be the only thing that Dr. Helvie has accomplished in her first year. As I have followed the position advertisements for next year, there have been a number of new administrators and directors. Administrator / central office bloat is a sign of a weak leader that needs to consolidate power. (pages 78-79)

Exhibit_84-00005

- The new head of school Sherry Helvie is stepping on lots of toes of beloved teachers and staff. People are angry and people are pulling their kids because the people we have known and trust with our kids have been tossed by the wayside. In general here are the complaints I hear: Angry about Jamie Napier being let go. He had fixed a long time issue that parents had been trying to get help with bullying. Seems like the head of school "let him go" without talking to the school. People really had high hopes with her, but she is treating Orchard like a regular old school, business as usual. Doesn't seem like she is a team player. Rumor has it that Jamie Napier must have said something Helvie didn't want to hear that caused his dismissal. People want Ms Helvie out before she ruins Orchard's nurturing reputation. (page 84)

- Secondly, I am extremely upset, angry, shocked, and confused by the firing of Jamie Napier, the beloved and incredible head of the Middle School. He is the best leader I have ever worked for. He is so supportive of students and teachers. He has changed the entire culture of the middle school. When Sherri made this terrible decision, it rocked the faculty and community to the core. This was a decision that was not, in any way, made in the best interest of students and teachers. I lost so much faith in Sherri and the board's leadership after this experience. It was clear that teachers and families do not have any voice in this school. I do not trust the current leadership of our school. I do not feel that they understand Orchard. I am completely disheartened. (pages 89-90)

- Very concerned that Mr. Napier and Ms. McShea were let go for no apparent reason and they were both actually very good - then feeling deceived by administration stating "health reasons" when it was evident that was not the case. Can no longer trust what is being said... many people are feeling this way. (pages 91-92)

- I am choosing to send my children to a different private school because of the direction Orchard is headed. We were ready to start next year and then I had heard about the changes in attended a parent meeting run by the new headmaster and it was terrible. I ran into an old classmate there whose child had been harmed by another child that the School was allowing to come back next year. She suspected that was why the middle school director was fired as he had excluded that student as appropriate. The teachers that I remembered are leaving because the administration is not really concerned about teaching children. I was extremely sad but lucky my second choice school had not filled up. Someone needs to come in and help those in charge before the school ends up on the news. (pages 98-99)

- Turn over. Inability to retain good staff. In the time we have had kids at Orchard we've seen some of the best staff leave. We finally get someone good in the Middle School Position, and now he is leaving. No one is happy about it. It also sounds like there has been a decision to no longer have a librarian or counselor? I've recommended Orchard to others (and their kids now attend)- I certainly wouldn't do so again. There are a few really great teachers but whomever made these decisions (Board and Head of School?), has done a terrible disservice to the school. I'm not sure Orchard will recover from it. I don't know who much weight is out in this survey- it's pretty clear the decision makers are not listening to parents or staff. (page 102)

- Math seems to still be an issue. Displeased that Napier is leaving; whole school had positive changes w him. Not enthusiastic about many administrative positions being

Exhibit_84-00006

introduced. More use of surveys like this & options to call in to meetings etc would allow full-time working parents' voices to be heard more easily. 8:30 am is timing that can nearly guarantee many working parents can't attend. I think? A survey along those lines could answer a lot of questions. (pages 102-103)

- All the changes Dr. Helvie is making. The behavior problem students that Orchard allows to stay. The Board of Trustees is clueless if they do not make changes. (page 105)

- Middle schoolers' academic readiness for high school . Parent morale due to the lack of information that is legally allowed to be shared about Mr. Napier's leaving. (page 106)

- The administration. My children are not in ES so I am not sure about him, he is new. The MS director was wonderful but the principal fired him. The principal and assistant principal are not warm, involved, or handling any of the problems. Those are the main reasons we are looking elsewhere but so many Orchard students are that there are wait lists at nearby private schools so I am not sure what to do next year. (page 107)

