**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
NO. 23-1659**

| | |
|---|---|
| JAMES NAPIER, | On appeal from the |
| | United States District Court |
| Plaintiff-Appellant, | |
| | Southern District of Indiana, |
| v. | Indianapolis Division |
| | |
| ORCHARD SCHOOL FOUNDATION, | Case No. 1:19-cv-03556-SEB-MKK |
| | |
| Defendant-Appellee. | The Honorable Sarah Evans |
| | Barker, Judge |

---

## BRIEF OF DEFENDANT-APPELLEE

---

CHURCH CHURCH HITTLE + ANTRIM

Alexander P. Pinegar, IN Atty #26543-49
Jessica L. Billingsley, IN Atty #31890-29
Two North Ninth Street
Noblesville, IN 46060
Telephone:   (317) 773-2190
Facsimile:   (317) 773-5320
Email:        apinegar@cchalaw.com
              jbillingsley@cchalaw.com

*Attorneys for Defendant-Appellee
Orchard School Foundation*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS

Save As　　Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1659

Short Caption: James Napier v. Orchard School Foundation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Orchard School Foundation

(2)　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Church Church Hittle + Antrim

(3)　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: /s/ Alexander P. Pinegar　　　　Date: April 25, 2023

Attorney's Printed Name: Alexander P. Pinegar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　Yes ✔　No ☐

Address: Church Church Hittle + Antrim - Two North Ninth Street, Noblesville, IN 46060

Phone Number: 317-773-2190　　　　Fax Number: 317-773-5320

E-Mail Address: apinegar@cchalaw.com

rev. 12/19 AK

ii

Save As          Clear Form

Case: 23-1659     Document: 2       Filed: 04/24/2023     Pages: 1

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1659

Short Caption: James Napier v. Orchard School Foundation

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Orchard School Foundation

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Church Church Hittle + Antrim

(3)  If the party, amicus or intervenor is a corporation:

   i)  Identify all its parent corporations, if any; and
       N/A

   ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/Jessica L. Billingsley          Date: April 24, 2023

Attorney's Printed Name: Jessica L. Billingsley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [✓]  No [ ]

Address: Church Church Hittle + Antrim - Two North Ninth Street, Noblesville, IN 46060

Phone Number: 317-773-2190          Fax Number: 317-773-5320

E-Mail Address: jbillingsley@cchalaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ......................................... ii

TABLE OF CONTENTS .............................................................................. iv

TABLE OF AUTHORITIES ......................................................................... vi

JURISDICTIONAL STATEMENT .................................................................. 1

STATEMENT REGARDING ORAL ARGUMENT .......................................... 1

STATEMENT OF THE ISSUES .................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................... 9

ARGUMENT ............................................................................................ 12

I.    Orchard Is Entitled To Summary Judgment On Napier's Discrimination Claim. ........................................................................... 12

    A.    The District Court did not error by analyzing Orchard's summary judgment motion under both the *McDonnell Douglas* framework and the *Ortiz* standard ................................................. 12

    B.    The District Court correctly determined there are no genuine issues of material fact on which a reasonable jury could find that Orchard terminated Mr. Napier because he was male. ........................................... 16

        1.    The 37 "types of evidence" Mr. Napier lists do not create any genuine issues of material fact. ........................................ 16

        2.    The undisputed material facts show that Orchard terminated Mr. Napier because Dr. Helvie determined he had egregiously compromised her trust. .......................................... 32

        3.    The District Court's opinion is not undetermined by its reference to Wellesley College's website. ................................... 35

        4.    The Supreme Court's recent opinion addressing college admissions has no bearing on Title VII and the *Ortiz* standard. ............... 35

II.    Orchard Is Entitled To Summary Judgment On Mr. Napier's Retaliation Claim. ................................................................... 36

CONCLUSION ........................................................................... 41

Certificate of Compliance with F.R.A.P. Rule 32(a)(7) and Circuit Rule 32 ........................................................................ 42

Certificate of Service................................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Baines v. Walgreen Co*, 386 F.3d 656, 661-62, 665 (7th Cir.2017) ............................ 37

*Coleman v. Donahoe*, 667 F.3d 835, 846, 847 (7th Cir.2012) ............................... 29, 30

*Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) ............................. 17

*Debs v. Ne. Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998).............................. 22, 25

*EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006) ................................................. 38

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107-110 (2d Cir 2010)................ 26

*Haley v. Urb. Outfitters, Inc.*, No. 22-1932, 2023 WL 1775670 (7th Circ. Feb. 6, 2023) ................................................................................................................. 18, 22

*Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) .................................................... 14

*Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 407 (7th Cir. 2007), *aff'd.* 553 U.S. 442 (2008) ................................................................................................................. 26

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.,* 988 F.3d 948, 958 (7th Cir. 2021)....18

*Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007)...................... 27

*Lauth v. Covance, Inc.,* 863 F.3d 708, 717 (7th Cir. 2017) ........................................ 40

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)......... 9, 13, 14, 15, 16, 35, 36

*McKenzie v. Ill. Dep't of Transp.,*  92 F.3d 473, 483 (7th Cir. 1996)......................... 37

*Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455, 457 (7th Cir. 1999) ..... 12, 14, 32

*Morgan v. SVT, LLC,* 724 F.3d 990, 996 (7th Cir. 2013) ........................................... 37

*Nordstrom, Inc. v. Dunn,* 260 260 F.3d 778, 783 (7th Cir. 2001).......................... 2, 36

*Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 765, 766 (7th Cir. 2016).. 1, 9, 13, 14, ...............................................................................................15, 16, 17, 32

*Phelan v. City of Chicago,* 347 F.3d 679, 684-85 (7th Cir. 2003) .............................. 14

*Puffer v. Allstate Ins. Co.,,* 675 F.3d 709, 718 (7th Cir. 2012)....................................38

*Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998) ....................................38

*Smart v. Ball State,* 89 F.3d 437, 441 (7th Cir. 1996)................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 195-197 (2023) ..................................................................................35, 36

*Sweeney v. West,* 149 F.3d 550, 555 (7th Cir. 1998).………………………………… ...2, 36

*Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248 (1981) ......................................39

*Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020) ...........................13, 14

## STATUTES

42 U.S.C. § 2000e (1964)................................................................................36

42 U.S.C. § 2000e-2(a)(1) .............................................................................12

42 U.S.C. § 2000e-3(a) ..................................................................................36

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant, James Napier
("Appellant" or "Mr. Napier"), is complete and correct. Orchard School Foundation
("Orchard") further adds, consistent with Circuit Rule 28(a)(1), that it is an Indiana
nonprofit corporation, with its principal place of business in Indianapolis, Indiana.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not needed. This case requires a straightforward
application of Title VII to undisputed facts. The district court's thorough, 41-page
order articulates the salient facts, evidence, and legal issues and applies established
legal precedent to them. The Parties' briefs articulate their positions on the district
court's decision.

Accordingly, Orchard maintains that the benefit the Court would receive
from oral argument is outweighed by both the administrative burden to the Court to
conduct it (which could be directed to other appeals in which oral argument would
be more beneficial), and the thousands of dollars in additional costs and attorney
fees the Parties would incur to prepare for, travel to, and participate in it.

## STATEMENT OF THE ISSUES

1.     Whether, based upon the evidence the parties designated to the
district court, a reasonable factfinder could conclude that Orchard terminated Mr.
Napier's employment because he was male. *See Ortiz v. Werner Enterprises, Inc.*,
834 F.3d 760, 765 (7th Cir. 2016).

2.      Whether, based upon the evidence the parties designated to the district court, a reasonable factfinder could conclude that Orchard did not rehire Mr. Napier (for the position it had previously terminated him from) because he had filed a lawsuit concerning his termination. *See Nordstrom, Inc. v. Dunn*, 260 F.3d 778, 783 (7th Cir. 2001) (*citing Sweeney v. West*, 149 F.3d 550, 555 (7th Cir. 1998).

## STATEMENT OF THE CASE

Mr. Napier's Statement of the Case contains considerable background that is not relevant to the issues that were before the district court and are now before this Court in its *de novo* review of the district court's order granting Orchard's summary judgment motion. Therefore, Orchard offers the following Statement of the Case to assist the Court in identifying what information is relevant to whether there are genuine issues of material fact that require the Court to reverse the District Court.