- Our school's core leadership is our biggest weakness - specifically the head of school, assistant head of school, and CFO. They are not in touch with the teachers, daily classroom culture, nor divisional priorities. The dismissal of the MS Director -- who is a highly effective, well-respected, thoughtful leader -- is a significant concern. This abrupt and unexplainable action has hobbled the MS. There exists little to no trust in the core leadership team from the parents and faculty. Increasingly, there is a pervasive sense that the educational divisions of the school (EC, ES, MS) exist to serve the central offices, not vice versa. The central office continues to grow and expand with the hiring of three new directors to serve on the academic leadership team, while faculty positions in both ES and MS divisions are cut, or not re-hired upon retirement, in pursuit of an elusive 8:1 student to teacher ratio. Faculty/staff morale is low. Excellent teachers are looking for employment elsewhere, and several families with middle school students are also exploring other school choices. Great ideas (like merit scholarships) are approved for action only to be cut and unfunded when it comes to the bottom line. Increasing bureaucracy and red tape shared as "policies and procedures" serve to limit efficacy while also legitimizing an overly-complex finance system and bloated administration. (pages 108-109)

- The unexpected notice of the departure of the Middle School Director was an unwelcome surprise to some faculty and parents. A few parents are looking at other schools because of the perceived lack of transparency and support for the Director. There is a need to bring positive energy and enthusiasm for the mission back to the forefront. (page 109)

- lack of communication/vision in the EC/ES; low moral of staff after all the changes this year (firing of MS head, good teachers being asked to leave/losing their positions, scattered communication in EC/ES etc.); losing good families due to all the unrest in the school; losing our strong LS department (no dedicated speech, counselor, or person per grade); parents running the show at school. (pages 118-119)

**Q3. Where should the school focus its efforts in the future? What suggestions do you have for improving the school?**

Exhibit_84-00007

- It is hard to see any reasonable objective beyond demanding the immediate firing of Dr. Helvie. (page 36)

- Increase transparency for staff and parents. Reduce director/admin positions. Encourage board and head of school to inquire/request feedback prior to making significant decisions or changes. (page 37)

- High school readiness, support of teachers (abrupt removal of popular middle school director has decimated moral), campus security, parent volunteerism--more folks to do the work instead of just a worn-out few. (page 37)

- Get a new headmaster. Hire more teachers and people that work with the kids and get rid of people who are in the business office. (page 44)

- Find a new head of school. Do NOT move forward with the plan of administration bloat but direct those resources to the teachers instead. Cut cost to families, provide more financial aid (the way that aid is calculated is borderline criminal. We will out the PPS form for a reason. If the PPS says that a family can only pay $5k (for example) then that is what they should pay, not some calculation that results in an amount much much higher than the stated amount. Fundraise specifically to increase both the endowment and the financial aid pool for families. (page 45)

- Set curriculum standards - hold kids to them. Benchmark with other similar schools. Keep the spirit/mission of Orchard but step up the academic rigor please! Get the Middle school administration issue under control. Mr. Napier was excellent. His communication to parents about key Middle school issues were helpful and really appreciated. (pages 54-55)

- I recommend removing the new head of school, who in less than one full year has created a toxic environment that can be felt the second I enter the building. I had no idea one person and those she's chosen to put around her could dismantle a wonderful school so quickly. It's incredibly obvious to me that the children and their education is NOT what her motivation is. As a parent she's made it obvious to me that unless I have something to offer her she has zero use for me!! Please please remove Sheri Helvie, and get someone who will return this school to the amazing child focused one it should be. (page 56)

- Fire Sherri Helvie. Rewrite the bylaws governing the board so that their focus is on protecting the school community instead of protecting the Head of School in the case of a bad hire. Bad hires happen, people misrepresent their abilities, the school shouldn't have to pay for that for years to come because a handful of Board members made a poor choice - actually in the case of Orchard, 2 in a row now! (page 57)

- Based on what I have seen of Dr. Helvie's first year as head of school at Orchard, the future of my child at the school is very much in doubt. My hope for the school moving forward is for this to be Dr. Helvie's only year as head of school. (pages 78-79)

- Having Ms. Helvie check her actions with other long term Orchard Administration, Staff, Teachers and Parents. Or we should be doing a national search for a new head of school. (page 84)