Orchard is a private school in Indianapolis that serves children ages three through eighth grade. [Doc. 104-12 at 1 (Helvie Aff. ¶ 2).][1] Orchard hired Mr. Napier in 2016 as Middle School Director. [Doc. 104-1 at 3 (Answer to Amended Complaint¶ 6).] Mr. Napier's duties included supervising the Middle School Coordinator, Angela Brothers. [Doc. 117-1 at 2 (Napier Aff. ¶22).]

Prior to July 1, 2018, Orchard's Head of School was Tom Rosenbluth. [Doc. 117-1 (Napier Aff. ¶23).] Hal Schwartz was the Early Childhood and Elementary School Director. [Doc. 104-2 at 6 (Napier Dep. 21:11-14).] In addition, Nick Eble

---

[1]      Citations to "Doc." refer to the District Court's docket and are identified by ECF docket number. Citations to "Appx." refer to documents Mr. Napier filed with his required short appendix.

2

served as Assistant Head of School. [Id.] Mr. Napier and Mr. Schwartz reported to

Mr. Eble, who, in turn, reported to the Head of School. [Doc. 104-12 (Helvie Aff. ¶

3).]

Orchard hired Dr. Sherri Helvie as the new Head of School, effective July 1,

2018. [Doc. 104-2 at 8 (Napier Dep. 29:18-20).] Mr. Napier would characterize her

hire as beginning a "sort of watershed" of changes at Orchard. [Id. at 14-17.] A few

weeks after she started, Dr. Helvie sent an email referencing the "Senior

Administrative Team" (which included the Assistant Head of School, the Director of

Institutional Advancement, and the CFO) and the "Academic Leadership Team"

(which included the Assistant Head of School and Mr. Napier and Mr. Schwartz, the

Directors of the two primary divisions in the school). [Doc. 104-4 at 1 (Helvie 7/16/18

Email).] Mr. Napier perceived this as a demotion of sorts, whereby the "new senior

leadership team" no longer included him. [Doc. 104-4 at 32 (Napier Dep. 126:4-11).]

He no longer felt "in the know" and had less access to Dr. Helvie than he had had

with her predecessor. [Doc. 104-2 at 8-9 (Napier Dep. 32:14-34:13).] While he—as

part of the Academic Leadership Team—continued to meet with Dr. Helvie about

every two weeks, those meetings did not include the same level of strategy

discussions that had occurred earlier. [Id. at 18 (Napier Dep. 72:5-20).] However, his

pay did not decrease, nor did his day-to-day responsibilities change. [Id. at 8-9

(Napier Dep. 32:2-4, 33:8-10).]

In Fall 2018, a Middle School teacher at Orchard announced she would retire

at the end of the 2018-19 school year. [Doc. 104-2 at 15-16 (Napier Dep. 60:15-

3

61:11).] To replace her, Mr. Napier focused his attentions on an individual then employed at a nearby school. [Id. (Napier Dep. 60:18-62:6).] Dr. Helvie instructed Mr. Napier not to post the position until she had the opportunity to speak with the head of the other school. [Id. (Napier Dep. 64:14-18).] Mr. Napier did not hear back from Dr. Helvie that she had spoken with the head of the other school. [Doc. 104-2 at 17 (Napier Dep. 65:1-4).] Nonetheless, Mr. Napier had the position posted. [Doc. 104-2 at 16 (Napier Dep. 63:1-3).] Within 24-48 hours, Dr. Helvie had the posting taken down. [Id. (Napier Dep. 63:3-5).]

In Winter 2018/2019, Dr. Helvie asked Mr. Napier to provide an updated job description of the Middle School Coordinator position, held by Angela Brothers. [Doc. 104-2 at 17 (Napier Dep. 67:23-68:4).] Dr. Helvie also asked Hal Schwartz to provide an updated job description for the parallel position at the Elementary School Division, the Early Childhood and Elementary School Coordinator of Student Services, which was held by Gretchen Bricker. [Doc. 104-12 (Helvie Aff. ¶ 7); Doc. 104-13 (Schwartz Aff. ¶ 4).] Dr. Helvie was evaluating these coordinator positions because she was thought that the job descriptions were vague, which made her hesitant to retain the positions. [Doc. 104-12 (Napier Dep. 67:13-17); Doc. 104-12 (Helvie Aff. ¶¶ 6-7).] The creation of these new job descriptions was discussed at leadership meetings, and while Mr. Napier could not recall Dr. Helvie saying that the topic was "of uber secrecy," he acknowledged that Dr. Helvie would usually end those meetings reminding everyone that "what's been talked about in here should stay in here." [Doc. 104-2 at 23 (Napier Dep. 6-12).] Dr. Helvie did, however, recall

4

that she directed Mr. Napier and Mr. Schwartz to keep the development of the new job descriptions confidential. [Doc. 104-12 (Helvie Aff. ¶ 7).] Mr. Schwartz confirmed Dr. Helvie instructed it should be confidential. [Doc. 104-13 (Schwartz Aff ¶ 6.).]

Around January or February 2019, Ms. Brothers became concerned about her job and started asking Mr. Napier pointed questions about whether her job was in jeopardy. [Doc. 104-2 at 21 (Napier Dep. 82:16-23).] Mr. Napier testified that "did not lie terribly well" and told Ms. Brothers, "if and maybe possibly" and that "we're putting together your job description." [Id. (82:22-25).]

This led Ms. Brothers to contact Dr. Helvie and they met soon thereafter on February 20, 2019. [Doc. 104-15 (Helvie 2/22/19 Email).] In the meantime, on February 19, 2019, Mr. Napier admitted to Dr. Helvie that he had enlisted Ms. Brothers' assistance in writing out his priorities for her job description. [Doc. 104-15 (Id.)] This surprised Dr. Helvie, as she considered that a breach of their "administrative confidence" as they worked together to clarify what the Coordinator position might look like before they shared it directly with Ms. Brothers. [Id.] The following day, Dr. Helvie met with Ms. Brothers as the latter had requested, and Ms. Brothers confirmed what Mr. Napier had shared with her. [Id.] Dr. Helvie, in turn, then confirmed with Ms. Brothers that she was reviewing all administrative roles in the school, including Ms. Brothers'. [Id.] This upset Ms. Brothers, which Dr. Helvie understood. [Id.] On February 22, 2019, Dr. Helvie reported these developments by email to the co-Chairs of Orchard's Board and stated she planned to meet with Mr. Napier the following week to address "his decision to breach the

confidentiality of our Academic Leadership Team conversations" and to tell him that by enlisting Ms. Brothers to write out her own duties, he had subjected Ms. Brothers to incredible stress and failed in his duties as supervisor and Middle School Director. [Id.] Dr. Helvie closed her email stating that Mr. Napier had "egregiously compromised [her] trust in him" and had "sadly . . . activated the gossip network himself." [Id.]

Approximately two weeks later, on March 6, Dr. Helvie met with Mr. Napier and told him his contract would not be renewed for the following school year. Mr. Napier testified that Dr. Helvie told him: "I've lost confidence in you because you have disclosed to Angie Brothers about her job, which has caused her undue stress, and that has also bled over to Gretchen Bricker." [Doc. 104-2 at 24 (Napier Dep. 94:20-23).] Dr. Helvie told Mr. Napier she intended to inform the school community by email and asked him to help her "craft the email." [Id. at 96:7-9.] Mr. Napier later refused this request and instead asked that the email not be sent because he thought it would publicly humiliate him. [Id. at 26 (Napier Dep. 101:19-102:13.] However, Dr. Helvie wanted to send the email so faculty members would be aware Mr. Napier would not be returning before they had to decide whether to re-execute their employment contracts for the following year. [Id. at 104:13-21.]

Nick Eble, the Assistant Head of School, had no role in the decision to terminate Mr. Napier. [Doc. 104-3 at 3 (Eble Depo. 15:4-5).]