Exhibit_84-00008

- We desperately need new leadership in the three core leadership positions: head of school, assistant head of school, and CFO. (page 108)

*Verbatim quotations from ISACS Survey Documents produced by Defendant on June 25, 2020.*

Exhibit_84-00009

Case 1:19-cv-03556-SEB-DLP   Document 117-35   Filed 11/22/22   Page 1 of 2 PageID #: 1656
Case: 23-1659   Document: 19   Filed: 02/13/2024   Pages: 141

**Middle School Faculty and Administrative Leaders (2018-2022)**

067335

| | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Head of School | Sherri Helvie | Sherri Helvie | Sherri Helvie | Sherri Helvie | Sherri Helvie |
| Assistant Head of School | Nick Eble | Nick Eble | Nick Eble | Nick Eble | Nick Eble |
| Director of EC & ES | Hal Schwartz | Hal Schwartz | Heather Girton | Heather Girton | Heather Girton |
| Middle School Director | James Napier | Angie Brothers | Angie Brothers | Angie Brothers | Angie Brothers |
| DEI Head | | Lisa Pryor | Lisa Pryor | Lisa Pryor | Marcus Hatcher |
| Business Office | Courtney Williams | Courtney Williams | Courtney Williams | Courtney Williams | KaAnne Morris/Valerie Hunt |
| Human Resources | Stephanie Meiss | Stephanie Meiss | Stephanie Meiss | Redde HR | Crystal Lax |

## AFFIDAVIT OF GRETCHEN BRICKER

I, Gretchen Bricker, under penalty of perjury, declare that the following is true and correct.

1. My name is Gretchen Bricker, I am a competent adult, and I have personal knowledge of the following facts.

2. In addition to having a Bachelor's Degree in Education and a Master's Degree in Special Education, I hold an Administrative License that qualifies me to be a principal in a K-8 school in Indiana.

3. In 2000, I began working at The Orchard School ("Orchard") as an elementary teacher and taught second, third, and fourth grades.

4. My husband Joseph Bricker worked for Orchard as the Assistant Director of Outdoor Education and also volunteered there on a variety of projects.

5. All of our three children attended Orchard.

6. In August 2016, Nick Eble was given the position of Assistant Head of School ("HOS").

7. In about June 2017, I was promoted to the position of Coordinator of Student Service for the Early Childhood/Elementary School ("EC/ES").

8. Although Angela Brothers held a position in the Middle School ("MS") titled Coordinator of Student Life and Leadership that had different duties than I did, we worked closely together and had weekly meetings.

9. At the conclusion of the 2017-2018 school year, MS Counselor/Psychologist Hillary French resigned, and she was not replaced.

10. After Ms. French left, no one discussed the issue of counseling with me.

11. In the spring of 2018, Orchard posted a position for a Director of Outdoor Education and my husband applied for the position, but Orchard promoted a female teacher, Colleen Brumford, to Director of Outdoor Education instead of my husband, a male.

12. My husband left Orchard, in part due to his nonselection for the position, the poor treatment of him by Orchard in the process, and the better treatment of the female employee.

13. I worked with Jamie Napier for more than ten years, and I observed his skills as a teacher and later as an administrator.

14. In about 2016, Jamie Napier came back to Orchard from the position of Assistant HOS at University High School to become the Orchard MS Director, at the request of persons at Orchard who wanted him to improve the performance of the Orchard Middle School students, many of whom would be later going to University High School.

15. Jamie Napier is an admirable teacher and administrator.

16. I have received comments from other administrators, faculty, parents, and students for many years, and their comments were also that Jamie Napier is an admirable teacher and administrator.

17. Jamie Napier is very good at communicating with others and administering schools.

18. Jamie Napier was very highly regarded at Orchard and at the other schools where he has taught and been an administrator.

19. Jamie is calm, cooperative, and professional in his communications and administration.

20. My supervisor, EC/ES Director, Harold "Hal" Schwartz, Jamie Napier, MS Director, Nick Eble, Assistant HOS, and the HOS were on the senior leadership team.