After Dr. Helvie informed Mr. Napier that his contract was not going to be renewed, she offered Ms. Brothers the position of Acting Middle School Director for

the following school year, 2019-2020. [Doc. 104-2 at 24 (Napier Dep. 95:24-25); Doc.
104-8 (Helvie 3/8/19 Email).] Mr. Napier encouraged her to take the position, which
she did, because he did not "want this scandal to become a fulcrum for which the
school dissolved itself." [Doc. 104-2 at 25-26 (Napier Dep. 100:15-101:5).] Ms.
Brothers had worked continuously at Orchard School since 1998. [Doc. 104-7 at 3
(Brothers Dep. 5:2-23).] She has a master's degree in Curriculum, Assessment, and
Instruction. [Id. at 2 (Brothers Dep. 4:18-19; Doc. 104-9 (Brothers CV).] Mr. Napier
had been mentoring and training Ms. Brothers for leadership. [Doc. 104-2 at 15
(Napier Dep. 60:22-24).]

Dr. Helvie sent the email—that Mr. Napier had refused to assist with—to the
school community on March 8, 2019. [Doc. 104-8 (3/8/19 Email).] The email stated
that "Jamie Napier will not be returning as Orchard's Middle School Director [next
year]. In his nearly three years in the role, Jamie has introduced important
program innovations . . . and I'm appreciative of his many contributions to Orchard
. . . Please join me in thanking Jamie for his leadership . . ." [Id.] The email also
announced that Ms. Brothers would be Acting Middle School Director for 2019-
2020. [Id.] Mr. Napier did not think anything in the email was untrue; it was
"simply factual." [Doc. 104-2 at 26 (Napier Dep. 103:15-17).]

On March 15, 2019, Mr. Napier sent the Orchard board chair a written
description of the issues he had with Dr. Helvie. It did not mention or allege that
Dr. Helvie actually terminated him because he was male. [Doc. 117-25 at 1-3
(Napier 3/15/19 Letter).]

Following the above developments, in late March, Dr. Helvie met with Middle School faculty, who asked her why Mr. Napier was not returning. She was not in a position to divulge confidential information about a personnel matter. [Doc. 104-10 at 10 (Helvie Dep. 39:6-25).] She also met with parents, and told them that she was appreciative of the good work Mr. Napier had done and that it would be inappropriate to share information regarding personnel matters. She rebutted one parent's speculation that "there must be negative things or reasons," stating, "No, I do not want a single person leaving this room thinking disparaging things about Jamie Napier." [Id. at 11-12 (41:2-42:19).]

In March 2019, Dr. Helvie also met with Ms. Bricker (the Early Childhood and Elementary School Coordinator) and notified her that her position was also going to be eliminated but that she could return to a teaching position. [Doc. 117-40 (Bricker Aff. ¶ 43).] Ms. Bricker chose not to take that position. [Id. at ¶ 49.]

On August 21, 2019, Mr. Napier filed his initial complaint in this case. [Doc. 104-1 at 8 (Answer to Amended Complaint ¶ 41).] Orchard posted a job vacancy advertisement for the permanent Middle School Director position in November 2019. [Doc. 104-17 (Job Posting).] Mr. Napier submitted an application. Nick Eble oversaw the search and selection process. [Doc. 104-3 at 4 (Eble Dep. 19:2-4).] Mr. Eble was aware that Dr. Helvie had previously decided that Mr. Napier would not be returning for the 2019-2020 school year and that their continued relationship would not be conducive to the school's future. [A-81; Doc. 104-3 (Eble Dep. 15:6-21).] From this he inferred that perhaps there had been a breach of trust between them.

8

[Id.] Mr. Eble rejected Mr. Napier's application—and another former (female) employee's—on the basis of poor past performance. [Doc. 104-18 at 1 (Eble Aff. ¶¶ 5-7).] Mr. Eble's standard hiring practice was to remove former employees with past performance issues from the candidate pool. [Doc. 104-18 (Eble Aff. ¶ 5).] After Mr. Napier learned his application had been rejected, he filed a second charge of discrimination with the EEOC, and subsequently a second lawsuit against Orchard. The District Court consolidated the cases and Mr. Napier amended his complaint to incorporate his claims into a single pleading. [See generally Doc. 104-1 at 10-12 (Answer to Amended Complaint, ¶¶ 46, 51, 54, 56, 57, 58) and Doc. 88 (9/21/21 Order).]

Orchard moved for summary judgment, which the district court granted. [Appx. A-1 ff.]

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's order granting Orchard summary judgment on both of Mr. Napier's claims. Under both the straightforward standard articulated by this Court in *Ortiz v. Werner Enterprises, Inc., infra,* and the burden shifting framework created by *McDonnell Douglas Corp. v. Green, infra,* the undisputed facts demonstrate that Orchard terminated Mr. Napier's employment for reasons that had nothing to do with sex.

It is undisputed that, shortly after her tenure as Head of School began, Dr. Helvie instructed Mr. Napier not to post an advertisement for a vacant teaching

position until Dr. Helvie had spoken to the head of another private school. Mr. Napier had the position posted anyway.

It is undisputed that Dr. Helvie instructed Mr. Napier and his Elementary School Division counterpart, Hal Schwartz, to review and rework the job descriptions of their direct subordinates. It is undisputed—for Mr. Napier does not deny it; he only states he did not recall it—that Dr. Helvie instructed Mr. Napier and Mr. Schwartz to undertake this project in confidence. At the very least, it is undisputed that Dr. Helvie honestly believed she had instructed Mr. Napier to do this work confidentially. Mr. Napier designated no evidence showing Dr. Helvie did not have that understanding.

It is undisputed that Mr. Napier did not keep this confidential. When Ms. Brothers asked him if her job was in jeopardy, Mr. Napier stated that he "did not lie terribly well" and told her that "we're putting together your job description."

It is undisputed that this alarmed Ms. Brothers and that she met with Dr. Helvie about it. It is undisputed that Mr. Napier himself acknowledged to Dr. Helvie that he had asked Ms. Brothers to help him with rewriting the job description. It is undisputed that Dr. Helvie perceived that this breach of confidence was a failure on Mr. Napier's part, that his actions had "activated the gossip network," and that, as a result, he had "egregiously compromised" her trust.

It is undisputed that when Dr. Helvie met with Mr. Napier to tell him that his contract would not be renewed, she told him that she had lost confidence in him.

10

In the face of this undisputed evidence, Mr. Napier did not designate any evidence that similarly situated females had engaged in the same conduct under Dr. Helvie's supervision but had been treated differently by Orchard. In fact, Mr. Napier did not designate evidence that *any* employee under Dr. Helvie's supervision had acted similarly but had been treated differently.

Instead, Mr. Napier supposes that the entire situation was based on miscommunication. But this is incongruous with his sex discrimination claim. For "poor communication" (even if it exists) is not a basis for liability under Title VII. Sensing this, Mr. Napier often attempts to connect the alleged miscommunication to a perceived culture where males were disfavored at Orchard, but he ultimately did not designate evidence showing that Dr. Helvie harbored such feelings or had used "miscommunication" as a pretext to justify her decision to terminate Mr. Napier's employment.

In short, despite Mr. Napier's oft-repeated list of 37 categories of evidence he contends the district court failed to account for, this is a straightforward fact pattern the Court is very familiar with in Title VII cases. Even assuming a different employer might have or could have handled the situation differently (or better), the evidence is undisputed and overwhelming that Orchard's decision to terminate Mr. Napier's employment had nothing to do with the fact that he was male. It was, instead, based upon his supervisor's belief that he had failed to follow her instructions and thereby greatly undermined her ability to trust him.

For these reasons, the Court should affirm the district court's order granting Orchard summary judgment on Mr. Napier's discrimination claim.

Similarly, Mr. Napier failed to designate evidence showing that his filing of this lawsuit was the but-for cause for Orchard's decision to not re-hire him. The undisputed evidence shows that Mr. Eble oversaw that hiring process. It is undisputed that he was aware that Dr. Helvie had previously terminated Mr. Napier's employment because she did not feel their continued relationship was not conducive for Orchard's future. It is undisputed Mr. Eble removed Mr. Napier's application from the applicant pool on that basis—and that he removed a female's application on the same basis of poor past performance.

For these reasons, the Court should affirm the district court's order granting Orchard summary judgment on Mr. Napier's retaliation claim.