21. Jamie received comments from administrators, staff, faculty, parents, and students that he was doing an excellent job at Orchard.

22. On July 1, 2018, Dr. Sherri Helvie became the HOS for Orchard.

23. In July 2018, Dr. Helvie demoted my supervisor, Hal Schwartz, and Jamie Napier from the senior leadership team and replaced the males with two females, Jennifer Bostrom and

Courtney Williams who had no supervision of education faculty or staff.

24. The demotion of the two males was very unusual for a school, because the primary business of the school was the Early Childhood/Elementary and Middle Schools.

25. Orchard had no High School, so the only schools were the MS administered by Napier and the EC/ES administered by Schwartz.

26. I was the Coordinator for the EC/ES.

27. Angie Brothers was the Coordinator for the MS.

28. In the Fall of 2018, Coordinator Brothers began telling me that she thought our jobs coordinating for Schwartz and Napier were going to be eliminated.

29. After Coordinator Brothers made those statements, I began asking my supervisor, EC/ES Director Hal Schwartz, if my job was in jeopardy, and Schwartz said that it was not.

30. I repeatedly asked Director Schwartz at least weekly about the future of my job, and Schwartz continually reassured me that my job was secure.

31. Other than Coordinator Brothers, the only Orchard employee that I discussed the possibility of my job being eliminated with was a teacher who is a close friend.

32. I did not discuss the possibility of my job being eliminated with MS Director Jamie Napier.

33. Napier did not talk to me about my job.

34. No one told me that Napier said anything about my job or implied anything about my job.

35. Around January 2019, Orchard brought in two professors from the Butler University School of Education as consultants, and we were told they were going to help us grow and learn as a school.

36. When I met with the consultants in February 2019, I answered their questions honestly, and the consultants said they were at Orchard to listen and give feedback.

37. On March 8, 2019, Dr. Helvie issued an email to all faculty and parents stating that Napier's contract would not be renewed and naming Angela Brothers as Interim MS Director.

38. Brothers talked to me about Dr. Helvie telling her that Dr. Helvie was ending her job as Coordinator and that Brothers could go back to teaching, which Brothers did not want to do, or she could take Napier's job as the Interim MS Director.

39. Dr. Helvie's conversation with Brothers made me stressed and fearful about my job as coordinator.

40. Jamie Napier did not have any conversation with me or with anyone talking to me about my job.

41. Jamie Napier did not cause me any stress.

42. Jamie Napier had always been professional with me.

43. On about March 11, 2019, I met with Dr. Helvie and Director Schwartz, who told me that my Coordinator position was being eliminated and that I would be returning to a teaching position.

44. When I asked Director Schwartz why he lied to me about the status of my job, Dr. Helvie would not let him answer me.

45. Dr. Helvie said it was her decision to eliminate the Coordinator position.

46. Dr. Helvie and Director Schwartz gave me the impression by their statements and actions that it was Dr. Helvie who had caused Schwartz to lie to me.

47. Dr. Helvie does not have a good reputation for honesty and truthfulness.

48. It was Dr. Helvie, and Director Schwartz through her, who were causing me stress by their lies to me.

49. Contracts were due the following week, but I did not want to return to full-time teaching and did not sign my contract.

50. Human Resources ("HR") Coordinator Stephanie Meiss said that I should sign the contract and then break it if I changed my mind, but I still refused to sign the contract.

51. After I met with Dr. Helvie and Director Schwartz, Helvie told Schwartz not to meet with me, but we continued to have our weekly staff meetings.

52. On March 18, 2019, I sent an email to EC/ES parents notifying them that my Coordinator

position was being eliminated and that I was offered a second-grade teaching position that I considered a demotion.

53. I felt that the parents I had worked with for many years deserved to be notified, and Dr. Helvie had not made an announcement about my position being eliminated.

54. I also posted the content of my email on my personal Facebook page and later that day, I received an email from Dr. Helvie telling me to take down my Facebook post immediately.

55. I replied to the email by asking Dr. Helvie why she requested that I remove the post, and although Helvie did not reply, I deleted the post.