## ARGUMENT

### I. <u>Orchard Is Entitled To Summary Judgment On Napier's Discrimination Claim.</u>

#### A. The District Court did not error by analyzing Orchard's summary judgment motion under both the *McDonnell Douglas* framework and the *Ortiz* standard.

Title VII makes it unlawful for an employer to discharge an individual "because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Although Title VII has been applied to protect members of historically discriminated-against groups, its protections are not limited to those in such groups. *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 455 (7th Cir. 1999). When confronted with a summary

judgment motion in a Title VII case, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Under this standard, evidence must be considered as a whole and "no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" However, under the *Ortiz* standard, the burden shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)— "sometimes . . . referred to as an 'indirect' means of proving employment discrimination"—remains viable, *Ortiz,* 834 F.3d at 766, and may be used "as a supplemental tool." *Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020).

The *McDonnell Douglas* framework is well known, but to quickly summarize it: The plaintiff has the burden of demonstrating that he is a member of a protected class, was meeting the employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably that similarly situated employees who were not members of the protected class. If the plaintiff satisfies each of these elements of a prima facie case, then the defendant-employer has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff then must submit evidence that the employer's articulated reason was a pretext. *Id.* at 598.

In addition, because it is the "unusual employer who discriminates against majority employees," this Court has recognized that in "reverse discrimination"

cases, a plaintiff must show "background circumstances" to support a sex discrimination claim. *Mills*, 171 F.3d at 456–57. Thus, under the *McDonnell Douglas* framework, to establish a prima facie case of sex discrimination in a reverse discrimination suit a plaintiff must establish: (1) "'background circumstances that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something "fishy" about the facts at hand;'" (2) that the plaintiff adequately performed his employment responsibilities; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff received different treatment than similarly situated persons who were not members of the same protected class. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684–85 (7th Cir. 2003)).

Because Mr. Napier "elected to structure his [summary judgment response] brief and supportive arguments under the *McDonnell Douglas* burden-shifting framework," [Appx. A-15] it certainly was not error for the district court to use that analytical framework in reviewing Orchard's summary judgment motion. *Tyburski*, 964 F.3d at 598. Nonetheless, Mr. Napier argues that the district court erred in applying the burden-shifting framework from *McDonnell Douglas* instead of the totality of the evidence from *Ortiz*. [Appellant's Br. at 26]. As noted above, Mr. Napier is correct that there is only one standard, regardless of approach, but here the district court properly analyzed the evidence (or lack thereof) under <u>both</u> the *McConnell Douglas* framework and the *Ortiz* standard. [Appx. A-15, A-33.] In doing

so, the district court concluded that "[v]iewing the evidence then as a whole, we conclude that no reasonable factfinder could find that Mr. Napier's gender was the cause of his discharge from employment by Orchard." [Appx. A-34].

For the same reason, Mr. Napier's complaints about *how* the district court used the *McDonnell Douglas* framework fall flat. For example, Mr. Napier contends the district court erred by requiring a prima facie case when Orchard had already and clearly articulated a non-discriminatory reason for terminating him [Appellant's Br. at 28] and for requiring evidence of background evidence suggesting that Orchard was the rare employer that would discriminate against men even though males are a minority at Orchard. [Appellant's Br. at 27]. These contentions do not account for what is discussed above: The *McDonnell Douglas* framework is just that—a framework—and a supplemental tool that may still be used under the *Ortiz* standard, and the District Court addressed Mr. Napier's claims under <u>*both*</u> the *McDonnell Douglas* framework and the *Ortiz* standard. After painstakingly culling through the evidence and issues under the *McDonnell Douglas* framework— background circumstances, Orchard's job expectations, treatment of similarly situated women (if any)—the District Court also analyzed the facts through the *Ortiz* standard, determining Mr. Napier had failed to designate evidence that justified his case going to the jury. [*See* Appx. A-15—A-38.]

15

**B. The District Court correctly determined there are no genuine issues of material fact on which a reasonable jury could find that Orchard terminated Mr. Napier because he was male.**

Below, Orchard will address Mr. Napier's arguments in much the same way as the district court did. As shown below, a review of Mr. Napier's 37 categories of evidence demonstrates that, under the *McDonnell Douglas* framework, Mr. Napier cannot demonstrate genuine issues of material fact on any—let alone all—of these issues: whether there were background circumstances on which a jury could find that Orchard was the type of employer to discriminate against men; whether Mr. Napier had met Orchard's legitimate job expectations; and whether Orchard treated him less favorably than it treated similarly situated women. Following that, Orchard will demonstrate that, examining the evidence as a whole, there was not "evidence that would permit a reasonable factfinder to conclude that [Mr. Napier's] . . . sex . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

**1. The 37 "types of evidence" Mr. Napier lists do not create any genuine issues of material fact.**

Mr. Napier opens the argument section of his brief [Appellant's Br. at 23-24] by listing 37 categories of (alleged) evidence that he contends the district court failed to properly consider when it determined that no reasonable factfinder could find that Orchard terminated him because he was male. Throughout the remainder of the argument section, Mr. Napier elaborates on some, but not all, of these 37 pieces of evidence. Orchard will attempt to address each one below. In so doing, Orchard will also demonstrate that it has met the standard under *Ortiz,* whereby

16

the evidence, considered as a whole, does not permit a reasonable factfinder to conclude that Orchard terminated Mr. Napier because he was male. *See Ortiz*, 834 F.3d at 765.

1. "Background circumstances of Orchard's multiple statements against males and favoring females"

The district court addressed this. [Appx. A-18-19]. The statements Mr. Napier relies on were made prior to Dr. Helvie's arrival as Head of School, and Mr. Napier has failed to provide any evidence Dr. Helvie herself made such statements or was even aware of them. [*See* Appellant's Br. at 8-9; Appx. A-18-19.] *See Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 723 (7th Cir. 2001) ("Stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive."). He has further failed to provide evidence connecting the statements to Dr. Helvie's decision to terminate Mr. Napier for egregiously breaching her trust.

2. "Orchard has an Elementary School (ES), a Middle School (MS), and no high school"

This fact has no bearing on whether sex discrimination occurred—either on a circumstantial or direct basis.

3. "An industry stereotype against males in early childhood schools"

In support of this assertion, Mr. Napier cites [*see* Appellant's Br. at 8] only his own testimony and a few comments in a teacher's email from 2016, which, ironically *supported* the hiring of a male (Mr. Schwartz) as Director of Orchard's Early Childhood and Elementary Division. Regardless of whether Mr. Napier's theory is true, Mr. Napier provided no evidence that *Orchard* had a stereotype

17

against males in early childhood schools—indeed, it employed a male as Director of that division—or that such a stereotype played a part in Dr. Helvie's decision to terminate him.

### 4. "Orchard's debate whether or not to hire Napier because he is a male"

Again, assuming this debate occurred, it did not involve Dr. Helvie; she was hired as Head of School two years after Orchard hired Mr. Napier. Mr. Napier provided no evidence that the history of this debate influenced Dr. Helvie's decision or that she was aware of it.

### 5. "Mr. Napier's exemplary performance"

For present purposes, Orchard does not dispute that Mr. Napier had received positive feedback from Dr. Helvie's predecessor. However, Mr. Napier's own testimony shows that he had failed to follow Dr. Helvie's instructions on key personnel matters. [Doc. 104-2 at 15-17 (Napier Dep. 63:1-3, 64:14-18, 65:1-4) (regarding the teaching position posting in Fall 2018); Doc. 104-2 at 21 (82:22-25) (regarding informing Ms. Brothers that he and Dr. Helvie were putting together Ms. Brothers' job description).] Mr. Napier has not provided any evidence disputing Dr. Helvie's statements that she considered this an egregious breach of trust. As stated in *Haley v. Urb. Outfitters, Inc.*, No. 22-1932, 2023 WL 1775670 (7th Cir. Feb. 6, 2023), on which the district court relied, when evaluating the employer's purported reason for termination, a court can "look only to see if the employer honestly believed those reasons." *Id.* at 3 (*citing Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021)). Mr. Napier has not designated evidence

18

creating a genuine issue of material fact as to whether Dr. Helvie honestly believed that Mr. Napier had breached her trust.

### 6. "Orchard's glowing appraisal of him"

This fails for the same reasons stated directly above.