56. It was Dr. Helvie who was causing me stress, not Jamie Napier.

57. The HR Coordinator, Stephanie Meiss, told me that I was creating a hornet's nest, but Orchard treated me better than Jamie Napier, who did nothing wrong.

58. I was offered a contract to teach, but Napier was not offered any contract.

59. Dr. Helvie issued a blast email to all faculty and parents stating that Napier's contract was not renewed, but Dr. Helvie did not issue such an email for the nonrenewal of my contract as Coordinator.

60. When I tried to explain on Facebook that I was being demoted to teaching, Dr. Helvie asked me to take down my posting, which I did.

61. I was extremely stressed due to my job situation, so I applied for family medical leave.

62. I worked half days for the remainder of the school year.

63. I neither quit nor resigned from my employment at Orchard.

64. The following year, Hal Schwartz suddenly resigned, and Dr. Helvie appointed Heather Girton as Interim Director, and later Director, of the EC/ES.

65. Orchard has given employees promotions that they were not qualified for, including Angela Brothers to Interim Director, and later to Director, of the Middle School and Heather Girton to Interim Director, and later to Director, of the Early Childhood and Elementary School.

66. Dr. Helvie appointed the interim directors without posting the positions for applications and then promoted the interim directors to permanent directors without much of a search.

67. Orchard treated Jamie Napier worse than Jennifer Bostrom, Courtney Williams, Angela Brothers, me, Heather Girton, Dr. Helvie, and other female employees who were given warnings, letters of counseling, discipline, leaves, and other actions less harmful than non-renewal and a blast email months before the end of the school year.

68. In my 20 years at Orchard, I did not receive an unsatisfactory performance review or any discipline.

☐
1

I declare under penalty of perjury that the foregoing is true and correct, pursuant to Title 28, United States Code, Section 1746.
Executed on _____ Dec 14 _____, 2022

Printed name: Gretchen Bricker

1

```
 1    relationship.

 2 Q  Anything else?

 3 A  No.

 4 Q  Did you have any role in the termination of Jamie?

 5 A  No.

 6 Q  And how did the termination of Jamie come about?

 7 A  Dr. Helvie, the head of school, had me come to her

 8    office and informed me that she had made the

 9    decision that Jamie would not be returning the

10    following year.

11 Q  For what reason?

12 A  I did not ask.

13 Q  And what did she say?

14 A  To the question I did not ask?  I'm sorry.  I

15    don't --

16 Q  You didn't ask.  Did she say why Jamie would not be

17    returning?

18 A  Well, that she felt that their relationship was not

19    going to be conducive to the school moving forward.

20    No specifics.  I don't know particularly.  Breach

21    of trust perhaps.

22 Q  Anything else?

23 A  Well, his general sour grapes would be my

24    conjecture.

25 Q  Anything else?
```

## <u>AFFIDAVIT OF NICHOLAS EBLE</u>

I, Nicholas Eble, do hereby swear and affirm under the penalties for perjury that the following representations are true:

1.      I am a competent adult, over eighteen years of age, and have personal knowledge of all matters contained in this affidavit.

2.      I am the current Assistant Head of School at the Orchard School. I have held this position since 2014.

3.      As part of my duties, I oversaw the search and selection process for the Middle School Director position which spanned from late 2019 to early 2020.

4.      After posting the job vacancy for the Middle School Director position, Orchard received approximately 48 applications. Among those applications were applications submitted by the interim Middle School Director Angela Brothers and the former Middle School Director Jamie Napier.

5.      As is my standard hiring practice, I vetted the 48 applications and removed applicants from the pool of consideration for various reasons including qualifications, geography, and past poor performance if the candidate had previously been employed by Orchard.

6.      I removed Napier from the pool of candidates for consideration due to his past poor performance in the position.

7.      I also removed another former Orchard employee from consideration, also due to poor past performance, a woman.

8.      At the conclusion of the search and selection process, I offered the position to Angela Brothers.

I declare under penalties of perjury that the foregoing statements are true.


Dated: 7/31/22                         _____

                                       Nicholas Eble, Affiant