### 7. "Orchard's termination of the male Head of School (HOS)"

Mr. Napier asserts this in his list of 37 items and also states it in the fact section of his brief. [Appellant's Br. at 9.] He cites four lines of his own deposition testimony for the assertion: "But my first year would've been the '16-'17 school year. At the end of that school year, Tom Rosenbluth was informed that he had one more year as head of school, and then he would be exiting." This just is not evidence a reasonable jury could rely on to conclude that Dr. Helvie terminated Mr. Napier because he was male.

### 8. "Orchard's statements against males and about 'the legality of that position'"

This overlaps with #1 and #4 above. The specific statement referenced was made by Jo Butler, the consultant Orchard used when searching for a new Head of School during the 2017-2018 school year. [Doc. 117-7 at 4.] She was describing the impression _a candidate_ seemed to have after his interview—that "you're a white male and therefore at a huge disadvantage." [Id.] Plus, Ms. Butler's statement regarding the legality of that position demonstrates that at least Orchard's search consultant recognized it was illegal to make personnel decisions based on sex. Regardless, this statement predated Dr. Helvie's tenure and Mr. Napier provided no evidence that Dr. Helvie thought "white males" were at a "huge disadvantage."

19

9. "Orchard hired a female HOS, Dr. Helvie, who said she
concentrated in women's studies and followed the philosophy
of a radical feminist"

This assertion [*see* Appellant's Br. at 10] appears based on a statement in the

materials Dr. Helvie submitted when she applied for the Head of School position

about reading Paulo Freire and bell hooks when pursuing her doctorate. [Doc. 117-

32 at 4.] This is not evidence that Dr. Helvie decided to terminate Mr. Napier

because he was male. [*See* Appx. A-19-20 (district court's discussion of Mr. Napier's

allegations concerning Dr. Helvie's educational background).]

10. "Two weeks after beginning at Orchard, Dr. Helvie demoted
from the four-person senior leadership team the two male
directors of Orchard's only schools and replaced the males
with two females who did not supervise any teachers"

The district court addressed this at length. [Appx. A-24-26.] While Mr.

Napier perceived this as a demotion [Doc. 104-2 at 32 (Napier Dep. 126:5-6)], his

pay did not decrease, his day-to-day responsibilities did not change, and he

continued to meet with the Head of School. The bottom line is that Mr. Napier has

failed to show that Dr. Helvie's renaming—or perhaps, at most, re-organizing—

Orchard's leadership teams is evidence that she was predisposed to discriminate or

terminate Mr. Napier because he was male. Instead, Mr. Napier felt slighted but

that cannot be the basis for a Title VII action. *See Smart v. Ball State*, 89 F.3d 437,

441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an

actionable adverse action").

11. "Dr. Helvie immediately told Mr. Napier not to communicate
with her directly but to communicate with her through the
Assistant HOS (AHOS), Mr. Eble"

12. "Dr. Helvie did not regularly communicate directly with Mr. Napier and Mr. Eble and she made them afraid to ask her questions"

Orchard will address these together. Mr. Napier elaborates on these points on pages 35-37 of his brief. In those pages, Mr. Napier connects Dr. Helvie's alleged communication style to a discriminatory intent. But in fact, Mr. Napier only complains about Dr. Helvie's communication style. Even if Dr. Helvie's communication style was poor—and Orchard does not concede that was the case— that is not evidence that she fired Mr. Napier because he was male. Mr. Napier even acknowledges that the "[alleged] lack of Dr. Helvie's communication to Mr. Napier and Mr. Eble _caused_ the termination of Mr. Napier." [Appellant's Br. at 37 (emphasis added).] It is of course possible that Dr. Helvie and Mr. Napier miscommunicated regarding the posting of a vacancy announcement and the re-working of Ms. Brother's job description, but Dr. Helvie is not on trial for alleged miscommunication.

13. "Mr. Napier and the MS Coordinator, Ms. Brothers, had been working on her job description since June 2018 and it was not confidential"

14. "Dr. Helvie requested Mr. Napier to give her a new job description that reflected his priorities for the coordinator role, and she did not request confidentiality"

15. "Mr. Napier did not disclose to Ms. Brothers his new job description that reflected his priorities for the coordinator role"

16. "Ms. Brothers did not have the job description with Mr. Napier's priorities and she only had the old job description"

These assertions seem to be at the heart of Mr. Napier's complaints regarding Dr. Helvie. He alleges that he had a different understanding of what he had been charged to do regarding Ms. Brothers' job description and the confidentiality of that task. It seems that he believes the entire project was approached in a haphazard way. But these contentions should remind the Court of its oft-quoted statement that it "does not sit as a super-personnel department," *Debs v. Ne. Illinois Univ.,* 153 F.3d 390, 396 (7th Cir. 1998), and that in assessing Dr. Helvie's belief that Mr. Napier had not followed her directives, it is not the Court's task to determine if her belief was "correct, justified, or even if it was fair." *Haley,* 2023 WL 1775670.

Moreover, in his deposition, Mr. Napier essentially acknowledged that when Ms. Brothers asked him direct questions, he was caught between answering her fully and following Dr. Helvie's directives. [Doc. 104-2 at 21 (Napier Dep. 82:22-25) ("And her questions became more pointed and I did not lie terribly well, like, I mean, we're putting together your job description. All I could say was if and maybe possibly.")] This admission belies his attempts to cast his actions as conforming with Dr. Helvie's directives (or lack thereof) regarding confidentiality.

Regardless, Mr. Napier does not provide evidence disputing that Dr. Helvie had an honest belief that he had betrayed her trust, nor does he provide evidence disputing that this was the stated reason for her decision to terminate him.

17. <u>"Dr. Helvie gave Mr. Napier a high recommendation for a HOS position at another private school"</u>

This occurred in early February 2019, if not before. [Doc. 104-2 at 43 (Napier Dep. 171:3-7).] Mr. Napier states he interviewed for the other position on February

12, 2019. [Appellant's Br. at 12.] That predates when Mr. Napier told Dr. Helvie

that he had asked Ms. Brothers to help him rewrite the job description, which

surprised Dr. Helvie, for she saw that as a breach of confidence. [Doc. 104-15

(Helvie 2/22/19 email) (stating this occurred on "Tuesday" which would have been

February 19, 2019).] It also predates the meeting Dr. Helvie had with Ms. Brothers

on February 20, 2019. [Id.]

18. "Dr. Helvie disclosed to Ms. Brothers the proposed plan of Dr. Helvie to demote Ms. Brothers to a teaching position, Ms. Brothers became stressed and was observed crying at the school, and Ms. Brothers disclosed to ES Coordinator Gretchen Bricker the statements of Dr. Helvie, which stressed Bricker as well"

19. "Direct and ambiguous statements in which Dr. Helvie tried to blame Mr. Napier for disclosing Dr. Helvie's plan, but Mr. Napier did not disclose her plan, Dr. Helvie disclosed her plan"

This "it wasn't me—it was her" argument with respect to who disclosed what

to whom is nothing more than semantics. Orchard does not dispute that Ms.

Brothers became fully aware of what Dr. Helvie was considering when the two met

on February 20, 2019. [Id.] But Mr. Napier does not dispute that he shared

information with Ms. Brothers that led her to become "more and more anxious" and

to request the meeting with Dr. Helvie. [Id. at 21 (Napier Dep. 82:16-84:2).] Even

now, Mr. Napier does not seem to understand that Dr. Helvie terminated him for

poorly managing the entire situation, activating the gossip network, and

egregiously compromising her trust. [Doc. 104-15 at 2 (Helvie 2/22/19 Email).]

20. "Dr. Helvie told Mr. Napier in March that he was terminated as of the end of the school year, and she failed to give him a

23

notice of an accusation against him and an opportunity to
respond before terminating him"

21. "Orchard failed to offer a specific reason for the termination"

22. "Dr. Helvie's termination of Mr. Napier for a non-specific
false reason of a breach of a non-existent and non- specific
instruction of confidentiality"

Mr. Napier does not claim in this case he was entitled to procedural due

process. Nor did Title VII require Dr. Helvie to provide him notice of an accusation,

an opportunity to respond, or even why she was terminating him. Perhaps if

another similarly situated employee had breached Dr. Helvie's trust and been

provided such notices and opportunities, then Mr. Napier's assertions would have

some merit under the Title VII standards. But Mr. Napier has failed to identify any

such employee. Moreover, it is not as if Dr. Helvie provided him no reason for the

termination. As Mr. Napier acknowledged, when Dr. Helvie met with him, she

stated: "I've lost confidence in you because you have disclosed to Angie Brothers

about her job, which has caused her undue stress, and that has also bled over to

Gretchen Bricker." [Doc. 104-2 at 24 (Napier Dep. 94:20-23).] Finally, whether Dr.

Helvie and Mr. Napier had a different view as to her directives has been dealt with

above in responding to points #13-#16.

23. "Dr. Helvie's immediate mass email to all faculty and staff
that Mr. Napier would not be reemployed three months later
at the end of the school year, humiliating him, making him a
lame duck in his job, and ruining his opportunities for
leadership employment"

The email was not "immediate." It was sent two days after Dr. Helvie and

Mr. Napier met and after Mr. Napier refused to help Dr. Helvie craft the email. The

email simply states that he would not be returning for the following year. Mr.

Napier's primary complaint about the email is that it did not provide any

elaboration for why he was not returning. [Doc. 104-2 at 26 (Napier Dep. 103:16-

104:12).] This is ironic given his refusal to help write the email. No reasonable

factfinder could determine that it was designed to humiliate him. And in any event,

whatever consequences Mr. Napier believes the email caused go to issues beyond

whether Dr. Helvie's acted on the basis of Mr. Napier's sex.

24. "Dr. Helvie's immediate announcement of the promotion in
March effective at the end of the school year to the position of
Director of the MS of the female coordinator, Ms. Brothers,
whom Dr. Helvie had said she was considering demoting to
teaching, who was observed crying in the school, and who
disclosed to the ES Coordinator Ms. Bricker the statements
of Dr. Helvie that caused the stress"

This assertion seems to be that Dr. Helvie made a poor decision to promote

Ms. Brothers because Ms. Brothers was (allegedly) emotionally unstable. This

invites the Court to act as super-personnel department, which it has notably said it

will not do. *Debs*, 153 F.3d at 396. In addition, Mr. Napier has not designated

evidence rebutting Dr. Helvie's contemporaneous explanation that she was

examining Ms. Brothers' *position* as Middle School Coordinator, not Ms. Brothers

*herself* as an employee. [*See* Doc. 104-15 at 1 (Helvie 2/22/19 Email).] In addition,

Mr. Napier himself thought that if Ms. Brothers did not take the position of Acting

Director that the school would have "unglued" and "dissolved." [Doc. 104-2 at 25-26

(Napier Dep. 100:22-101:5).]

25. "suspicious timing"

Mr. Napier does not explain what was suspicious. But it is undisputed that

Dr. Helvie was hired July 1, 2018, that Dr. Helvie made the decision to terminate

Mr. Napier in February 2019, and that she acted within days of fully realizing how

Mr. Napier had breached her trust with respect to Ms. Brothers' job position and

description.

26. "Mr. Napier's complaints of discrimination"

27. "The failure of Dr. Helvie to investigate Mr. Napier's
    complaints and her failure to correct the discrimination"

28. "The failure of Orchard's board to investigate Mr. Napier's
    complaints of discrimination and failure to correct the
    discrimination"

29. "Dr. Helvie's and Orchard's failure to investigate the
    complaints of the many faculty and parents who supported
    Mr. Napier"

Mr. Napier elaborated on these points on pages 31-32 of his brief, citing two

cases for the general proposition that the lack of an investigation (or a poor

investigation) is indicative of liability under Title VII. But those cases do not

support that proposition. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th

Cir. 2007), *aff'd*, 553 U.S. 442 (2008) ("This is not to say that merely pointing to an

employer's shoddy investigatory efforts is sufficient to establish pretext. Erroneous

(but believed) reasons for terminating an employee are not tantamount to

pretextual reasons."); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107-110 (2d

Cir. 2010) (stating investigation was "questionable at best" but also discussing

several other pieces of evidence that supported pretext, including a statement from

26

plaintiff's supervisor suggesting supervisor thought plaintiff was old). Mr. Napier also cites *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) for the proposition that an employer's approach of doing nothing after receiving multiple complaints about serious conditions is a straight road to liability under Title VII. In *Isaacs*, the plaintiff complained of a hostile work environment "repeatedly" to supervisors and management, including of incidents where her immediate supervisor told her he would not train her unless she listened to him "describe his sexual exploits and desires" and where another supervisor ran into her with a forklift and then remarked: "See what can happen to you, bitch." *Id.* at 386-387. It is impossible to see how this case is applicable to Mr. Napier's situation. He did not complain "repeatedly" and certainly did not make complaints approaching those Isaacs made. He only complained to the Orchard Board *after* Dr. Helvie told him she was terminating him.

Respectfully, Mr. Napier's arguments regarding "investigation" are a red herring. He does not dispute what he told Ms. Brothers about the review of her job position. He does not dispute that he acknowledged to Dr. Helvie that he had involved Ms. Brothers in the task of reviewing her job description. And he does not dispute that Ms. Brothers shared and confirmed with Dr. Helvie what Mr. Napier had told her. There was nothing for Dr. Helvie to investigate, and since Dr. Helvie reported these things to the Board co-chairs herself, there was nothing for the board to investigate either, even if there was a legal requirement to do so.

30. "Orchard's failing to give Mr. Napier any writeup, counseling, discipline, or any other action that it gave to female employees except the one female whom it terminated for theft"

31. "Orchard's failure to give Mr. Napier an Employee Termination Notice that it gave to other involuntarily terminated employees"

32. "Orchard's failure to follow its training on preventing and correcting discrimination for Mr. Napier"

33. "Orchard's deviations from its policies"

34. "The resignation of the male ES Director at the end of the following academic year without any other claimed employment and Orchard replacing him with a female teacher with lower qualifications"

35. "Orchard's promotion and hiring of all female leaders for two years, 2020-2021"

These points are related to two themes of Mr. Napier's brief: That Orchard deviated from its standard procedures and that Orchard treated Mr. Napier differently from similarly situated women. These assertions are incorrect and the district court did not error it how it addressed them.

First, Orchard's personnel policies contemplated immediate termination, with or without notice: "An employee may be terminated from employment at any time with or without notice at the discretion of the Head of School." [Doc. 104-16 at 61.] Examples of misconduct that could lead to termination included violation or breach of confidentiality with regard to information pertaining to employees. [Id.] In light of this policy, Mr. Napier's contention that Orchard did not follow its policies and training fails to account for how serious the concerns Dr. Helvie had regarding

his performance. Nor does Mr. Napier dispute that she shared those concerns with him. Nor does he provide any evidence to show she did not honestly hold those concerns. That undisputed evidence shows that Mr. Napier's supervisor believed that he had egregiously compromised her trust. Mr. Napier cannot point to any evidence of any comparator committing such a serious offense.

Second, the evidence, which Mr. Napier does not dispute, is that there was no recent precedent set regarding providing documentation for an involuntary termination at the Director level. [Appx. A-56 (Helvie-Meiss 3/7/19 Email).] Mr. Napier asserts that Orchard did not give him the same written notice of termination that it gave other employees who were involuntarily terminated, but the evidence he cites [*see* Appellant's Br. at 15, *citing* A-54-63] does not demonstrate any precedent for what information Orchard (and particularly) Dr. Helvie had provided Director-level positions. Those documents also show that Orchard had prepared a Notice of Termination that tracked what Dr. Helvie had told Mr. Napier and Mr. Napier offers no evidence to explain why (as he allege) Orchard did not ultimately provide him the Notice; he instead asks the Court to merely speculate that it is evidence of discrimination.

Turning to Mr. Napier's points and argument (*see* Appellant's Br. at 41-42) about how he was treated in comparison to similarly situated women, he failed to designate evidence showing that a reasonable jury could conclude he was treated differently from truly similar women. While analysis of this question must be "flexible" and bound by "common-sense," similarly situated employees "must be

directly comparable in all material respects." *Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012) (citations omitted). "In the the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847 (internal citations and quotations omitted). None of the women Mr. Napier identifies is remotely a true comparator.

First, Mr. Napier identifies Ms. Bostrom (Director of Institutional Advancement) and Ms. Williams (Chief Financial Officer), who Dr. Helvie identified as being on the Senior Administrative Team, while Mr. Napier remained on the Academic Leadership Team. There is no evidence that either ever betrayed Dr. Helvie's trust. Nor is there any evidence that either were tasked with assisting Dr. Helvie with rewriting job descriptions for key academic personnel as Mr. Napier was. Mr. Napier complains that "neither had academic responsibilities" and therefore were not qualified "to lead a school" but that misses the point of Dr. Helvie's distinction between the administrative team and the academic leadership team, of which Mr. Napier remained a member.

Mr. Napier also identifies Angela Brothers, who ultimately succeeded him as the Director of the Middle School, as a comparator who Orchard treated differently. But Ms. Brothers had a different supervisor (Mr. Napier himself rather than Dr. Helvie) and there is no evidence Ms. Brothers ever compromised her supervisor's trust. Mr. Napier implies it was illogical for Dr. Helvie to promote Ms. Brothers to

the Director position when she had previously planned to "demote" her to a teaching position [Appellant's Br. at 41], but that mischaracterizes the evidence. It is undisputed that Dr. Helvie's intentions were based on Ms. Brothers' position being vaguely defined, not on Ms. Brothers' herself. Moreover, any comparison of Ms. Brothers' and Mr. Napier's job qualifications invites the Court to engage in the type of super-personnel department analysis that it has said it will not do. But, clearly, it is not as if Ms. Brothers had no qualifications. She had worked continuously at Orchard since 1998. [Doc. 104-7 at 3 (Brothers Dep. 5:2-23).] She has a master's degree in Curriculum, Assessment, and Instruction. [Id. at 2 (Brothers Dep. 4:18-19; Doc. 104-9 (Brothers CV).] And, ironically, Mr. Napier said himself that it was vital for Orchard's stability that Ms. Brothers accept the Director position. [Doc. 104-2 at 25-26 (Napier Dep. 100:22-101:5).]

In addition, Mr. Napier claims that Ms. Bricker was treated more favorably than he was. Ms. Bricker did not report to Dr. Helvie and was not in a similar position as Mr. Napier. There is no evidence she betrayed her supervisor's trust. As pointed out by the district court, Ms. Bricker was arguably treated less favorably than Mr. Napier since she left Orchard's employment after declining to accept a demotion to classroom teaching—even though there was no evidence she had engaged in misconduct. [*See* Appx. A-32.]

Finally, Mr. Napier asserts that a jury could have found sex discrimination as a cause for his termination because Orchard hired and promoted all female leaders for 2020-2021. Mr. Napier does not develop any authority supporting this

31

argument. As discussed by the district court [*see* Appx. A-23], it is true that a "disproportionate" hiring pattern by an employer that has females "dominat[ing] the supervisory positions" can be evidence that would "overcome the background presumption that a white man was not subject to employment discrimination." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999). But Mr. Napier did not designate evidence supporting this theory. At the time of his termination, the Head of School (Dr. Helvie) was female but the other academic leaders were male (Mr. Napier, Nicke Eble, Hal Schwartz). Over the following few years, Mr. Napier was permanently replaced by a female (Angela Brothers), who Mr. Napier himself encouraged to take the position. But otherwise Mr. Napier did not designate evidence showing that a disproportionate hiring pattern emerged in the few years after he was terminated.

36. "all of the above evidence showing the pretext of the defendants' non-specific, false, and inadequate reason for the termination"

37. "and all of the above evidence showing a causal link between Mr. Napier's gender and his termination"

These are conclusory statements. They are not evidence.

## 2. The undisputed material facts show that Orchard terminated Mr. Napier because Dr. Helvie determined he had egregiously compromised her trust.

In reviewing the above, the following is clear and undisputed from the designated evidence and demonstrates the district court properly granted Orchard's summary judgment motion under the *Ortiz* standard.

Dr. Helvie honestly believed she had given Mr. Napier instructions regarding how to handle a vacant teaching position and the review and reworking of his direct subordinate's, Ms. Brothers', job description. Mr. Napier does not dispute that he was given the instruction about the vacant teaching position, nor does he dispute that he caused the vacancy to be posted despite Dr. Helvie's directive. With respect to the job description review, Mr. Napier contends it was a communication breakdown, even stating that the "[alleged] lack of Dr. Helvie's communication to Mr. Napier and Mr. Eble _caused_ the termination of Mr. Napier." [Appellant's Br. at 37 (emphasis added).] Assuming there was a communication breakdown, that is a straightforward admission that it was not Mr. Napier's sex that caused Dr. Helvie to terminate him, and Mr. Napier designates no evidence showing that Dr. Helvie did not have an honest belief regarding what she had instructed him to do. Moreover, Mr. Napier acknowledged he told or at least implied to Ms. Brothers that her job position was being reviewed. [Doc. 104-2 at 21 (Napier Dep. 82:22-25) ("And her questions became more pointed and I did not lie terribly well, like, I mean, we're putting together your job description. All I could say was if and maybe possibly.")] He does not dispute this caused Ms. Brothers to become alarmed. [Id. at 21 (Napier Dep. 82:16-84:2).] Finally, Mr. Napier acknowledges that when Dr. Helvie met with him, she stated, "I've lost confidence in you because you have disclosed to Angie Brothers about her job, which has caused her undue stress, and that has also bled over to Gretchen Bricker." [Doc. 104-2 at 24 (Napier Dep. 94:20-23).] He designates no evidence undermining her contemporaneous writing to the Board Co-Chairs that

his actions had subjected Ms. Brothers to incredible stress, that he had failed in his duties as a supervisor and Middle School Director, and that he had "egregiously compromised" her trust and "activated the gossip network." [Doc. 104-15 (Helvie 2/22/19 Email).]

The above paragraph, based on undisputed evidence and Mr. Napier's own testimony and admissions, presents a straightforward situation where an organization's chief executive officer had to act swiftly when it became clear to her that her subordinate (who also had high-level management responsibilities) had not followed her instructions and had compromised her trust. Perhaps other managers would have acted differently, chalking it up to a communication breakdown or deciding to extend the subordinate another chance. But that is not the purview of Title VII. Mr. Napier has simply failed to provide credible evidence creating a genuine issue of material fact on whether his employer credibly believed he had failed to follow his ultimate boss's instructions and whether his employer terminated him for that very reason.

********************

For the reasons discussed above, the Court should affirm the district court's order entering summary judgment as to Mr. Napier's discrimination claim. However, before closing this section of its brief, Orchard will address below two additional arguments Mr. Napier's raises regarding the District Court's analysis.

### 3. The District Court's opinion is not undermined by its reference to Wellesley College's website.

Mr. Napier takes issue with the district court's reference to a description of the Women's and Gender Studies program at Wellesley College. [Appellant's Br. at 30-31; Appx. A-20]. Mr. Napier argues it was error for the district court to go outside the record without notice. [Appellant's Br. 30]. However, the district court did not rely on the description of Women's and Gender Studies program at Wellesley College to determine that Dr. Helvie's educational background did not constitute a "fishy circumstance." The district court's order clearly states the reasons for reaching that conclusion: 1) Dr. Helvie's educational pursuits were too far removed in time (nearly two decades prior) to the events at issue in the case; and 2) even assuming the education amounted to a bias in favor of women, Mr. Napier supplied no evidence that Dr. Helvie's educational background had any connection to any statements or hiring decisions. [Appx. A-20]. The district court referenced the statement from Wellesley College's website merely to refute Mr. Napier's implication that an individual with an educational background in Women's and Gender Studies would automatically be predisposed to engage in gender discrimination. [Appx. A-20-21]. It was a minor point in the district court's 41-page order and is not a basis to determine the district court erred.

### 4. The Supreme Court's recent opinion addressing college admissions has no bearing on Title VII and the *Ortiz* standard.

Mr. Napier invokes the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023)

35

("SFFA"), to oppose how the district court applied the first element of the prima facie case under the *McDonnell Douglas* framework. [Appellant's Br. at 29-30].

But *SFFA* does not apply here. *SFFA* interpreted the Equal Protection Clause and Title VI (neither of which apply to Orchard as a private employer), not Title VII. Moreover, the facts in *SFFA* are fundamentally different from the facts at issue here. *SFFA* concerned university admission standards; this case concerns an individual employment decision. In addition, race was an express factor in making admissions decisions at Harvard and the University of North Carolina. *SFFA,* 600 U.S. at 195-197. But Title VII has long made consideration of sex in employment decisions prohibited. 42 U.S.C. § 2000e (1964). Thus, whatever change the Supreme Court made to Equal Protection Clause analysis in *SFFA* is simply not relevant to how this Court should analyze Mr. Napier's Title VII claim under the *Ortiz* standard—regardless of whether or not it uses the *McDonnell Douglas* framework as a "supplemental tool."

## II. <u>Orchard Is Entitled To Summary Judgment On Mr. Napier's Retaliation Claim.</u>

Title VII forbids an employer from retaliating against an employee who has "opposed any practice" unlawful under Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To survive summary judgment in a failure-to-rehire context, a plaintiff must establish that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action after his participation; and (3) there was a causal link between the adverse action and

the protected activity. *Nordstrom, Inc. v. Dunn*, 260 F.3d 778, 783 (7th Cir. 2001) (*citing Sweeney v. West*, 149 F.3d 550, 555 (7th Cir. 1998).

Mr. Napier claims that Orchard retaliated against him because he filed his lawsuit alleging Orchard violated Title VII when it terminated him as Middle School Director. He points specifically to Orchard's decision to not interview him after he submitted an application for the Middle School Director position (that had been vacated as a result of his termination). [Doc. 92 at 5 (Amended Complaint).]

Orchard agrees that Mr. Napier's filing of his lawsuit was a protected activity under Title VII and that its decision to not rehire him was an adverse employment action. Orchard disputes whether Mr. Napier has brought forth any evidence on which a reasonable jury could conclude that there was a casual link between Mr. Napier's lawsuit and Orchard's decision not to rehire him.

To prove causation, Mr. Napier must show that Orchard would have rehired him "but for" his filing of the lawsuit. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). He can prove this through direct evidence—for example, an admission—or through "various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action." *Baines v. Walgreen Co.*, 863 F.3d 656, 661–62, 665 (7th Cir. 2017) (*quoting Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013)) (noting that examples of such circumstantial evidence include unusual departure from hiring procedures, employer's untruthfulness, and suspicious timing).

In his Brief, Mr. Napier lists 16 categories of evidence he contends the District Court did not properly account for. Most of these duplicate categories he listed in support of his discrimination claim (*e.g.,* #3 – "Mr. Napier's exemplary performance"); are vague (*e.g.,* #7 – "suspicious timing"), and/or are conclusory (*e.g.,* #15 – "all of the above evidence showing . . . pretext . . ."). Mr. Napier then devotes approximately only one page to his argument on his retaliation claim.

Therefore, Orchard contends Mr. Napier has largely waived his arguments on his retaliation claim. *See, e.g., Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law."). Nonetheless, Orchard addresses them below.

Mr. Napier's primary contention is that a jury could reasonably conclude he was retaliated against because Mr. Eble rejected Mr. Napier's application on the basis of past poor performance in the position even though Mr. Eble was not aware of the specific reasons why Dr. Helvie terminated Mr. Napier. He cites two cases for the proposition that a non-specific reason without evidence known to Mr. Eble for his decision is not a sufficient non-discriminatory reason. Neither case supports Mr. Napier's retaliation claim.

*EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006) concerned a case where individuals with no apparent prior relationship with Target applied for managerial positions. The court discussed how employer's "self-serving" assertion that it found an applicant "poor" without any further explanation would not create a genuine

38

issue of material fact on whether the employer honestly held that opinion. *Id.* at 958; *see also Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998) (stating that "subjective evaluation criteria" such as an employee's lack of "consistency, leadership, initiative, and responsibility skills" were a sufficient basis for an employer's adverse action). *EEOC* is of limited, if any, relevance to Mr. Napier's retaliation claim. It did not concern a situation where an employer rejected an applicant based upon prior performance with the employer. And while Mr. Eble's stated reason for rejecting Mr. Napier's application was succinct, it was far more specific than Target's statement that the applicant "did not meet the requirements for [the position].") *Id.* at 958.

Mr. Napier also cites *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248. (1981). There, the Supreme Court stated that the defendant's explanation of its reasons must be "clear and reasonably specific." *Id.* at 258. But that statement addresses what the defendant must articulate when explaining *in litigation* what the nondiscriminatory reason was for its action. Orchard has clearly articulated, in great detail, why it terminated Mr. Napier and the performance issues that would have formed a basis for Dr. Helvie and Mr. Eble not to rehire Mr. Napier.

That Mr. Eble was not aware of the details at the time he rejected Mr. Napier's application does not change this analysis. It is undisputed that Mr. Eble was aware that Dr. Helvie had decided Mr. Napier would not be returning for the 2019-2020 school year and that their relationship would not be conducive to the school's future. [A-81; Doc. 104-3 (Eble Dep. 15:6-21).] From this he inferred that

perhaps there had been a breach of trust. [Id.] This inference was, of course, correct.

Mr. Eble's decision to remove Mr. Napier's application on the basis of past poor

performance was standard procedure. [A-82; Doc. 104-18 (Eble Aff. ¶ 5).] In fact,

Mr. Eble testified that he removed a female applicant for the same reason. [Id. ¶ 7.]

And, finally, Mr. Napier provides no evidence that Mr. Eble did not base his

decision not to rehire him on his own honestly held belief that Orchard had

terminated Mr. Napier for cause. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th

Cir. 2017) ("[J]udgments regarding the fairness of a particular action or the

accuracy of an employer's belief about an employee's job performance have no place

in determining whether the employer acted based on an improper motive.")

(internal citation omitted).

    In a one-sentence paragraph, Mr. Napier also alleges that Orchard's decision

to select Ms. Brothers as the permanent Middle School Director is evidence upon

which a reasonable jury could conclude that Orchard retaliated against him.

[Appellant's Br. at 47.] But Mr. Napier presents no actual evidence showing that

Ms. Brothers was not qualified; it is not the Court's role to sit as a "super-personnel

department"; and Ms. Brothers qualifications are largely irrelevant here since Mr.

Napier's application had been undisputedly rejected on the basis of past poor

performance.

    In short, as stated by the District Court, there is a "total dearth of evidence"

on which a reasonable jury could find that Orchard would have rehired him for the

position of Middle School Director but-for his filing of a lawsuit against Orchard.

[Appx. A-39.] And because Orchard articulated a sufficient, nondiscriminatory reason for its decision to reject his application, Mr. Napier's retaliation claim fails as a matter of law.

## CONCLUSION

Orchard requests that the Court affirm the district court's order granting it summary judgment on all of Mr. Napier's claims.

CHURCH CHURCH HITTLE + ANTRIM

By: */s/ Alexander P. Pinegar*

Alexander P. Pinegar, IN Atty #26543-49
Jessica L. Billingsley, IN Atty #31890-29

Two North Ninth Street
Noblesville, IN 46060
Telephone:     (317) 773-2190
Facsimile:     (317) 773-5320
Email:         apinegar@cchalaw.com
               jbillingsley@cchalaw.com

*Attorneys for Defendant-Appellee*
*Orchard School Foundation*

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(A)(7) AND CIRCUIT RULE 32

The undersigned counsel, in compliance with F.R.A.P. Rule 32(a)(7) and Circuit Rule 32, hereby certifies that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) and Circuit Rule 32 for a brief produced with a proportionally spaced font. Specifically, based upon the word count of our word processing program, Microsoft Word Standard 2016, I certify that the Brief of Defendant-Appellee contains 10,664 words, exclusive of the items listed in F.R.A.P. 32(f).

CHURCH CHURCH HITTLE + ANTRIM

By: */s/ Alexander P. Pinegar*
Alexander P. Pinegar, IN Atty #26543-49

Dated: April 25, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2024, I electronically filed the foregoing Brief of Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Alexander P. Pinegar*
Alexander P. Pinegar, IN Atty #26543-49